customer information; when Plaintiff answered that he was an inmate trying to understand the test, the technician said that he was sorry, that he could not talk to him, and that there was nothing he could do to help him. Plaintiff called back immediately and the call was not answered, and his later calls were not returned.

82. These requests and responses document Plaintiff's efforts to obtain the Bureau's underlying testing directives, vendor communications, authentication, and source records. Plaintiff relies on the chronology as evidence of diligence and of the particular materials unavailable to him, including materials necessary to investigate the institutional attribution described in Paragraph 48. The withholding continues: Request No. 2026-04268 remains open (Paragraph 78), and the four pages located in response to Request No. 2026-05140 remain withheld. Plaintiff asserts no FOIA claim in this action; the four-page withholding is challenged in the separate Eastern District of California action identified in Paragraph 79.

**J. The District of Oregon Proceeding**

83. In January 2019, Plaintiff petitioned for habeas relief under 28 U.S.C. § 2241 in the District of Oregon challenging the disciplinary finding. Judgment was entered against him on May 18, 2020. Oregon Action, ECF 39, 40. Plaintiff appealed; the appeal, No. 20-35493 (9th Cir.), was voluntarily dismissed on his unopposed motion under Federal Rule of Appellate Procedure 42(b). Oregon Action, ECF 42 (Dec. 8, 2020).

84. The Oregon Action seeks, among other relief, vacatur of the 2020 judgment and expungement of Incident Report No. 3084272. In its May 6, 2026 order — which the court, on other grounds, declined to let stand by its order of June 23, 2026 — the Oregon court stated: "The Court notes, however, that Petitioner has preserved his right to continue with his civil litigation against the United States in the Central District of California, following that court's suggestion to dismiss without prejudice so he could follow the requirements of the Federal Tort Claims Act." Oregon Action, ECF 53 at 7 (May 6, 2026). The Oregon Action is identified in the Notice of Pendency of Other Actions on file in this action (ECF 4), and the Eastern District of California action identified in Paragraph 79 in an amended Notice of Pendency filed concurrently with this pleading. Plaintiff will move promptly under Rule 15(d) to supplement this Complaint upon any vacatur or expungement. To the extent the Court concludes that any claim or component requires favorable termination of the disciplinary finding before it may proceed, Plaintiff respectfully requests that it be stayed, in the exercise of the Court's discretion to manage its docket, pending resolution of the Oregon Action, or in the alternative dismissed without prejudice, without dismissal of any independently cognizable claim.

**K. Plaintiff's Injuries**

85. Confinement injuries. Plaintiff spent approximately three and one-half

months in the Lompoc SHU in administrative detention, from on or about December 6, 2017 until his transfer in March 2018, locked down approximately 23 to 24 hours per day, escorted in restraints when out of his cell, limited to approximately three showers per week, and deprived of programming, employment, visitation, and normal correspondence — predicated on a drug identification that the governing instructions did not permit as recorded (Paragraphs 34, 59–60). After leaving FCI Lompoc, he was held in a lockdown unit at a contract detention facility in Pahrump, Nevada, pending transport by the United States Marshals Service, until his arrival at FCI Sheridan on March 26, 2018 (Paragraph 65). Plaintiff pleads the Pahrump housing as a consequence of the Lompoc detention and transfer; he does not allege that any act at that facility is independently actionable. The disciplinary sanctions disallowed 41 days of good conduct time, and the finding delayed Plaintiff's Residential Reentry Center placement by approximately six weeks and adversely affected his custody classification, transfers, and program eligibility.

86. Physical and psychological injuries requiring treatment. The prolonged isolation caused Plaintiff injuries with physical manifestations that did not exist before the confinement and that persist to this day: chronic insomnia and sleep disturbance, persistent nightmares, and hypervigilance around other people. Promptly upon his release from custody, Plaintiff sought and began sustained

mental-health treatment, including psychotherapy and prescribed medications, for these conditions, and that treatment and those prescriptions are documented in his treatment and pharmacy records. These injuries were proximately caused by the confinement and by the testing and reporting failures on which the confinement was predicated.

87. Aggravation of a documented physical condition. Before the events at issue, Plaintiff suffered from severe degenerative disease of the spine, documented by both BOP and outside physicians, for which BOP's own medical staff prescribed a standing narcotic pain-management regimen. The conditions of the segregated confinement alleged in Paragraph 85 aggravated that condition: Plaintiff could not exercise or stretch regularly; the single daily hour of out-of-cell recreation was available only to inmates awake, dressed, and standing at the cell door by approximately 4:30 to 5:00 a.m. with the cell in inspection order, a requirement Plaintiff's spinal condition often made physically impossible for him to meet; and he was escorted in restraints when outside the cell. During the confinement Plaintiff also required transport to outside medical clinics for other documented conditions. The Bureau's own health records document the prescribed regimen before, during, and after the Lompoc placement. Before his December 2017 placement in the Lompoc SHU, Plaintiff was prescribed one tablet of a short-acting opioid pain medication each evening. On January 10, 2018, while at

Lompoc, BOP increased the prescription to one tablet of the same strength twice daily as needed; on March 14, BOP prescribed one same-strength tablet each morning and two each evening. On his arrival at Sheridan on March 26, BOP ordered a long-acting opioid beginning March 27. On April 3, BOP continued that medication and added a short-acting opioid each evening; on August 10, BOP increased the prescribed dose of the long-acting medication while continuing the short-acting medication. The Bureau's own prescribing history thus records a stepwise escalation of opioid therapy: from a single nightly dose before segregation, to up to two tablets daily in January 2018 and three tablets daily by March 14, to long-acting opioid therapy on arrival at Sheridan, combined long- and short-acting therapy from April 3, and a higher long-acting dose from August 10. On December 13, 2017, one week after his placement in the SHU, BOP medical staff recorded Plaintiff's report of increased pain in the SHU from the stress of that environment. Plaintiff pleads the dated prescriptions as treatment records and the December report as his contemporaneous account, not as an independent medical opinion establishing the cause of every later medication change. (BOP health records produced September 15, 2026: 2017 PDF pp. 5–6, 14; 2018 PDF pp. 34–35, 61, 68, 72–73, 90, 98, 104, 106, 108, 143–144.)

88. Employment injuries. In approximately August 2022, Plaintiff was hired by Verizon into a senior commission-based role with expected first-year total

compensation of approximately $175,000, after passing a full background check. In September 2022, a co-worker's workplace allegations triggered a human-resources investigation; the investigation cleared Plaintiff of those allegations, but in its course the co-worker supplied materials derived from Plaintiff's BOP Code 111 disciplinary finding. In or about May–June 2023, Verizon terminated Plaintiff's employment and designated him ineligible for rehire. The outside investigator Verizon had retained to conduct the investigation told Plaintiff by telephone that he was terminated only because of the allegation that he had smuggled drugs into prison — an allegation derived from the Code 111 drug-introduction finding. When Plaintiff asked her by email for a copy of the investigation's findings, she declined by email, stating that the findings were private documents belonging to Verizon that he could obtain only by subpoena. On information and belief, those findings and Verizon's termination records remain in Verizon's possession.

89. Family and household injuries. The disciplinary finding has been used against Plaintiff in California family-court proceedings affecting his household, requiring the retention of counsel (a $10,000 flat retainer, with continuing fees) to respond to characterizations of Plaintiff drawn from the finding.

90. Plaintiff alleges humiliation, anxiety, reputational injury, and emotional distress accompanying the confinement and the injuries in Paragraphs 86–87. He

was not incarcerated when this action was filed, and 28 U.S.C. § 1346(b)(2) has no application to it. He also alleges aggravation of his documented spinal disease and associated physical symptoms, distinct from purely emotional harm.

91. Economic damages include past and future lost earnings and lost earning capacity; the past and future costs of the treatment alleged in Paragraph 86; past and continuing family-court fees and costs, and out-of-pocket expenses, in amounts to be proven at trial. Plaintiff seeks one recovery for each injury and no duplicative recovery across counts or defendants; against Safariland, each damages category is sought only to the extent the conduct alleged in the applicable count was a substantial factor in causing it.

**L. Timeliness: Accrual and Tolling, Count by Count**

92. FTCA presentment and suit. Plaintiff presented his original $2,000,000 administrative claim on January 27, 2026; BOP received the amendment increasing the sum certain to $8,000,000 on February 6, 2026, before any written denial; Plaintiff's request for reconsideration was delivered on March 26, 2026; and BOP issued its Final Denial of the claim as amended on July 1, 2026. This action was commenced within six months of that denial. (Exhibit A.) 28 U.S.C. §§ 2401(b), 2675(a). The time limits of § 2401(b) are not jurisdictional and are subject to equitable tolling. *United States v. Kwai Fun Wong*, 575 U.S. 402, 420 (2015).

93. Deferred accrual of claims dependent on the disciplinary finding. The SHU detention and the Code 111 disciplinary finding rest on the same recorded NIK identification: the detention began the day after the test and was continued, on information and belief, on reviews that rested on that identification (Paragraph 62); the recorded NIK result is the only identification of any drug in the produced disciplinary record (Paragraphs 59–63); and the finding disallowed 41 days of good-conduct time (Paragraph 64). A judgment that the recorded identification supplied no lawful basis for Plaintiff's confinement may therefore be held to imply the invalidity of that finding. *See Edwards v. Balisok*, 520 U.S. 641, 646–48 (1997). In the Ninth Circuit, an FTCA action "for negligently calculating a prisoner's release date, or otherwise wrongfully imprisoning the prisoner, does not accrue until the prisoner has established, in a direct or collateral attack on his imprisonment, that he is entitled to release from custody." *Erlin v. United States*, 364 F.3d 1127, 1133 (9th Cir. 2004). *Erlin*'s claim sounded in negligence, and the court reserved whether *Heck v. Humphrey*, 512 U.S. 477 (1994), "would also delay the accrual of a false imprisonment claim under the FTCA," and whether its rule applies to a tort action "brought after the prisoner had been released, without any such attack." *Erlin*, 364 F.3d at 1133. Plaintiff alleges that *Erlin*'s rule governs any claim here whose success would necessarily imply the invalidity of the outstanding finding, and that its reasoning extends to Count I to the same extent,

including as to the confinement that continued after the February 13, 2018 finding, pending the transfer the finding produced (Paragraph 102). Plaintiff's collateral attack on the finding is pending and under submission in the District of Oregon, which has held that the petition is not moot (Paragraph 9). To the extent the Court concludes that any claim against the United States depends on the invalidity of the finding, that claim has not yet accrued, and Plaintiff requests that it be stayed pending the Oregon Action or, in the alternative, dismissed without prejudice (Paragraph 84).

94. Alternative accrual and equitable tolling. If any claim against the United States is held to have accrued independently of the disciplinary finding, Plaintiff pleads equitable tolling in the alternative: he pursued his rights diligently (Part V.I), and the following circumstances, beyond his control, stood in the way of earlier presentment. (a) On August 28, 2019, while Plaintiff was in custody, the government responded to his discovery request in the Oregon Action that "the BOP has no emails between DHO Chetwood and SIS Aguilar about Steffey's Code 111 violation" (Oregon Action, ECF 24 at 4), while the January 2018 regional chain directed to every SIS office in the Region remained in the Bureau's files (Paragraph 56); and on September 27, 2019, BOP withheld in full the four pages of NIK directives responsive to his FOIA request (Paragraph 74). (b) In late October 2019, at FCI Sheridan, SIS Lieutenant Carter told Plaintiff, in a witness's

presence, that he would be placed in the SHU unless he turned over the internal BOP emails he held and disclosed how he had obtained them; at a second meeting in late November 2019, Lieutenant Carter stated in substance, “We know that that’s a false reading,” and that it was known among BOP staff that inmates were placed in the SHU on the basis of a burgundy Test U result treated as positive for drugs when staff “wanted to” do so. Oregon Action, ECF 54-1, Ex. 1 (Forsyth Decl., dated May 10, 2026) ¶¶ 4–10 (filed May 11, 2026). At a meeting at FCI Sheridan in late 2019, Lieutenant Carter also told Plaintiff that he had just gotten off the phone with the Western Regional Office (“Region”); that Region wanted to know how Plaintiff had obtained the internal BOP emails he held and where he had gotten them; and, in substance, that if Plaintiff did not disclose where he had obtained them, he would be placed in the SHU indefinitely and accused of having compromised staff. On information and belief, the call came from, or at the direction of, R. John Lynn, the Western Region’s senior Special Investigative Agent, who supervised the SIS operations of the Region’s institutions and who authored the January 2018 regional emails (Paragraphs 52–53). The basis for that belief is that Lieutenant Carter was FCI Sheridan’s SIS lieutenant, that the call concerned SIS records, and that, before the call, Plaintiff had attached copies of those same emails to the administrative appeal of a different inmate (not the inmate described in Paragraph 45) to the Western Regional Office. The records of

that call and of any communications between the Regional Office and FCI Sheridan's SIS staff about it are within the United States' exclusive possession. (c) In response to Plaintiff's February 2020 request for its testing flow chart and training records, BOP's May 6, 2020 determination withheld the flow chart in full, as a duplicate of the earlier request whose responsive pages it had already withheld, and released in part only two training pages (Paragraphs 49, 74–75). (d) In more than six years, BOP has produced none of the testing directives, advisories, Lynn communications, or BOP–Safariland communications Plaintiff requested — the records needed to show the source of the reporting practice and its attribution to Safariland (Paragraph 48). Apart from the two partially redacted training pages (Paragraph 75), it has withheld in full every testing directive it located, including the four pages located in response to his request for the "March 27th SIS Advisory," a withholding OIP affirmed on September 22, 2026 and that Plaintiff is now litigating in the Eastern District of California (Paragraphs 73–79, 82). That withholding continues. BOP also would not acknowledge the internal BOP records Plaintiff already had: he sent BOP copies of internal BOP emails and directives and asked it to acknowledge them, and it never did (Paragraph 73). BOP thus withheld both its own copies of those records and any official acknowledgment that they were genuine. (e) While those directives were withheld, the United States defended the disciplinary finding in Plaintiff's own case as

resting on positive NIK results: “corroborating evidence of the NIK Test’s positive result for narcotics” (Oregon Action, ECF 38 at 4); the Oregon court entered judgment against Plaintiff on May 18, 2020 (Paragraph 83); and the United States’ October 8, 2020 appellate answering brief described two positive NIK tests (Paragraph 63). Plaintiff requests tolling for the period during which these circumstances prevented timely presentment.

95. The June 23, 2026 Oregon order granted Rule 59(e) relief, held the petition not moot, and authorized a further amended Rule 60 motion; it did not itself set aside the original judgment or the disciplinary finding. Plaintiff will move under Rule 15(d) to supplement this Complaint upon any order vacating or expunging the finding.

96. On information and belief, the administrative detention was not imposed or continued on any ground independent of the recorded identification and the investigation built upon it: no reviewing official identified any basis for the continued detention that did not rest on them (Paragraphs 62, 102), and the incident report charging the drug offense issued only on January 31, 2018, fifty-seven days after the test. The SIS technician told Plaintiff that he was in the SHU because another inmate “received legal mail that tested positive for amphetamines and that it was ‘Spice’” — a substance no NIK test identifies (Paragraph 38) — and because Plaintiff had received an email containing the

envelope's tracking number (Oregon Action, ECF 1 at 16, ¶ 10); the tracking-number inquiry was part of the investigation built upon the recorded identification. The detention and the disciplinary finding therefore rest on the same predicate for purposes of Paragraph 93.

97. Counts III and IV: accrual under California's discovery rule. The two-year period of Cal. Civ. Proc. Code § 335.1 runs from accrual as postponed by the discovery rule. Where a plaintiff's reasonable and diligent investigation "discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort," the discovery rule postpones accrual of the claim based on the newly discovered conduct. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807–08, 813 (2005). Plaintiff pleads the time and manner of discovery, and accrual, theory by theory. (a) What Plaintiff pursued earlier. Plaintiff sought BOP's testing directives (Paragraphs 73–75, 81) and disputed BOP's recording of his test in the Oregon Action (Paragraph 83); BOP withheld the directives (Part V.I). When Plaintiff asked Safariland directly in April and May 2020 how a burgundy Test U reaction following a Test A reaction should be interpreted, its forensic technician declined to speak with him once he identified himself as an inmate (Paragraph 81). Nothing Plaintiff had in 2019–2020 disclosed that the Safariland-branded certification course had told correctional users that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a

correctional setting" (subparagraph (c)). (b) The certification directive. BOP's January 21, 2010 directive, released in part on May 6, 2020 in response to Request No. 2020-02370 (Paragraphs 49, 75), showed that BOP obtained every NIK certification through a vendor — the course, the examination, the grading, and the certificate. It did not name the vendor, its vendor contact information was redacted, and it disclosed nothing about what the vendor's course taught correctional users. (c) The correctional double standard. Plaintiff was not a party to *Jenkins v. United States*, No. 1:20-cv-01815-CLM-SGC (N.D. Ala.). In or about July 2025, while researching federal decisions involving NIK testing through online sources and Lexis, he learned of *Jenkins*; he later obtained exhibits from its record through PACER, including, on or about August 21, 2026, the certification course docketed there as ECF 96-16 (filed May 13, 2024). Before he learned of *Jenkins*, nothing directed him to an exhibit filed in that Alabama action. Plaintiff did not see the REV 0511 course before July 2025. That course addressed correctional institutions separately from other agencies: its results slide for other users, headed "Test Results (Excluding Correctional Institutions)," states that results "*cannot* be considered proof positive," while its correctional slide states that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting" (Paragraphs 115, 117). The "proof positive" slide does not appear in the May 2017 revision; on information and belief, Safariland gave no

notice of its withdrawal to the correctional users and institutions certified on the earlier course (Paragraph 124). (d) December 15, 2025: Safariland's construction. Safariland's December 15, 2025 memorandum was the first statement by either the manufacturer or BOP, addressing Plaintiff's case, that construed the Test U instruction to require additional testing to confirm the result of a burgundy reaction (Paragraph 71), and, answering Plaintiff's K2/Spice allegation, it argued that it need not warn of risks "outside the scope of their marketed product uses" (Paragraph 39). (e) Accrual. Counts III and IV rest on the correctional carve-out in the certification course — explicit in the REV 0511 course's "proof positive" slide — and on Safariland's failure to correct it (Paragraphs 115, 117, 124). They accrued no earlier than July 2025: Plaintiff did not see, before then, the REV 0511 course's statement that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting" (subparagraph (c)). The May 2017 revision's correctional statements (Paragraph 115) did not disclose that wrong. Its results slide places its correctional sentence among statements to every user that test results "*cannot* be considered proof positive, conclusive, or evidentiary" and that the substance "should *always* be forwarded to a forensic laboratory"; its review slide's parenthetical, "(excluding some correctional applications)," appears beside the statement that substances "should *always* be submitted to a forensic laboratory." Read without the REV 0511 course, those statements describe how

correctional facilities use results — the BOP practice Plaintiff challenged in the Oregon Action. They did not disclose the REV 0511 statement, or that it had been withdrawn without, on information and belief, notice to the users certified on the earlier course (Paragraph 124). Counts III and IV do not claim that the insert, chart, or pouch, standing alone, was defective; those materials, which Plaintiff and his appointed counsel cited from 2019 forward as authority against BOP (Oregon Action, ECF 1 at 8, 16; *id.*, ECF 37 at 10–11; *id.*, ECF 37-3), are pleaded as the point-of-use context in which the course's correctional message operated. Counsel likewise cited the May 2017 revision as authority against BOP (*id.*, ECF 37-2). The January 21, 2010 directive showed only that BOP certified its testers through a vendor; it disclosed nothing about the vendor's correctional course content (subparagraph (b)). Plaintiff did not suspect, before July 2025, that the warnings Safariland delivered to correctional testers contributed to the recorded identification, and Safariland itself first construed its Test U instruction to mean that a burgundy reaction "would require additional testing to confirm the result" on December 15, 2025 (Paragraph 71). Plaintiff's January 18, 2019 petition and affidavit show what he then suspected: they alleged that the NIK tests BOP used were "notoriously manipulated by BOP staff" and produced amphetamine readings from paper towels, toilet paper, ink-jet paper, sage, and other items — readings Lieutenant Bance confirmed he knew of (Paragraph 63A(f)) — and they invoked

the manufacturer's own instruction manual, that the tests are not designed for liquid samples and that "the choice of paper is critical," as authority against BOP's testing. Oregon Action, ECF 1 at 8, 16. Those allegations faulted BOP for disregarding the manufacturer's instructions, including its paper instruction, on which Plaintiff then relied as authority against BOP; they did not suggest, and Plaintiff did not then suspect, that the manufacturer's own warning system, training, or communications with BOP contributed to the recorded identification. The correctional-course theory is a wholly different sort of wrongdoing from the BOP recording practice Plaintiff challenged in the Oregon Action. (f) Despite the diligence described in Part V.I, Plaintiff could not have discovered earlier the facts alleged in subparagraph (c).

98. The limitations period on the claims against Safariland was equitably tolled while Plaintiff pursued claims against Safariland arising from the same testing and injuries in *Steffey v. Peters*, No. 2:25-cv-11105-VBF-SK, and while he exhausted the FTCA administrative claim that the court's order contemplated. On January 16, 2026, the court offered Plaintiff the option to dismiss that action without prejudice "to exhaust tort claims with the United States before filing an FTCA suit." *Id.*, ECF 37. Plaintiff exercised that option on January 21, 2026 (*id.*, ECF 38), mailed his administrative claim the next day (Paragraph 16), and filed this action seven weeks after BOP's Final Denial. Safariland, which had appeared

in *Peters* through counsel and moved to dismiss, thus had timely notice of the claims and of their refiling after exhaustion; tolling caused it no prejudice; and Plaintiff acted reasonably and in good faith. *See McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal. 4th 88, 102 (2008) (timely notice, lack of prejudice, and reasonable, good-faith conduct).

99. No statute of repose applies to any claim herein.

## VI. CLAIMS FOR RELIEF

### COUNT I — FALSE IMPRISONMENT (FTCA — Against the United States)

100. Plaintiff realleges and incorporates Paragraphs 1 through 99 as though fully set forth here.

101. Under California law, as incorporated by 28 U.S.C. § 1346(b)(1), false imprisonment is "the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 715 (1994) (internal quotation marks omitted) (quoting *Molko v. Holy Spirit Ass'n for the Unification of World Christianity*, 46 Cal. 3d 1092, 1123 (1988)). A privilege to confine extends only to its lawful scope; confinement lawfully commenced becomes false imprisonment when it is continued without lawful authority. *See Sullivan v. County of Los Angeles*, 12 Cal. 3d 710, 717–19, 722 n.11 (1974).

102. Acting within the scope of their employment, BOP officers

intentionally confined Plaintiff, without his consent, in administrative detention in the Lompoc SHU for approximately three and one-half months. The confinement's asserted predicate was a drug identification the governing instructions did not permit as recorded: a baseline Test U reaction recorded as an independent positive; a time-sensitive Test A predicate never measured or objectively preserved; and testing performed on printed paper for a suspected substance (synthetic cannabinoids) the test could not identify. On information and belief, no reviewing official identified any basis for the continued detention that did not rest on that identification and the investigation built upon it (Paragraph 62). Confinement imposed and continued on that predicate exceeded the scope of any privilege to confine. BOP's regulations define that scope. Administrative detention for investigation is authorized only where the inmate's "presence in the general population poses a threat to life, property, self, staff, other inmates, the public, or to the security or orderly running of the institution" and the inmate is "under investigation or awaiting a hearing for possibly violating a Bureau regulation or criminal law." 28 C.F.R. § 541.23(c), (c)(1). The Segregation Review Official must review the supporting records within three work days, review the placement at a hearing within seven days, review the records every seven days thereafter, and hold a further hearing after every 30 days of continuous placement. *Id.* § 541.26(a)–(c). Each continuation therefore required a present basis for both

conditions, and, as alleged above, every basis any reviewing official identified rested on the recorded identification and the investigation built upon it (Paragraphs 62, 96). Plaintiff does not allege that administrative detention required a laboratory-confirmed drug finding. He alleges, on information and belief, that the only possible violation and threat asserted for his placement and its continuation were the introduction of drugs through the intercepted envelope. The SIS technician told Plaintiff that the envelope was legal mail that "tested positive for amphetamines" and was "Spice" (Paragraph 96), and the incident report stated the conclusion that Plaintiff "was involved in the introduction and sale of designer drugs" (Oregon Action, ECF 12-2 at 1). The hearing officer later invoked the same threat for the Code 111 sanctions, describing narcotics that "pose a serious threat to the secure and orderly running of the institution" (*id.*, ECF 12-5 at 4). The only identification of any drug in the produced disciplinary record was the recorded NIK identification (Paragraphs 59–61, 63, 93); in 2019, Plaintiff swore that he "was told that the package contained 'designer drugs' but none were actually identified" (Oregon Action, ECF 1 at 16, ¶ 11). The SIS investigation built on that identification was completed on January 30, 2018 (Oregon Action, ECF 12-2 at 1), with no further testing (Paragraph 62). The other circumstances on which the United States has relied identify no drug, and, on information and belief, no reviewing official identified them as an independent basis for detention

(Paragraph 63). Because the hearing officer suspended the 60-day disciplinary-segregation sanction (Paragraph 64; Oregon Action, ECF 12-5 at 4), Plaintiff's confinement after the hearing was not post-disciplinary detention, which applies only to an inmate "ending confinement in disciplinary segregation status," 28 C.F.R. § 541.23(c)(4). Plaintiff remained in the SHU after the hearing because the finding raised his security-classification points and he was to be transferred to a higher-security institution; he was transferred to FCI Sheridan in March 2018 (Paragraphs 62, 65). That confinement, pending a transfer the finding produced (*see* 28 C.F.R. § 541.23(c)(2)), rested on the finding and, through it, on the recorded identification (Paragraph 93); on information and belief, any continuation on account of the referral Aguilar described (Paragraph 62), if one was made, rested on the same identification and the investigation built upon it (Paragraphs 62, 96). As an additional and alternative ground, staff recorded the burgundy Test U reaction as itself "indicating Amphetamines" (Paragraph 59), although, on information and belief, the vendor-certification training BOP mandated (Paragraphs 49–50) teaches that burgundy is the reagent's baseline, that dark blue is Test U's only affirmative endpoint, and, in its May 2017 revision, that a burgundy reaction indicates amphetamine only "by default" after a completed Test A shift (Exhibit C) — a shift whose color changes and elapsed time the training requires to be recorded (Paragraph 35), and which no one timed or

preserved (Paragraph 60). Under the further alternative alleged in Paragraph 63A, no privilege attached at all. That alternative does not rest on knowledge of Test U's baseline alone; a burgundy Test U reaction can, at most, support a conditional inference when a timed Test A transition precedes it (Paragraphs 34–35). It rests on the facts alleged in Paragraph 63A: that the staff who recorded, reported, and relied on the identification knew that it depended on a Test A observation no one had timed or preserved; that it was nevertheless recorded as two independent positives; that the SIS technician threatened Plaintiff with added punishment if he contested the charge; and that the detention continued on that record without any identified basis that did not rest on it (Paragraphs 59–60, 62, 63A, 96). Officers who confine a person on an identification they know the testing did not establish act outside any privilege to confine. The placement orders, review records, and identities of the officers who ordered and continued each period of confinement are in the United States' exclusive possession. This count seeks damages for the confinement of Plaintiff's person, not for the loss or nonretention of the intercepted paper.

103. This count is preserved by the law-enforcement proviso of 28 U.S.C. § 2680(h), because the officers who confined Plaintiff were investigative or law enforcement officers as alleged in Paragraph 27. The discretionary-function exception, 28 U.S.C. § 2680(a), does not reach the

confinement alleged: the officers had no discretion to confine Plaintiff on an identification that the certified testing method, which on information and belief BOP required its certified staff to follow (Paragraph 109), did not permit as recorded, *see Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) ("In general, governmental conduct cannot be discretionary if it violates a legal mandate."), and continuing detention on a record whose asserted predicate was never objectively preserved involved no judgment grounded in social, economic, or political policy. As to the confinement after the hearing, Plaintiff challenges its reliance on the finding and, through it, on the recorded identification (Paragraphs 93, 102), not any classification or designation judgment as such. Under the further alternative alleged in Paragraph 63A — that the staff who recorded, reported, and relied on the identification knew that it depended on a Test A observation no one had timed or preserved — confining and continuing to confine Plaintiff on that identification was not a choice among permissible alternatives at all.

104. As a direct and proximate result, Plaintiff suffered the injuries proximately caused by the segregated confinement itself: the confinement injuries alleged in Paragraph 85, to the extent caused by that confinement; the physical and psychological injuries alleged in Paragraph 86; the aggravation of his documented spinal condition alleged in Paragraph 87; the dignitary and emotional injuries

alleged in Paragraph 90, to the extent they accompany and flow from the physical conditions of the confinement rather than from any later communication of the disciplinary record; and, of the economic damages alleged in Paragraph 91, the past and future costs of the treatment alleged in Paragraph 86 and the out-of-pocket expenses attributable to the confinement — in amounts to be proven at trial, not to exceed $8,000,000 in the aggregate against the United States, subject to 28 U.S.C. § 2675(b). The employment and family-court injuries alleged in Paragraphs 88 and 89, the lost-earnings component of Paragraph 91, and any reputational injury are claimed against Safariland under Counts III and IV and are not claimed under this count. This count is tried to the Court. 28 U.S.C. § 2402.

**COUNT II — NEGLIGENCE: OPERATIONAL TESTING (FTCA — Against the United States)**

105. Plaintiff realleges Paragraphs 1 through 99 as factual context. Count II is pleaded in the alternative to Count I under Rule 8(d)(2). It asserts negligent physical performance of the testing undertaking identified in Paragraphs 106–107 and the resulting physical harm alleged in Paragraph 110. The breach pleaded in this count is careless performance of the undertaken analysis, distinct from a failure to communicate accurate information.

106. Plaintiff invokes California's duty of reasonable care under Civil Code § 1714(a) and the limited duty arising from an undertaking of services necessary

for another person's protection. He alleges that BOP undertook physical analysis of the intercepted material, that careless performance created a foreseeable risk of physical harm through ensuing restraint, and that the undertaken service — not federal disciplinary authority — is comparable to private testing services in like circumstances. The scope of that service, a performance breach distinct from communication, and physical-harm causation are essential to this count. Kit proficiency and vendor certification bear on the undertaking and the care it required; Paragraph 109 alleges the federal directives that made the certified method mandatory for BOP's certified testers. The state-law sources of the duty are Civil Code § 1714(a) and California's negligent-undertaking doctrine, which follows Restatement (Second) of Torts § 324A. *Artiglio v. Corning Inc.*, 18 Cal. 4th 604, 612–14 (1998). Courts applying California law have held that a drug-testing laboratory owes the person whose specimen it tests a duty of care in performing the analysis. *Quisenberry v. Compass Vision, Inc.*, 618 F. Supp. 2d 1223, 1230–31 (S.D. Cal. 2007); *Fujisawa v. Compass Vision, Inc.*, 735 F. Supp. 2d 1171, 1177 (N.D. Cal. 2010) (collecting cases). Count II does not challenge the incident report, the hearing, the disciplinary finding, or any other quasi-adjudicative function; it challenges the physical analysis performed on December 5, 2017, weeks before any charge issued (Paragraph 62).

107. BOP employees negligently executed the time-sensitive testing

undertaking by failing to time and record the Test A predicate on which any amphetamine-type inference depended, as the certified method requires (Paragraph 35), or to preserve it objectively (Paragraph 35A). The produced record contains no measured elapsed interval or visual capture of the transition. On information and belief, the digital camera BOP used to photograph the papers and test pouches could have recorded the brief transition (Paragraph 35A). The absence of any measured interval or capture is pleaded as evidence that the analysis was not timed or recorded, not as proof by itself that the transition did not occur. Under the certified method, a Test A reaction outside the stated time frame was to be treated as a negative reaction at which testing stops (Paragraph 35). Plaintiff alleges on information and belief that a timed and recorded observation would not have satisfied that predicate: the reagent's acid can itself turn a cellulose carrier brown, an endpoint that must be distinguished, by timing and recording, from the drug-associated orange-to-brown progression (Paragraphs 31A, 31C), and the memorandum's description of "an immediate orange rapidly turning brown color" records no measurement and comes from the tester who, in the same memorandum, recorded the reagent's own burgundy Test U color as "indicating Amphetamines" (Paragraphs 59–60). If so, the reaction would have been treated as negative, testing would have stopped, no amphetamine-type identification would have been recorded, and, on information and belief, Plaintiff would not have been

placed or held in administrative detention, because no reviewing official identified any basis for the continued detention that did not rest on that identification and the investigation built upon it (Paragraphs 62, 96). Plaintiff does not challenge under this count the choice of what to test; the carrier's reaction is pleaded to show why the omitted timing and recording would have changed the result.

108. Plaintiff alleges a duty of care in the physical performance of the undertaken testing service and physical harm caused by its negligent execution. His claim is that the analysis itself was performed without the care that undertaking required, before its result was reported or used. He does not seek recovery under Count II because a report communicated inaccurate information; the separate performance duty and breach described in Paragraphs 106–107 are the basis of this count.

109. Plaintiff challenges the specific performance described in Paragraph 107. The Bureau's January 21, 2010 directive requires that "[a]ll NIK certifications must be obtained through the vendor following the procedures noted on the attached document," and Program Statement 6060.08 § 11, in force in 2017, required institutions to maintain the kits "to determine the identity of unknown substances" and required proficiency in their use (Paragraphs 40, 49). The certification requirement is mandatory on its face: every BOP NIK certification ran through the vendor's program, which supplied the course, the examination, the

grading, and the certificate (Paragraph 49). On information and belief, the tester held a certification issued through that program; its date and course revision are recorded in BOP's and the vendor's files. Separately, on information and belief, BOP required its certified staff to perform and record NIK tests by the method in which they were certified — the Polytesting sequence, with each reaction timed and its color changes and elapsed time recorded (Paragraph 35) — through testing directives whose content BOP has withheld (Paragraphs 74–79). Paragraph 46 is pleaded in the alternative. If the March 27, 2017 Advisory directed staff to record a burgundy Test U reaction as an amphetamine indication, that direction reflected a technical judgment about what a reagent color shows, not social, economic, or political policy, and it did not dispense with timing and recording the Test A predicate on which this count rests. Under those requirements, staff had no discretion to record an amphetamine-type identification without the observation on which that method made it depend. In the alternative, even if a performance step allowed judgment, observing the time-sensitive reaction, comparing it with the applicable color criteria, and recording what was observed did not require a judgment grounded in social, economic, or political policy. Plaintiff challenges how the undertaken analysis was physically performed, not a policy choice whether to investigate or to undertake testing. In an FTCA action arising from BOP staff's NIK testing of paper at another federal prison, the court recorded the

United States' concession "that applying the NIK drug test kit instructions isn't conduct that falls under the discretionary function exception." *Jenkins v. United States*, No. 1:20-cv-01815-CLM-SGC, ECF 75 at 5, 2024 U.S. Dist. LEXIS 49311, at *7 (N.D. Ala. Mar. 20, 2024) (citing ECF 70 at 2), *notice of appeal filed*, ECF 107 (N.D. Ala. Sept. 18, 2024), *appeal docketed*, No. 24-13028 (11th Cir.). After a bench trial, the court found that "[i]t is BOP policy to test suspected contraband with a NIK test kit by following the test kit's instructions" and held that the exception did not apply to alleged breaches that "relate to the alleged failure to follow a specific NIK test kit instruction." *Jenkins*, ECF 105 at 6, 11 n.1. It ruled for the United States on breach and causation, on a record in which it credited the tester's testimony that Test A turned orange and then brown before Test U. *Id.* at 7–12. Here, that Test A transition was never measured or objectively preserved (Paragraphs 35, 60), and Plaintiff alleges what a timed observation would have shown (Paragraph 107). The January 18, 2017 Advisory and the January 2018 Lynn chain supply the separate buprenorphine A–U–K context alleged above; the later emails are not pleaded as a directive received before December 2017. Plaintiff does not assert a freestanding constitutional tort under this count.

110. As a direct and proximate result of the operational failures alleged in Paragraph 107, Plaintiff suffered: the confinement-related physical and

psychological injuries and the aggravation alleged in Paragraphs 86 and 87, to the extent proximately caused by those failures; and the treatment costs and out-of-pocket expenses attributable to those injuries under Paragraph 91 — in amounts to be proven at trial, not to exceed $8,000,000 in the aggregate against the United States, subject to 28 U.S.C. § 2675(b). The employment and family-court injuries alleged in Paragraphs 88 and 89 are not claimed under this count. Count II does not depend on Count I. It does not challenge the decision to place Plaintiff in administrative detention or the conditions of the SHU as such; it seeks the injuries Plaintiff suffered while confined as damages proximately caused by the negligent performance of the testing. *See Jenkins*, ECF 75 at 5–6 (discretionary-function exception did not bar damages related to the plaintiff's time in the SHU that were proximately caused by the failure to follow the NIK test instructions). If the Court concludes that the gravamen of this count is the confinement rather than the negligent performance of the analysis, the count arises out of false imprisonment by investigative or law enforcement officers (Paragraph 27) and is preserved by the proviso of 28 U.S.C. § 2680(h); the physical analysis, not any statement, is the conduct on which this count is based. This count seeks damages for injury to Plaintiff's person; it asserts no claim arising from the seizure or detention of the intercepted paper as property. This count is tried to the Court. 28 U.S.C. § 2402.

**COUNT III — STRICT PRODUCTS LIABILITY: FAILURE TO WARN**

**(Against Safariland — Jury Demanded)**

111. Plaintiff realleges and incorporates Paragraphs 1 through 99 as though fully set forth here. This count does not depend on any allegation of fraud, knowledge of falsity, or conspiracy.

112. Safariland supplied the NIK pouches, inserts, and chart and, on information and belief, the certification course (Paragraphs 49–50), for institutional use in testing material associated with inmates. BOP's procedures required each participant to purchase the vendor's certification course on disk (Paragraph 49); the course was sold for use with the NIK line. The product at issue is the NIK system Safariland sold for correctional use. Its warnings and instructions reached BOP's testers through the insert, the chart, and the mandatory course together; the course is pleaded as a channel through which Safariland warned and instructed the product's users, not as a separate product. The defect alleged in this count lies in the warnings and instructions Safariland delivered to correctional testers through that course (Paragraph 117): for correctional users alone, they qualified the course's presumptive-only warnings — a qualification that, under the first alternative in Paragraph 114, diluted for those users the distinction between a baseline or routing observation, the conditional A–U amphetamine inference, and a completed presumptive identification.

113. Plaintiff was neither the purchaser nor the operator of the NIK product and was not present during the test. He alleges that he lacked access to the instructions, chart, and training during the testing and disciplinary process and could not independently retest the intercepted material. The warnings relevant to the alleged causal error were those delivered to the institutional tester and decision makers.

114. Plaintiff alternatively alleges that the warning system actually delivered to correctional users obscured the conditional nature of the amphetamine route, or that personnel understood the applicable instructions and nonetheless used or reported the results improperly. Under the first alternative, Plaintiff attributes the identified testing error to the inadequate and inconsistent warnings Safariland delivered to correctional testers through its certification course (Paragraph 117). Under the second, he attributes the error to the United States' improper performance of instructions its personnel understood. He alleges each Defendant's own actionable conduct and resulting harm; rejection of one alternative does not establish the other.

115. Safariland's training anticipates use of NIK results in correctional discipline and warns of improper detention from erroneous interpretation. Exhibit I (rev. 0517), pp. 31, 62; Exhibit I (REV 0511), pp. 30, 59. The earlier REV 0511 course draws an express distinction: its slide headed "Test Results (Excluding

Correctional Institutions)" describes results as presumptive, calls for laboratory analysis, and cautions against making them the investigation's sole determining factor; its slide headed "Test Results (For Correctional Institutions)" states that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting," states that "NIK Polytesting is extremely accurate" and that "[p]ositive results are used for administrative punishments," and adds that "[s]mall confiscated quantities preclude return to court system for punishment," that "[a]dditional laboratory work would bog down an already overburdened system," and that "[i]n states like New York, correctional institutions do not send the suspect material to a lab for confirmation." Its summary expressly excludes some correctional applications from the general presumptive statement. Exhibit I (REV 0511), pp. 29–30, 70. Elsewhere, in slides addressed to all users, the same course states that "[a] positive predictable color change is only a *presumed* positive result for the suspected compound: in no way should the test results be considered a confirmation of identification," that "all test results, positive or negative, should be confirmed by the crime laboratory," that field testing "is not intended as a substitute for laboratory testing," and that "[t]his system is not infallible." Exhibit I (REV 0511), pp. 16–18. The May 2017 course no longer contains the "proof positive" slide but keeps a correctional carve-out: its results slide states that field test results are presumptive and never confirmatory and calls for forensic

laboratory analysis, but also states that “[i]n correctional facility applications, tests are used as determination of the substance, as the results are used in disciplinary procedures,” and its review slide again states that NIK results are presumptive “(excluding some correctional applications).” Exhibit I (rev. 0517), pp. 31, 73. Plaintiff pleads those complete contexts as evidence of foreseeable institutional use and the need for clear distinctions among component observations, sequence-level inferences, and laboratory confirmation. The earlier correctional exception cannot be omitted when evaluating the manufacturer’s message. Which course revision the responsible Lompoc personnel received is recorded in BOP and Safariland certification records. The correctional slide did not itself instruct users to record a baseline or routing reaction as a drug identification. It and the May 2017 statements are pleaded both as notice — that Safariland knew correctional users would treat NIK results as proof in discipline, which made clear warnings distinguishing baseline and routing observations from completed identifications essential — and as part of the defect alleged in Count III (Paragraph 117).

116. The NIK units used on December 5, 2017 — including, per the testing memorandum, Test A lot no. 10279321 and Test U lot no. 10250541 — were, on information and belief, sold and distributed to BOP in the 2015–2017 period, during which BOP issued the September 29, 2015 and January 18, 2017

Advisories. The warnings accompanying those units, as actually delivered to this institutional user, were inadequate at the time of their manufacture and distribution: by then, the Safariland-branded certification course had told correctional users that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting," and, on information and belief, every revision in use during that period excluded "some correctional applications" from its statement that results are presumptive (Paragraphs 115, 117); on information and belief, Safariland gave those users no corrective notice (Paragraph 124). The risk was known or knowable to Safariland when those units were distributed.

117. The alleged defect is the warning and instruction system Safariland delivered for the NIK product to correctional testers through its purchased certification course: for correctional users alone, that system carved correctional applications out of its presumptive-only warnings — expressly in REV 0511 and, in softer terms, in the May 2017 revision. The Safariland-branded REV 0511 course set out those warnings — that NIK results are "*presumptive* in nature (never confirmatory)," "*cannot* be considered proof positive, conclusive, or evidentiary," and should never be "the sole determining factor in the investigation" — under the heading "Test Results (Excluding Correctional Institutions)," and told correctional users, under the heading "Test Results (For Correctional Institutions)," that "[i]n *some jurisdictions*, NIK results are

considered proof positive, but only in a correctional setting," that "NIK Polytesting is extremely accurate," and that "[p]ositive results are used for administrative punishments." The May 2017 revision ("rev - 0517") no longer contained the "proof positive" slide but kept the carve-out, telling users that "[i]n correctional facility applications, tests are used as determination of the substance" and that NIK results are presumptive "(excluding some correctional applications)" (Paragraph 115). Paragraphs 35, 50, and 102 describe what the course taught about the reagent's chemistry and the timed Test A predicate; this count concerns what the course told correctional users about the evidentiary weight of a reported "positive." Under the first alternative in Paragraph 114, that message diluted the course's chemistry teaching for those users. The course's correctional exception inadequately reconciled the weight it gave results in correctional discipline with the course's own statements to every user that test results are in no way a confirmation of identification (Paragraph 115), and with the chemistry and sequence instructions given elsewhere in the course, including the timed Test A predicate and the conditional significance of a burgundy Test U reaction (Paragraphs 33–35, 50). The reagents, and the chemistry the course taught, were the same for every user; what the correctional slide changed, for correctional users alone, was the weight the course told them a reported result could bear. The course's general statements did not cure that exception for correctional users: the

slide addressed to them, under its own heading, told them that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting," and the review slide repeated that the presumptive statement excluded "some correctional applications." *Cf. Stevens v. Parke*, *Davis & Co.*, 9 Cal. 3d 51, 65, 67 (1973) (an adequate warning "may be eroded or even nullified by over-promotion"; whether the warnings there were "nullified by overpromotion" was for the jury). Plaintiff does not allege that BOP was required to obtain laboratory confirmation (*see* Paragraph 102); the course's laboratory statements are pleaded for what they show about the message correctional users received, not as a duty owed by BOP. The chart used with the course, which called the A-to-U sequence a "positive result" and labeled its burgundy Test U square "Amphetamine" (Paragraph 34), is pleaded only as the point-of-use context in which that message operated. Count III does not claim that the insert, chart, or pouch, standing alone, was defective, and it does not depend on authorship of any SIS Advisory. Under the first alternative in Paragraph 114, Plaintiff alleges that the course's correctional message (Paragraph 115) led correctional testers and decision makers to treat each reported reaction as a determination of the substance, without the timing and sequence qualifications on which any amphetamine-type inference depended, and so produced the two-independent-positive presentation described in his case (Paragraphs 59–60). That alternative does not allege that the

course relieved BOP's certified testers of the timing and recording the certified method required (Paragraphs 35, 107, 109), and it is not an admission against Counts I and II. Under this count, the 2021 chart is identified to distinguish later instructions from the 2017 materials and to preserve its disclaimer that the revision does not affect the accuracy of previous charts; it is not offered to prove that the 2017 warnings were inadequate or the need or feasibility of a precaution.

118. Safariland cannot avoid liability by pointing to BOP's sophistication. A supplier invoking the sophisticated-intermediary doctrine "must show not only that it warned or sold to a knowledgeable intermediary, but also that it actually and reasonably relied on the intermediary to convey warnings to end users." *Webb v. Special Elec. Co.*, 63 Cal. 4th 167, 189 (2016); *see id.* at 177. Safariland did not actually or reasonably rely on BOP to protect persons in Plaintiff's position: on information and belief, it supplied the certification training on which BOP relied (Paragraphs 49–50); it knew its results were used in correctional discipline (Paragraph 115); and its own course carved correctional applications out of its presumptive-only warnings, expressly in REV 0511 and, in softer terms, in the May 2017 revision (Paragraphs 115, 117). Nor, under the first alternative in Paragraph 114, were the responsible personnel sophisticated as to the specific danger alleged — the recording of a routing or baseline reaction as a completed identification: the warning system delivered to them obscured it (Paragraph 117).

General familiarity with field testing does not establish knowledge of that danger.

119. Plaintiff alleges that adequate, consistent warnings in the certification course would have caused the responsible personnel to distinguish the conditional sequence from two independent drug identifications and to qualify any result lacking a reliably observed Test A predicate. He alleges that the resulting change in testing and institutional reliance would have prevented or shortened confinement that otherwise lacked an adequate ground, avoiding the physical aggravation and related injuries alleged. Plaintiff attributes the harm to the alleged testing and reliance errors, not merely to a wording change in a report. Nor would an adequate warning have been futile: BOP's own advisory system shows that color-reporting communications attributed to the manufacturer were promptly incorporated into nationwide directives (Paragraphs 42, 48).

120. As a direct and proximate result, Plaintiff suffered the injuries alleged in Part V.K — including the bodily confinement and restraint alleged in Paragraph 85 and the physical injuries and aggravation alleged in Paragraphs 86 and 87 — in amounts according to proof. Plaintiff demands a jury on this count.

**COUNT IV — NEGLIGENCE AND NEGLIGENT UNDERTAKING**

**(Against Safariland — Jury Demanded)**

121. Plaintiff realleges and incorporates Paragraphs 1 through 99 and 112 through 120 as though fully set forth here. This count does not depend on any

allegation of fraud, knowledge of falsity, or conspiracy. It proceeds on two distinct theories, separately pleaded below: (A) negligence, resting on Safariland's direct duty of reasonable care; and (B) negligent undertaking, resting on the services Safariland undertook to provide.

**A. Negligence (Direct Duty)**

122. Plaintiff alleges that Safariland owed reasonable care under California Civil Code § 1714(a) in supplying the NIK instructions and training and in performing the certification services it actually provided. The foreseeable affected persons included inmates whose confinement could depend on institutional testing. The asserted duty rests on risk created by Safariland's own supplied materials and affirmative services. It does not impose a freestanding duty to control BOP or protect Plaintiff from unrelated conduct by others. Theory (A) is a negligent failure-to-warn theory: it concerns the adequacy of the warning system Safariland delivered to correctional testers through its certification course (Paragraphs 112, 117), and asserts no duty to develop, market, or substitute a different product.

**B. Negligent Undertaking**

123. Plaintiff alleges a limited negligent undertaking by Safariland to provide NIK training, examination grading, and certification to BOP. The asserted duty extends only to services Safariland actually assumed and should have recognized as necessary to protect persons foreseeably affected by institutional

testing. Plaintiff alleges careless performance, physical harm including the spinal aggravation in Paragraph 87, and either increased risk from that performance or harm caused by BOP's reliance on the service. BOP relied on those services in lieu of any independent validation of NIK color interpretation: its directive required that all NIK certifications be obtained through the vendor (Paragraph 49). No personal purchase or reliance by Plaintiff is alleged.

124. On information and belief, Safariland carelessly performed the training and certification services it provided to BOP's correctional testers. On information and belief, it certified them on course materials that carved correctional applications out of their presumptive-only warnings — in the REV 0511 course, by telling them that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting" (Paragraphs 115, 117) — and it never corrected that message: the May 2017 revision ("rev - 0517") no longer contained the "proof positive" slide but told users that "[i]n correctional facility applications, tests are used as determination of the substance," and, on information and belief, Safariland gave the correctional users and institutions certified on the earlier course no notice that the "proof positive" statement had been withdrawn. Because, on information and belief, every revision in use from at least 2011 through 2017 carried a correctional carve-out, the message reached the responsible tester whichever of those revisions he was certified on (Paragraph 50A); the date and

revision of his certification are recorded in BOP's and Safariland's records (Paragraph 115). On information and belief, Safariland or its predecessor issued every BOP NIK certificate (Paragraph 49), and its records identify the correctional users it certified, so notice was feasible; having changed the message for new users, Safariland knew or should have known that previously certified users would continue to apply the one they had been taught. On information and belief, Safariland, LLC operated the certification program when the "proof positive" statement was withdrawn and thereafter; the failure to correct and to notify is its own conduct, not a liability inherited from a predecessor. California recognizes negligence in a manufacturer's failure to notify prior purchasers after it changes its product to address a hazard. *Hernandez v. Badger Constr. Equip. Co.*, 28 Cal. App. 4th 1791, 1827–28 (1994); *Lunghi v. Clark Equip. Co.*, 153 Cal. App. 3d 485, 494 (1984). Plaintiff alleges that the deficient services delivered to the responsible personnel contributed to the testing and confinement errors identified in Paragraph 119. Count IV does not impose a freestanding obligation to audit every BOP report or control BOP's nationwide practices, and BOP's invocation of the company's name in its own directives is not itself alleged to be Safariland's breach. The allegations of this Count made on information and belief concern matters recorded in Safariland's and the United States' files and unavailable to Plaintiff — the tester's certification date and course revision, Safariland's

certification records, and its communications with BOP (Paragraphs 73–79, 109, 115) — and rest on the facts alleged in Paragraphs 49, 50A, 115, and 119.

125. Discovery may reveal that the conduct alleged in this Count was undertaken, authorized, or ratified by an officer, director, or managing agent of Safariland, LLC within the meaning of California Civil Code § 3294(a)–(b). Plaintiff does not now seek exemplary damages and reserves the right to seek leave to amend to seek them should those facts be established. No punitive or exemplary damages are sought against the United States. 28 U.S.C. § 2674.

126. Safariland's breaches were a substantial factor in causing Plaintiff's injuries, for the reasons alleged in Paragraph 119. BOP's conduct was not a superseding cause: the institutional misuse was the very risk Safariland's duties addressed, and it was foreseeable — indeed, on the facts alleged in Paragraphs 68 and 115, known to Safariland. Under the alternative alleged in Paragraph 63A, staff reliance on an identification they knew to be unsupported was the hazard that the Safariland-branded course's correctional message — that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting" and that "NIK Polytesting is extremely accurate" — made foreseeable.

127. As a direct and proximate result, Plaintiff suffered the injuries alleged in Part V.K — including the bodily confinement and restraint alleged in Paragraph 85 and the physical injuries and aggravation alleged in Paragraphs 86

and 87 — in amounts according to proof. Plaintiff demands a jury on this count.

## VII. NO CONSTITUTIONAL TORT CLAIM; RESERVATION

128. No freestanding constitutional damages or *Bivens* claim is asserted. The United States' substantive liability is alleged under state law incorporated by the FTCA, and Safariland's liability under California law. The regulatory and constitutional context of hearing neutrality informs the particular process alleged in Paragraphs 55–56; it does not supply an additional FTCA cause of action.

129. Plaintiff reserves the right to seek leave to amend under Rule 15 — including to supplement under Rule 15(d) upon developments in the Oregon Action, and to seek leave to assert additional claims or remedies as warranted by facts developed in discovery. In particular: (a) upon any order vacating or expunging the disciplinary finding, Plaintiff intends to present to BOP an administrative claim for malicious prosecution under the proviso of 28 U.S.C. § 2680(h), based on the facts alleged in Paragraph 63A, and, once that claim is exhausted, to seek leave to add it to this action; and (b) if the March 27, 2017 Advisory or discovery discloses communications in which Safariland supplied or approved color-reporting guidance to BOP (Paragraph 48, alternative (a)), Plaintiff intends to seek leave to add claims based on those communications, including negligence, fraud, and misrepresentation involving risk of physical harm (Restatement (Second) of Torts §§ 310–311), and to seek exemplary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

1. Against the United States, on Counts I and II: compensatory damages in an amount to be proven at trial, not to exceed $8,000,000, subject to 28 U.S.C. § 2675(b);

2. Against Safariland, LLC, on Counts III and IV: compensatory damages according to proof;

3. Prejudgment interest against Safariland, LLC, and post-judgment interest against each Defendant, in each case solely to the extent permitted by law; no prejudgment interest and no punitive damages are sought against the United States, 28 U.S.C. § 2674;

4. To the extent the Court concludes that any claim or portion of a claim requires favorable termination of the underlying disciplinary finding, an order staying that claim pending final resolution of *Steffey v. Warden, FCI Lompoc*, No. 3:19-cv-00093-JR (D. Or.), or in the alternative dismissing that claim without prejudice;

5. Costs of suit as allowed by law; and

6. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b)–(c) and Local Rule 38-1,

Plaintiff demands trial by jury of all issues so triable on the claims asserted against Defendant Safariland, LLC (Counts III and IV). Plaintiff acknowledges that the FTCA claims against the United States (Counts I and II) are tried to the Court without a jury. 28 U.S.C. § 2402.

Respectfully submitted,

DATED: October 12, 2026

**Billy F. Steffey**
Plaintiff, Self-Represented

## VERIFICATION

I, Billy F. Steffey, am the Plaintiff in this action. I have read the foregoing First Amended Verified Complaint and know its contents. The facts alleged are true of my own knowledge, except (a) matters pleaded in the alternative under Federal Rule of Civil Procedure 8(d)(2)–(3), which are pleaded as alternatives and not as simultaneous assertions of fact, and (b) matters alleged on information and belief or stated on the basis of the documents, records, and proceedings identified herein, which I am informed and believe are true. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on October 12, 2026, at Sacramento, California.

**Billy F. Steffey**
Plaintiff, Self-Represented

# INDEX OF EXHIBITS

Exhibit A — BOP administrative-claim denials and delivery records: written denial of Feb. 12, 2026; final denial of the claim as amended, July 1, 2026, with postage-metered certified-mail envelope; and USPS delivery records for the claim, the amendment, and the March 23, 2026 reconsideration request (p. 119)

Exhibit B — NIK Test U Instructions for Use (Part No. 1004926 – REV1109) and governing-era IDENTIDRUG Polytesting Chart (Part No. 190-601, REV 0907), as docketed in *Steffey v. Warden, FCI Lompoc*, No. 3:19-cv-00093-JR (D. Or.), ECF 37-3 (p. 126)

Exhibit C — Safariland-branded NIK training materials, presentation 1005991, rev. 0517, excerpts, as docketed in *Steffey v. Warden, FCI Lompoc*, No. 3:19-cv-00093-JR (D. Or.), ECF 37-2 (p. 130)

Exhibit D — BOP SIS Advisory, "Buprenorphine HCL (Suboxone) Incident Reports," Jan. 18, 2017 (Trate/Jensen/Schwinn) (p. 136)

Exhibit E — Email chain of R. John Lynn, Western Regional Special Investigative Agent, Jan. 23–25, 2018, with attachments list (pp. 4–5: a second copy of the Jan. 25, 2018 forward, bearing a handwritten note made by Plaintiff) (p. 139)

Exhibit F — Incident Report No. 3025931 (Clark Bailey, FCI Herlong), excerpts referencing the March 27, 2017 SIS Advisory (the handwriting on this copy, including the underlining and line marks, was not made by Plaintiff) (p. 146)

Exhibit G — BOP FOIA request of May 10, 2026 concerning a March 27 SIS Advisory, and BOP determination of May 28, 2026 withholding all four located pages in full (p. 148)

Exhibit H — NIK Test W Instructions for Use (Part No. 1004931 – REV0215); NIK "Instructions on Use" sheet (Part No. 1091117 – REV1214) with the Forensics Source catalog page reproducing the IDENTIDRUG chart (no part or revision number), as docketed at ECF 12-6 pp. 3–4 in *Steffey v. Warden, FCI Lompoc*, No. 3:19-cv-00093-JR (D. Or.); NIK IDENTIDRUG Polytesting Chart (Part No. 190-601, REV 2021), both faces (p. 152)

Exhibit I — NIK System of Narcotics Identification, Basic Competency Course, REV - 0511, cover and pp. 11, 16–18, 29–30, 33, 54–56, 58–59, 70, and 73–74 of the 74-page course, as docketed at ECF 96-16 (Bates JENKINS_000208 et seq.) in *Jenkins v. United States*, No. 1:20-cv-01815-CLM-SGC (N.D. Ala.); NIK System of Narcotics Identification, presentation 1005991 rev - 0517, cover and pp. 9–10, 31, 45, 50, 62–63, 73, and 76, from the 77-page deck also filed in *Steffey v. Warden, FCI Lompoc*, No. 3:19-cv-00093-JR (D. Or.), ECF 69-5 (p. 158)

Exhibit J — Office of Information Policy final decision, September 22, 2026, Appeal No. A-2026-01552, Request No. 2026-05140, as filed on September 28, 2026 in *Steffey v. Federal Bureau of Prisons*, No. 2:26-cv-03395-TLN-SCR (E.D.

Cal.), ECF 1 at 17–18 (marked “Exhibit F” in that filing) (p. 185)

Exhibit K — Ng Jia Quan, Exploration of the Influence of Recovery Surface for the Determination of Methamphetamine Through Colour Test, Universiti Sains Malaysia, February 2025: bachelor honours project title page and English abstract, printed pp. i and xx–xxi, from the university repository PDF (p. 188)

Exhibit L — NIK Test A Instructions for Use (190-521 REV0215) and Safariland Safety Data Sheet for NIK Test A, revised September 17, 2014, pp. 1 and 3 (product identity and composition) (p. 192)

Exhibit M — FCI Lompoc mailroom memorandum of Correctional Systems Officer B. McDaniel and SIS memorandum for file, “NIK Testing,” of SIS Technician S. Aguilar, both dated December 5, 2017, as docketed at ECF 12-6 pp. 1–2 in *Steffey v. Warden, FCI Lompoc*, No. 3:19-cv-00093-JR (D. Or.) (p. 196)

# EXHIBIT A

BOP Administrative-Claim Denials and Delivery Records

Written denial of February 12, 2026

Final denial of the claim as amended, July 1, 2026, with certified-mail envelope

USPS delivery records for the administrative claim (delivered January 27, 2026), the amendment (delivered February 6, 2026), and the March 23, 2026 reconsideration request (delivered March 26, 2026)

**U.S. Department of Justice**

**Federal Bureau of Prisons**

*Western Regional Office*
*7338 Shoreline Drive*
*Stockton, California 95219*

**VIA CERTIFIED MAIL**

FEB 1 2 2026

Billy Steffey
455 Capitol Mall #802
Sacramento, CA 95814

Re: Tort Claim No. TRT-WXR-2026-01701 Received: January 27, 2026

Dear Mr. Steffey:

This is in response to the administrative claim submitted or forwarded to the Western Regional Office under the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671, et seq. You seek $2,000,000.00 for an alleged personal injury from December 5, 2017 to June 2018, at the Federal Correctional Complex, Lompoc, California.

Your "Claim for Damage, Injury or Death" (Standard Form 95) was received on January 27, 2026, in excess of the two-year filing limitation stipulated by the law for raising this allegation. As a result, the claim is untimely and barred from consideration.

Section 2672 of the FTCA delegates to each federal agency the authority to consider, determine and settle any claim for money damages against the United States for injury to or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his or her office or employment. Your claim contains no allegation of injury to or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his or her office or employment, for which the United States is liable. The Administrative Remedy Program allows for a formal review of an issue relating to any aspect of your confinement and is the proper avenue for your condition of confinement complaint(s).

Accordingly, your personal injury claim is denied. If you are not satisfied with this determination, you are afforded six months from the mailing of this letter to bring suit in the appropriate United States District Court.

Sincerely,

Robert J. France
Regional Counsel

J. M. Harcrow
Deputy Regional Counsel

RJF/jv

**U.S. Department of Justice**

**Federal Bureau of Prisons**

*Western Regional Office*
*7338 Shoreline Drive*
*Stockton, California 95219*

**VIA CERTIFIED MAIL**

JUL - 1 2026

Billy Steffey
455 Capitol Mall #802
Sacramento, CA 95814

Re: Tort Claim No. TRT-WXR-2026-01701 Received: February 6, 2026

Dear Mr. Steffey:

This is an amended response to the administrative claim submitted to this office under the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671, et seq. Our office received your amended claim on February 6, 2026. You seek $8,000,000.00 for an alleged personal injury from December 5, 2017, to June 2018, at the Federal Correctional Complex, Lompoc, California.

Your amended "Claim for Damage, Injury or Death" (Standard Form 95) was received on February 6, 2026, in excess of the two-year filing limitation stipulated by the law for raising this allegation. As a result, the claim is untimely and barred from consideration.

Section 2672 of the FTCA delegates to each federal agency the authority to consider, determine and settle any claim for money damages against the United States for injury to or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his or her office or employment. Your claim contains no allegation of injury to or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his or her office or employment, for which the United States is liable. The Administrative Remedy Program allows for a formal review of an issue relating to any aspect of your confinement and is the proper avenue for your condition of confinement complaint(s).

Accordingly, your personal injury claim is denied. If you are not satisfied with this determination, you are afforded six months from the mailing of this letter to bring suit in the appropriate United States District Court.

Sincerely,

Robert J. France
Western Regional Counsel

J. M. Harcrow
Deputy Regional Counsel

## USPS Tracking Screenshot — Cropped Excerpt

Plaintiff identifies the displayed tracking number with the amended-claim mailing.

Browser chrome and non-substantive navigation were cropped; displayed tracking and delivery content is unchanged.




*Screenshot captured from USPS.com on April 8, 2026.*

*Unmodified source image preserved in Plaintiff's case record.*

UNITED STATES POSTAL SERVICE

February 2, 2026

Dear Billy Steffey:

The following is in response to your request for proof of delivery on your item with the tracking number: **4209 5219 4557 9410 8301 0935 5007 9230 43**.

## Item Details

| | |
|---|---|
| **Status:** | Delivered, Left with Individual |
| **Status Date / Time:** | January 27, 2026, 9:19 am |
| **Location:** | STOCKTON, CA 95219 |
| **Postal Product:** | Priority Mail® |
| **Extra Services:** | Signature Confirmation™<br>Up to $100 insurance included |
| **Actual Recipient Name:** | I G |

Note: Actual Recipient Name may vary if the intended recipient is not available at the time of delivery.

## Shipment Details

| | |
|---|---|
| **Weight:** | 1lb, 0.0oz |

## Destination Delivery Address

| | |
|---|---|
| **Street Address:** | 7338 SHORELINE DR |
| **City, State ZIP Code:** | STOCKTON, CA 95219-4557 |

## Recipient Signature

Signature of Recipient:

Address of Recipient:



Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

# USPS Tracking Screenshot — Certified Mail No. 9589 0710 5270 3645 8359 66

Plaintiff identifies the displayed tracking number with the March 23, 2026 reconsideration-request mailing to the BOP Western Regional Office (Complaint ¶ 19). The tracking page is reproduced in full and unmodified: Delivered, Left with Individual, Stockton, CA 95219, March 26, 2026, 11:14 a.m.




*Screenshot captured from USPS.com on August 5, 2026.*
*Unmodified source image preserved in Plaintiff's case record; SHA-256 e7ba6eaa7d6acfb3c5d4cfdff4ebca2c70d028393fe9869f904666f170de2fb7.*



U.S. Department of Justice
Federal Bureau of Prisons
Western Regional Office
Attn: Legal Department
7338 Shoreline Drive
Stockton, California 95219

CERTIFIED MAIL®

9589 0710 5270 1470 0285 60

FIRST-CLASS
U.S. OFFICIAL MAIL
PENALTY FOR PRIVATE USE $300
US POSTAGE
PITNEY BOWES
ZIP 95219
02 7H
0005952410
$ 010.44⁰
JUL 01 2026

VIA CERTIFIED MAIL

Billy Steffey
455 Capitol Mall #802
Sacramento, CA 95814

# EXHIBIT B

NIK Test U Instructions for Use (Part No. 1004926 – REV1109)
and governing-era IDENTIDRUG Polytesting Chart
(Part No. 190-601, REV 0907)
As docketed in *Steffey v. Warden, FCI Lompoc*,
No. 3:19-cv-00093-JR (D. Or.), ECF 37-3

1004926 - REV1109

PUBLIC SAFETY

# SYSTEM OF NARCOTICS IDENTIFICATION

## INSTRUCTIONS FOR USE

## TEST U

**FOR:** Methamphetamine or Ecstasy

### Test Function

1. This reagent system presumptively identifies methamphetamine or MDMA (Ecstasy).

### How to Use Test U

1. Remove clip and insert into the test pouch an amount of powdered suspect material that fits inside this circle. ◯ Reseal the pouch with clip and tap or agitate gently to assure material falls to the bottom of the pouch.
2. Break the ampoules, beginning from left to right by squeezing the center of the ampoules with the tips of the thumb and forefinger.
3. Agitate each ampoule for about 30 seconds before proceeding to the next ampoule.

### Interpretation of Resulting Colors

1. An immediate dark blue color indicates the presumed presence of methamphetamine or MDMA (Ecstasy).
2. If any other color develops, proceed to Test A and continue Polytesting as instructed in the Polytesting procedures.

### CAUTION

A. Since these tests contain strong acid or base. it is suggested that Test F - Acid Neutralizer be used after testing and before disposal.
B. Before discarding used test pouches, remove the clip and add one measure of acid neutralizer from Test F.
C. Add slowly to prevent bubbling over.
D. Do not reseal the test pouch until effervescence has completely stopped.
E. Reseal the test pouch with the clip and discard in a tamper-free disposal unit.
F. No attempt should be made to crush the glass particles after the ampoules have been broken.
G. **Antidote:** In case of contact, immediately flush eyes or skin with water for at least 15 minutes while removing contaminated clothing and shoes. Call a physician. If swallowed, do not give emetics. Contact a physician.

### WARNING

These tests are NOT designed for use with liquid samples.

PUBLIC SAFETY
13386 International Parkway
Jacksonville, Florida 32218
904.485.1836 FAX: 904.741.5407




Exhibit B
Page 2 of 3

## Introduction to the NIK Polytesting System

The NIK® System of Narcotics Identification is based upon a polytesting procedure whereby a suspect material is subjected to a series of progressively discriminating screening tests. The results of individual tests may or may not yield a valid result. However, the sequential results of several tests provide a high degree of certainty that the suspect material is in fact what the NIK® Polytesting System indicates it to be.

Ongoing experiments are conducted with hundreds of licit and illicit chemical compounds in an effort to eliminate false positive results. However, no chemical reagent system for field use exists that is capable of eliminating occasional invalid test results. A complete forensic laboratory would be required to qualitatively identify an unknown suspect substance. In the absence of such a laboratory, utilizing the NIK® Polytesting System is your best assurance that the presumptive results of a positive identification are what they appear to be.

Always begin Polytesting with Test A and continue from test to test until a positive or negative result is obtained. Tests E, L, M, N, P, Q and R are exceptions to this rule and are designed as standalone tests.

**EXAMPLE:** Beginning with Test A, a suspect material sequences from orange to brown within 10 to 12 seconds. Following the Polytesting Chart, Test U comes next in sequence. A blue result in Test U confirms the presence of Methamphetamine. A reddish-pink or negative result in Test U indicates an Amphetamine-type compound. Only by following the proper sequence of tests from A to U is a positive result obtained.

## General Polytesting Procedures

Before testing can begin, it is important to classify the material using one of the classifications below:

**Tablets or other hard materials -** Crush a part of the tablet into powder and insert into the test pouch.

**Capsules** - Open the capsule, remove part of the powder and insert into the test pouch.

**Powders -** Insert powder directly into the test pouch

**Plant material** - Begin testing with Test E. Use only a few leaf fragments.

**Suspected Brown or Black Tar Heroin -** Begin testing with Test L.

**Liquid samples -** NIK® tests are NOT designed for use with liquid samples. However, liquids may be tested by placing the tip of an NIK® SUBSTANCE LOADING DEVICE or a 1cm square (roughly 1/2" square) piece of paper into the liquid. Remove and allow to air dry. Place the dry paper into the test pack and proceed with the test as instructed. The choice of paper is critical. Unscented, uncolored filter paper is ideal. NEVER use brown paper, hand towels or newsprint.

### Determining the amount of suspect material to use

The amount of suspect material needed to make a successful test varies with the amount and purity of the material. With the exception of plant material, gelatin squares, etc., you should begin by using the loading device to collect an amount of powdered suspect material that would fit inside this circle: ◯ If the resulting colors are too weak, use more material; if too intense, use less.

## Safety Precautions

Many of the tests in the NIK® Polytesting System contain strong acid(s) or bases. Always insert a portion of Pack F (Acid Neutralizer) into the test pack after testing and before disposal of the used test pack. Once an ampoule has been broken, no attempt should be made to further crush the glass or tablet remnants.

In the event that a test pack or chemical is ingested, seek immediate medical attention. If chemicals come into contact with the skin or eyes, wash the skin thoroughly with soap and water. Flush eyes with water and seek immediate medical attention. Call (800) 424-9300 or (202) 483-7616 to obtain additional safety information.

Store NIK® tests in a cool, dark area. Heat will speed up the action of the chemicals in each test, and extreme cold will slow them down. Appropriate care should be exercised. Do NOT store in direct sunlight. Technical Assistance is available during business hours at: (800) 852-0300 or (904) 485-1836

## Breaking the Chemical Ampoules

Care should be taken when breaking the glass ampoules in each test. Each test includes a plastic "harness" that serves to hold the ampoules in place and protect the user from injury. Press firmly in the center of the harness to break each ampoule. Once the glass has broken, do NOT continue to crush the glass ampoules, as a shard may puncture the pouch and result in injury.




## Interpretation of Test Results

For any test, there are three important factors you should look for:

1. The color or lack of color
2. The color change
3. The location of colors in the test pouch




To view the colors correctly, hold the test pack roughly 2 to 3 cm away from a white background. Light must filter through the test pouch to review the desired color results. Viewing test results under non-white light or over a colored surface may result in an incorrect determination of the resulting color. Color results may not match the color on the pouch exactly, but should be viewed as a color family. Blue is always blue, regardless of whether it is dark or light.

# EXHIBIT C

Safariland-Branded NIK Training Materials
Presentation 1005991, rev. 0517 (excerpts)
As docketed in *Steffey v. Warden, FCI Lompoc*,
No. 3:19-cv-00093-JR (D. Or.), ECF 37-2
The "Exhibit A" legends on these pages are those of ECF 37-2

# **Step 1:** Classify the Material to be Tested

- Solid materials (tablets)
- Capsules
- Powders/Crystals/Granules/ Flakes
- Plant material (Cannabis/Hallucinogens)
- Liquids
- Gels (Caps or Cubes)



SAFARILAND.

nik®

1005991 rev - 0517

35

# Testing Liquids

- NIK tests are designed to test dosage sample of unknown substances. Dosage samples are generally powder, crystals, pills or capsules. When liquid samples are encountered do not introduce them directly into any test pouch (except Test O for GHB). All other tests require the liquid sample to be dried before testing.
- To sample a liquid:
  - Thoroughly wet the tip of the Loading Device or wet a ½"x½" piece of paper with the liquid
  - Allow it to air dry
  - Then insert into the proper test kit and remove the perforated tip
- The paper should be unscented and uncolored; do not use brown hand towels or newsprint
- It is not recommended to use cotton swabs as the cotton may react with some of the chemicals and cause a erroneous color reaction




SAFARILAND.

# Test U for Methamphetamine and MDMA (Ecstasy)

- Test U contains 3 ampoules
  - 1st ampoule – No color change
  - 2nd ampoule – No color change
  - 3rd ampoule – Dark Blue

- Test U is used for both Methamphetamine and MDMA (Ecstasy). To determine difference, you must use Test A.



SAFARILAND.

nik® 1005991 rev - 0517 59

Exhibit A
Page 3 of 5

# Test U for Methamphetamine and MDMA (Ecstasy)

- The first two ampoules do not give a color reaction, but merely put the sample in the proper chemical order to produce a color reaction with the third ampoule.

- This test does not differentiate between MDMA and Methamphetamine. Test A must be used to provide that clarification. Test U tests for the presence of a chemical group called secondary amines. Both of these drugs fall into this chemical group. You may encounter other chemicals that are also in this group in the field. Test A is the only way to provide a better screening for the presence or non-presence of illicit drugs.

# Test U for Methamphetamine and MDMA (Ecstasy)

- It should also be noted that Test U will turn a burgundy color all by itself when the ampoules are broken with substance placed in the pouch. This is the nature of the chemicals.



- The logic to be used here is that Test A (if it shifts from Orange to Brown) tells us that the substance is presumptively an Amphetamine-type compound. Test U then tells us if there is an indication of Amphetamine (burgundy) or Methamphetamine (dark blue) present. By not turning dark blue and staying burgundy, this is considered a negative reaction for the presence of Methamphetamine and therefore, by default, it indicates Amphetamine.



SAFARILAND

# EXHIBIT D

BOP SIS Advisory

"Buprenorphine HCL (Suboxone) Incident Reports"

January 18, 2017

** SIS ADVISORY **
January 18, 2017
"Buprenorphine HCL (Suboxone) Incident Reports"

Federal Bureau of Prisons
Intelligence Section
320 First Street, NW - Room 543
Washington, DC 20534

COMM:
FAX:
LAN ID: [redacted]

Brad Trate, Administrator
Correctional Services Branch

M. Wade Jensen
Operations Intelligence Officer
Intelligence Section

Kevin Schwinn, Chief
Intelligence Section

**TO: Regional Directors/All ROs; BOP-CPD/Assistant Director; Warden/All Insts; SIS/All ROs; Corr Svc/All ROs; SIS/All Insts; Corr Svcs/All Insts; BOP-CPD/SIS; BOP-CPD/SIU; BOP-CPD/CTU; BOP-CPD/PMB Intel**

**PURPOSE: Update Field Test Kits for Buprenorphine HCL (Suboxone) and Clarify Incident Report Writing:**

**DISCUSSION**: This is an update to the SIS Advisory dated September 29, 2015.

The SAFARILAND Company has informed Central Office Intelligence Section of an update to the reported color results when testing for Buprenorphine HCL. In the September 29, 2015 SIS Advisory, the color change in NIK Test U - Methamphetamine Reagent - was reported as BROWN. The color change should have been reported as BURGANDY.

The NIK Polytesting procedure for the detection of Buprenorphine HCL is a combination of A, U, K tests.

NIK Test A - Marquis Reagent - results are purple
NIK Test U - Methamphetamine Reagent - results are **BURGANDY**
NIK Test K - Opiates Reagent - results are purple

It should be noted Heroin and Buprenorphine HCL will result in a similar purple color, but Heroin will change from green to purple while Buprenorphine HCL will go directly to purple. When using NIK Field Tests, staff should only report the test results.

UNCLASSIFIED/LIMITED OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE
This document is marked Unclassified/Limited Official Use Only/Law Enforcement Sensitive and may be disseminated, with proper attribution, to active Law Enforcement, DOD, or U.S. Intelligence Agencies. This document, or any segment/attachment thereof, may not be released without the approval of the Bureau of Prisons to any media sources, any non-law enforcement entity, the general public or those without a "need to know." It contains information that may be exempt from public release under the provisions of the Privacy Act (5 U.S.C. 552).