STEVEN D. SMELSER (SBN 180602)
*ssmelser@yukelaw.com*
SYDNEY A. SHAFFER (SBN 348771)
*sshaffer@yukelaw.com*
CAMILLE T BAYLIS (SBN 363838)
*cbaylis@yukelaw.com*
YUKEVICH | CAVANAUGH
355 S. Grand Avenue. 15th Floor
Los Angeles, California 90071-1560
Telephone: (213) 362-7777
Facsimile: (213) 362-7788
Email: eservice@yukelaw.com

Attorneys for Defendant,
SAFARILAND, LLC.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE. 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| BILLY F. STEFFEY,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>Defendants. | **CASE NO. 2:26-cv-09497-MCS-RAOx**<br><br>**DECLARATION OF SYDNEY A. SHAFFER IN SUPPORT OF DEFENDANT SAFARILAND, LLC'S MOTION TO DISMISS COUNTS III AND IV OF PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>*[Filed concurrently with Defendant Safariland, LLC's Notice of Motion and Motion to Dismiss Counts III and IV of Plaintiff's First Amended Complaint; Memorandum of Points and Authorities in Support; [Proposed] Order; and Request for Judicial Notice]*<br><br>District Judge: Hon. Mark C. Scarsi<br>Magistrate Judge: Hon. Rozella A. Oliver<br><br>Date: Monday, December 7, 2026<br>Time: 9:00 a.m.<br>Crtrm: 7C<br><br>Trial Date: None Set |

/ / /

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

# DECLARATION OF SYDNEY A. SHAFFER

I, Sydney A. Shaffer, declare:

1. I am an attorney duly licensed to practice before all courts of the State of California and an associate with the law firm of Yukevich | Cavanaugh, attorneys of record for Defendant SAFARILAND, LLC ("Defendant" or "Safariland") in this action.

2. I have personal knowledge of each and all of the facts stated in this declaration. If called as a witness, I could and would competently testify to the facts contained herein.

3. I submit this Declaration in support of Defendant Safariland, LLC's Notice of Motion and Motion to Dismiss Counts III and IV of Plaintiff's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and to confirm compliance with Local Rule 7-3 of the United States District Court for the Central District of California.

4. On August 19, 2026, Plaintiff Billy F. Steffey ("Plaintiff"), who is proceeding pro se, filed a Complaint against the United States of America and Safariland. (ECF 1.)

5. On October 12, 2026, Plaintiff filed a First Amended Verified Complaint ("FAC"). (ECF 18.) The FAC asserts Counts I and II against the United States under the Federal Tort Claims Act, and Counts III and IV against Safariland under California law. Count III asserts strict products liability against Safariland based on a failure to warn theory, and Count IV asserts claims for negligence and negligent undertaking against Safariland. The claims arise out of NIK testing conducted at the Federal Correctional Institution ("FCI") in Lompoc, California on

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE. 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

or about December 5, 2017, the confinement and discipline imposed in connection with that testing, and Safariland's warnings, training, instructions, and certification materials for NIK products.

6. On Monday, October 19, 2026, I telephoned Plaintiff and conducted a conference of counsel pursuant to Local Rule 7-3. I advised Plaintiff that the purpose of the call was to meet and confer under Local Rule 7-3 regarding his FAC and Safariland's contemplated motion to dismiss.

7. During the conference, I thoroughly discussed with Plaintiff the substance of Safariland's contemplated motion and the possibility of resolving the identified issues without motion practice. I explained that the counts at issue as to Safariland are Counts III and IV only, and that Safariland does not seek dismissal of Counts I and II against the United States. I identified the following issues:

a. **Statute of limitations and the discovery rule.** I noted that the relevant testing and disciplinary proceedings relating to Plaintiff's claims against Safariland occurred in 2017 and 2018, and asked Plaintiff when he contended any tolling applied and when he first learned of Safariland's alleged wrongdoing as distinct from the alleged conduct of the government. I stated Safariland's position that the limitations period begins when a plaintiff first suspects wrongdoing, rather than when he later locates additional supporting evidence.

b. **The outstanding disciplinary finding.** I asked whether the disciplinary finding referenced in paragraph 95 of the FAC remained outstanding. I stated that Safariland was evaluating the need to ask the Court to dismiss or stay any damages claim that would require a finding inconsistent with the Code 111 disciplinary finding or the disallowance of 41 days of good-conduct time.

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE. 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

8. Plaintiff responded to each issue and stated his positions were as follows:

a. As to the statute of limitations issue, Plaintiff stated that he first learned of Safariland's alleged wrongdoing in "late '25," when he read or saw online materials relating to *Jenkins v. United States*, No. 1:20-cv-01815-CLM-SGC (N.D. Ala.), a Federal Tort Claims Act case arising from NIK testing of paper at FCI Talladega in November 2016, downloaded discovery from the Court's online docket from those proceedings, and concluded that he believed Safariland had changed or revised its flow charts. Plaintiff maintained that he could not have discovered the allegations against Safariland earlier because the Bureau of Prisons allegedly reclassified or withheld materials and because he claims Safariland would not speak with him after learning that he was an inmate. Plaintiff stated that he had to accept what he had been told until he saw the *Jenkins* case and the updated flow chart. Plaintiff disputed Safariland's position regarding accrual and stated that he had undertaken more than reasonable efforts to pursue the matter.

b. As to the disciplinary finding, Plaintiff stated that the matter had been submitted for approximately 85 days and that he was awaiting a ruling. Plaintiff took the position that the issue was more properly a Bureau of Prisons issue, and that if the finding was invalidated it would restart the limitations period on several claims. Plaintiff stated that he wished to press forward and opposed any delay in the proceedings.

/ / /

/ / /

/ / /

9. During the conference, Plaintiff did not agree to amend, withdraw, or narrow Counts III or Count IV of the FAC against Safariland. The parties discussed the issues thoroughly but were unable to reach a resolution eliminating the need for Safariland's motion to dismiss. Accordingly, Safariland files the accompanying motion.

10. The conference of counsel described above was conducted on October 19, 2026, at least seven days before the filing of the accompanying motion, in compliance with Local Rule 7-3.

11. Attached hereto as **Exhibit 1** is a true and correct copy of the Discipline Hearing Officer Report, filed on March 6, 2019, 4 pages, as referenced in but not attached to the FAC filed by Plaintiff in this action. (ECF 18; Oregon ECF 12-5; RJN Ex. 1.)

12. Attached hereto as **Exhibit 2** is a true and correct copy of the Findings and Recommendation, filed February 25, 2020, 12 pages, as referenced in but not attached to the FAC filed by Plaintiff in this action. (ECF 18; Oregon ECF 30; RJN Ex. 2.)

13. Attached hereto as **Exhibit 3** is a true and correct copy of the Opinion and Order adopting the Findings and Recommendation, filed May 18, 2020, 2 pages, as referenced in but not attached to the FAC filed by Plaintiff in this action. (ECF 18; Oregon ECF 39; RJN Ex. 3.)

14. Attached hereto as **Exhibit 4** is a true and correct copy of the Judgment, filed May 18, 2020, 1 page, entered in Plaintiff's Oregon habeas corpus action. (Oregon ECF 40; RJN Ex. 4.)

/ / /

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE. 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

15. Attached hereto as **Exhibit 5** is a true and correct copy of the Order, filed June 23, 2026, 11 pages, as referenced in but not attached to the FAC filed by Plaintiff in this action. (ECF 18; Oregon ECF 63; RJN Ex. 5.)

16. Attached hereto as **Exhibit 6**, submitted in two PDF parts, are true and correct copies of the Objections and attachments, filed April 23, 2020, 56 pages in the supplied combined record (12, 36, 5, and 3 pages respectively), as referenced in and partially attached to the FAC filed by Plaintiff in this action. (ECF 18; Oregon ECF 37, 37-1, 37-2, 37-3; RJN Ex. 6.)

17. Attached hereto as **Exhibit 7** is a true and correct copy of Civil Minutes, filed January 16, 2026, 3 pages, PageID 397-399, as referenced in but not attached to the FAC filed by Plaintiff in this action. (ECF 18; Peters ECF 37; RJN Ex. 7.)

18. Attached hereto as **Exhibit 8** are true and correct copies of selected complete pages of the operative FAC filed by Plaintiff in this action and its attached course materials, identified individually in the exhibit index. (ECF 18, 18-1, 18-2, 18-3; RJN Ex. 8.)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 26th day of October, 2026, at Los Angeles, California.

Sydney Shaffer

SYDNEY A. SHAFFER

# INDEX TO EXHIBITS 1-8

Blue rectangular outlines are added emphasis. Originals are reproduced with their filing stamps and complete page context. Original ECF page numbers control; the page ranges below are the added continuous pagination.

**EXHIBIT 1** pp. 8-12

Oregon ECF 12-5
Discipline Hearing Officer Report, filed March 6, 2019, 4 pages.

**EXHIBIT 2** pp. 13-25

Oregon ECF 30
Findings and Recommendation, filed February 25, 2020, 12 pages.

**EXHIBIT 3** pp. 26-28

Oregon ECF 39
Opinion and Order adopting the Findings and Recommendation, filed May 18, 2020, 2 pages.

**EXHIBIT 4** pp. 29-30

Oregon ECF 40
Judgment, filed May 18, 2020, 1 page.

**EXHIBIT 5** pp. 31-42

Oregon ECF 63
Order, filed June 23, 2026, 11 pages.

**EXHIBIT 6** pp. 43-99

Oregon ECF 37 and 37-1 through 37-3
Objections and attachments, filed April 23, 2020, 56 pages in the supplied combined record (12, 36, 5, and 3 pages respectively).

**EXHIBIT 7** pp. 100-103

Peters ECF 37
Civil Minutes, filed January 16, 2026, 3 pages, PageID 397-399.

**EXHIBIT 8** pp. 104-135

Current FAC excerpts: ECF 18 pp. 9, 54-55; ECF 18-1 pp. 8-18, 31-44; ECF 18-2 pp. 28, 41; ECF 18-3 p. 5.

# EXHIBIT 1

Oregon ECF 12-5

Discipline Hearing Officer Report, filed March 6, 2019, 4 pages.

Blue rectangular outlines are added emphasis.
Original ECF page numbers control.
Complete document included.

BP-A0304
JAN 17

**DISCIPLINE HEARING OFFICER REPORT** CDFRM

**U.S. DEPARTMENT OF JUSTICE** **FEDERAL BUREAU OF PRISONS**

| | | |
|---|---|---|
| Institution: FCC Lompoc-Low | Incident Report Number: 3084272 | |
| Name Of Inmate: STEFFEY, BILLY | REG.NO.: 68463-097 | Unit: B-Low |
| Date of Incident Report: 01/31/2018 | Offense Code: 111 | |
| Date of Incident: 12/05/2017 | | |

Summary of Charges:
INTRODUCTION OR MAKING OR ANY NARCOTICS, MARIJUANA, DRUGS, ALCOHOL, INTOXICANTS, OR RELATED PARAPHERNALIA, NOT PRESCRIBED FOR THE INDIVIDUAL BY THE MEDICAL STAFF

I. NOTICE OF CHARGE(S)

A. Advanced written notice of charge (copy of Incident Report) was given to inmate on (date) 01/31/2018 at (time) 1940 (by staff member) G. Corn, Investigator

B. The DHO Hearing was held on (date) 02/13/2018 at (time) 0934

C. Inmate was advised of the rights before the DHO by (staff member) J. Webster, Counselor on (date) 02/05/2018 and a copy of the advisement of rights form is attached.

II. STAFF REPRESENTATIVE

A. Inmate waived right to staff representative. Yes ✓ No ____

B. Inmate requested staff representative and ____________ appeared.

C. Staff Representative's Statement:

D. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that:

E. Staff representative ____________ was appointed.

III. PRESENTATION OF EVIDENCE

A. Inmate neither admits or denies the charge(s).

B. Summary of Inmate Statement:
Inmate Steffey acknowledged his rights before the DHO. After being read the incident report, he stated, "I talked to Aguilar at length, I didn't think I was going to get a shot." He also provided a written statement.

C. Witnesses:

1. Inmate waived right to witnesses. Yes ✓ No ____

2. The following persons were called as witness at this hearing and appeared (Each witness name and statement listed below):
N/A

3. The following persons requested were not called for the reason(s) given (Each witness name and statement listed below):

4. Unavailable witnesses were requested to submit written statements and those statements received were considered (Each witness name and statement listed below):

D. Documentary Evidence: In addition to the Incident Report and Investigation, the DHO considered the following documents:
Inmate Investigative Report; Photosheets; Memorandums; TRULINCS Messages.

E. Confidential information was used by DHO in support of his findings, but was not revealed to the inmate. The confidential information was documented in a separate report. The confidential information has been (confidential informants have been) determined to be reliable because:
N/A. No confidential information relied upon.

IV. FINDINGS OF THE DHO

✓ A. The act was committed as charged.

___ B. The following act was committed:

___ C. No prohibited act was committed: Expunge according to Inmate Discipline PS.

V. SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS (Physical evidence, observations, written documents, etc.)

The DHO notes the date entered in Block 4 of the incident report (01/31/2018, the date the investigation closed) is in error. The correct date, the date narcotics were interdicted in the mail-room as described in the incident report, is 12/05/2018) This was pointed out to the inmate during the DHO hearing, and he had no objection and indicated he was ready to proceed.

The DHO has made a finding that you committed the prohibited act of Code 111, Introduction of any narcotics, based on the following evidence:

1) The DHO relied on the written report from a staff member:

A written statement submitted by S. Aguilar, SIS Technician, which states: On January 31, 2018, SIS received SIS Case LOF-17-0034, signed by the Warden indicating on January 30, 2018, an SIS investigation was completed. During the course of this investigation it was concluded inmate Steffey, Billy, Reg. No. 68463-097, was involved in the introduction and sale of designer drugs at FCC Lompoc-FCI (Low). On December 5, 2017, Mail Room staff received an incoming envelope from Law Offices of Leslie R. Ramos, 901 H St., Sacramento, CA 95814, with tracking number 70171450000084946239, addressed to inmate [redacted] Reg. No. [redacted] The envelope had a suspicious amount of markings on it, and upon inspection, there were ten (10) unusually thick pieces of paper inside. Utilizing a light box, stains and discoloration could be seen on the papers. The paper was tested with the NIK Narcotics Identification System test kits A and U, with a positive test for Amphetamines. A review of the TRUVIEW system 1 Degree of Separation of [redacted] reveals, a money link with inmate Steffey, Billy, Reg. No. 68463-097. A review of TRULINKS messages for Steffey revealed, on November 23, 2017, at 11:51 am, Steffey sent an outgoing email to Lisa Rassmussen ESQ inmateresoursces@protonmail.com. In the email Steffey states, "Just this time, draft my motion exactly the same and serve on the same guy." On November 25, 2017, at 5:42 pm, an outgoing email from Steffey to Lisa Rassmussen ESQ inmateresoursces@protonmail.com, Steffey states, "Please resend that eviction again to the exact same tenant as you did last time. Go heavy!" On December 5, 2017, at 8:42 am, outgoing email from Steffey to Lisa Lisa Rassmussen ESQ inmateresoursces@protonmail.com, Steffey states, "Please take care of what I paid you to do and serve the guy." On December 5, 2017, at 1:06 pm, incoming email from inmateresoursces@protonmail.com, to Steffey, email states, "I reached out. 70171450000084946239 "(tracking number of incoming envelope). On December 5, 2017, at 1:16 pm, an outgoing email from Steffey, Lisa Rassmussen ESQ inmateresoursces@protonmail.com, Steffey states, "Thank you Lisa." On December 5, 2017, at 5:06" pm, incoming email from inmateresoursces@protonmail.com, to Steffey email states, "Did the documents get served have u heard from the tenant." On December 5, 2017, at 5:45 pm, an outgoing email from Steffey, to Lisa Rassmussen ESQ inmateresoursces@protonmail.com, Steffey states, "No. Should they of? The property manager said he hasn't mentioned anything. When you look at the email, does it show he got the email already? What day?" Through the multiple Email communications, it reveals, Steffey facilitated and arranged with an outside person to have narcotic soaked papers to be sent to another inmate housed at FCC Lompoc-FCI (Low). Communications also reveal Steffey was aware of the package being sent and had been anticipating its arrival. Steffey received confirmation of it with the tracking number that matched with the package that was sent to inmate [redacted]

2) Your statement to the Investigator:

The DHO first reviewed and considered your statement to Lieutenant G. Corn, Investigator, who stated you were issued a copy of the charges against you, you were read your rights, and you stated you understood your rights during the Disciplinary Process. You were quoted during this interview as saying, "I have no comment, due to possible charges being brought on by outside law enforcement agency." The DHO notes you were informed of your rights and considered your refusal to make a statement as an adverse inference against you; however, this alone was not used to make a finding that you committed this prohibited act.

The DHO also noted you maintained a good attitude during this investigation.

3) Your statement to the Unit Disciplinary Committee:

The DHO then considered, and gave great weight to your statement at the Unit Disciplinary Committee (UDC) Hearing in which you were quoted as saying, "I have no comment, due to possible charges being brought on by outside law enforcement agency." The DHO notes that your refusal to make a statement at the UDC Hearing on behalf of your defense was considered as an adverse inference against you. However, this was not the only evidence relied upon to make a finding in this case.

4) Witness(es) statement: Waived by the inmate.

5) Staff representative statement: Waived by the inmate.

6) Memorandum(s), photographs, and other evidence considered:

The DHO considered Inmate Investigative Report #LOF-17-0034, which describes in detail the investigation leading up to the incident report, and from which the elements of the incident report are drawn. The contents of this report are FOIA Exempt and therefore not disclosable to you.

The DHO considered the photographic evidence depicting the mail items and NIK polytest as described in the incident report.

The DHO considered the memorandum submitted by B. McDaniel, Correctional Systems Officer, in which they described how they discovered the narcotic laced mail items.

The DHO also considered the memorandum submitted by S. Aguilar, SIS Technician and incident report writer, in which they described how they tested the items using the NIK polytest kit.

The DHO also gave due consideration to the TRULINCS e-mails in which you correspond with Lisa Rassmussen ESQ; and takes particular note that you discuss Tracking Number 70171450000084946239, the tracking number of the package as described in the incident report. This e-mail clearly associates you with the narcotic containing package delivered to FCC Lompoc.

7) Statement at the DHO hearing:

You acknowledged your rights before the DHO. After being read the incident report, you stated, "I talked to Aguilar at length, I didn't think I was going to get a shot. I know of other drug issues"

Inmate Steffey also provided a written statement: Staff should be held to the same or a higher standard as far as following rules and program statement. AW Garcia has already told mailroom and SIS to STOP OPENING LEGAL MAIL. If a package was "suspicious" they could of still opened it in front of inmate per policy, returned to sender or called law office. Excuse to open legal mail. NOTHING IN POLICY ALLOWS.
Aguilar told Lt. Corn he didn't want to write a shot, came from over his head.
Person who was receiving mail got no shot. Only reason I did was because I got tracking emailed to me. Both of us communicated with same guy for legal help. No emails of me asking for drugs or relaying who to email to. Did I get his tracking by mistake?
What is "designer drugs"?? Has it been tested? Does anyone even know what it is? Could be coffee spill for all we know.
My paralegal has sent real lawyer twice to see me and have me sign documents while at Lompoc to evict people.
No history of drug sales ever. Nothing found in my property or locker and no money transfers or large deposits. Only same 4 family members send me money.
NUMEROUS ERRORS on shot ie (date, emails being sent, emails out of context to fit narrative, opening legal mail)

Conclusions and findings:

You claim the legal mail shouldn't have been opened. The mail wasn't addressed to you, you have no standing to comment on how mail to other inmates is handled.

You claim the report writer didn't want to write an incident report, he was ordered to do so. Staff are obligated to prepare an incident report when they become aware of misconduct; they do not have discretion, particularly in regards to serious charges.

You claim you were emailed the tracking number by mistake. The DHO believes this claim to be incredible.

Case 3:19-cv-00093-JR Document 12-5 Filed 03/06/19 Page 4 of 4

You claim you have no history of drugs. That claim has no bearing on the charge that you facilitated the introduction of narcotics into FCC Lompoc in this case. The DHO further notes you verbally stated to the DHO that you know of other drug issues. The DHO considers this statement adversely, as it suggests you are purposely withholding potentially incriminating information.

You question whether the narcotics were tested. They were, and the results were positive for amphetamine.

The date error on the incident report was discussed with you at the beginning of the DHO hearing. Noted.

After being advised of your rights by the investigator and by the UDC, you neither admitted nor denied the charge. As noted above, the DHO drew an adverse inference in determining that you committed the prohibited act as charged.

Therefore, based on the greater weight of the totality of the evidence presented above, the DHO concludes you committed the prohibited act of Code 111, and the charge is sustained. The following sanctions are imposed:

VI. SANCTION OR ACTION TAKEN (List each prohibited act with respective sanctions for that act)

| | |
|---|---|
| Disallow Good Conduct Time From PLRA Comp #010 | 41-Days |
| Disciplinary Segregation | 60-Days (Suspended pending 180-days clear conduct) |
| Loss of Commissary Privileges | 180-Days |
| Loss of Visiting Privileges (All Social Visiting Privileges) | One Year (Suspended pending 180-days clear conduct) |

VII. REASON FOR EACH SANCTION OR ACTION TAKEN

CODE 111: Introduction of any narcotic not authorized by medical staff in a correctional setting is a very serious violation in that these narcotics are brought into the institution via illegal means and pose a serious threat to the secure and orderly running of the institution.

The loss of privileges are punitive sanctions administered in an effort to discourage any future disruptive behavior. The disallowance of Good Conduct Time is a mandatory sanction based on your sentence method. These disciplinary sanctions administered are done so in proportion to the frequency and severity of the prohibited act code violation committed, and is in compliance with guidelines set forth in P.S. 5270.09 Inmate Discipline Program.

VIII. APPEAL RIGHTS 02/13/18 The inmate has been advised of the findings, specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure. A copy of this report has been given to the inmate.

IX. Discipline Hearing Officer

| Printed Name | Signature | Date |
|---|---|---|
| W.J. Chetwood, DHO | [signature] | 02/16/2018 |

DHO Report Delivered to Inmate by:

| W. Chetwood | [signature] | 2-16-18 1450 |
|---|---|---|
| Printed Name of Staff | Signature of Staff | Date and Time Delivered |

Via USPS Mail

STEFFEY, BILLY 68463-097 3084272 02/13/2018

PDF Prescribed by P5270 Replaces BP-304 of MAR 16

# EXHIBIT 2

Oregon ECF 30

Findings and Recommendation, filed February 25, 2020, 12 pages.

Blue rectangular outlines are added emphasis.
Original ECF page numbers control.
Complete document included.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BILLY F. STEFFEY,

Petitioner,

v.

WARDEN J. SALAZAR,

Respondent.

Civil No. 3:19-cv-00093-JR

FINDINGS AND RECOMMENDATION

RUSSO, Magistrate Judge.

Petitioner, an inmate at FCI Sheridan, brings this habeas corpus action pursuant to 28 U.S.C. § 2241. Currently before the Court are petitioner's Motion for Discovery and/or Inspection (ECF No. 20) and the Petition for Writ of Habeas Corpus (ECF No. 1). For the reasons that follow, both motions should be DENIED.

## BACKGROUND

Petitioner was convicted in the District of Nevada for conspiracy to traffic and use one or more counterfeit devices to obtain items in value in excess of $1,000 and for aggravated identity

theft. Declaration of William J. Chetwood ("Chetwood Decl."), ECF No. 12, p. 2. On August 7, 2014, he was sentenced to 84 months of imprisonment. Id. Petitioner is currently housed at FCI Sheridan, but was previously housed at FCI Lompoc, California. Id.

On December 5, 2017, the FCI Lompoc mailroom received an envelope with the tracking number 70171450000084946239, which was addressed to another inmate. Chetwood Decl., p. 5. Correctional Systems Officer B. McDaniel opened the envelope and discovered what appeared to be legal paperwork from an attorney. Chetwood Decl., Exh. B, p. 1; Exh. F, p. 1. However, the paper felt "unusually thick" and "grainy," and appeared to have stains and discolorations. Chetwood Decl., Exh. F, p. 1.

SIS Technician S. Aguilar tested the paper for drugs using a NIK brand chemical field-testing kit. Chetwood Decl., Exh. F, p. 2. Aguilar cut a small piece of paper from the contents of the envelope and tested it with NIK Test A. Id. According to Aguilar's report, the Test A result "had an immediate orange rapidly turning brown color, indicating Amphetamines." Id. Aguilar cut another small piece of paper and tested it with Test U, which "turned an immediate dark burgundy color, indicating Amphetamines." Id.

Aguilar reviewed the "TRUVIEW system 1 Degree of Separation," which revealed a "money link" between Petitioner and the inmate to whom the mail was addressed. Chetwood Decl., Exh. E, p. 2. Aguilar reviewed emails between Petitioner and an unknown paralegal identified as "Lisa Rasmussen, Esq.," which led Aguilar to believe Petitioner had arranged for the papers to be sent to the other inmate. Id. The emails did not reference illegal substance explicitly, but Aguilar believed that the emails' references to legal work on behalf of Petitioner for evictions were in code. Id. The emails linked Petitioner to the incoming mail because, on

Case 3:19-cv-00093-JR Document 30 Filed 02/25/20 Page 3 of 12

the same day the package was discovered by Officer McDaniel, Ms. Rasmussen sent Petitioner an email with the package's tracking number, saying, "I reached out. 70171450000084946239."[1] Id.

On January 31, 2018, Aguilar issued an Incident Report charging Petitioner with violation of Prohibited Act Code 111 for the "Introduction or making of any narcotics, marijuana, drugs or related paraphernalia not prescribed for the individual by medical staff." Chetwood Decl., Exh. B, p. 1. The narrative in the report stated that Petitioner "facilitated and arranged with an outside person, to have narcotic soaked papers to be sent to another inmate housed at FCC Lompoc-FCI (Low)." Id. Upon receipt of the Incident Report, Petitioner stated, "I have no comment due to possible charges being brought by outside law enforcement agencies." Id.

On February 5, 2018, the United Discipline Committee ("UDC") referred the matter to the Discipline Hearing Officer ("DHO") for further hearing. Chetwood Decl., Exh. B, p. 3. In the referral, the UDC recommended that, contingent on a finding of a violation, the DHO impose the following sanctions: 41 days loss of good time credit, 60 days disciplinary segregation, one-year loss of email and phone privileges, and a disciplinary transfer. Id. The Notice of Disciplinary Hearing delivered to Petitioner identified the alleged violation as "Introduction or making of any narcotics, marijuana, drugs or related paraphernalia not prescribed for the individual by medical staff." Chetwood Decl., Exh. C, p. 1.

---

[1] Aguilar also considered other emails exchanged between Petitioner and Rasmussen both before and after the package was received at FCI Lompoc, which appeared to reveal that Petitioner was aware of the package being sent and anticipating its arrival.

On February 13, 2018, DHO William J. Chetwood conducted a disciplinary hearing. Chetwood Decl., Exh. 3. At the hearing, Petitioner did not request a staff representative and did not call witnesses or present evidence in his defense. Chetwood Decl., Exh. 3, p. 1. Petitioner "neither admit[ed] or denie[d] the charge(s)." Id. Chetwood described that petitioner "acknowledged his rights before the DHO. After being read the incident report, he stated, 'I talked to Aguilar at length, I didn't think I was going to get a shot. I know of other drug issues.'" Id. Petitioner also submitted a written statement, as follows:

> Staff should be held to same or higher standard as far as following rules & program statement. AW Garcia has already told mailroom & SIS to STOP OPENING LEGAL MAIL.
>
> If package was "suspicious" they could of still opened & inspected in front of inmate per policy, returned to sender or called law office. Excuse to open legal mail. NOTHING IN POLICY ALLOWS!
>
> Aguilar told Lt. Corn he didn't want to write shot, came from over his head.
>
> Person who was receiving mail got no shot. Only reason I did was because I got tracking emailed to me. Both of us communicated with same guy for legal help. No emails of me asking for drugs or me relaying who to mail to. Did I get his tracking by mistake?
>
> What is "designer drugs"?? Has it been tested? Does anyone even know what it is? Could be coffee spill for all we know!
>
> My paralegal has sent real lawyer twice to see me and have me sign documents while at Lompoc to evict people.
>
> No history of drug sales EVER, nothing found in my property or locker and no money transfers or large deposits. Only same 4 family members send me money.
>
> NUMEROUS ERRORS on shot ie (date, emails being sent, emails out of context to fit narrative, opening legal mail).

Chetwood Decl., Exh. F (emphasis in original).

On February 16, 2018, DHO Chetwood completed his Disciplinary Hearing Officer Report. Chetwood Decl., Exh. D. DHO Chetwood concluded that Petitioner committed the Prohibited Act as charged. Id. In reaching this decision, he relied upon written statements from Aguilar, Petitioner's statements to the investigator and the UDC, photographic evidence depicting the mail items and NIK polytest, memoranda from Officer McDaniel and Technician Aguilar describing how the mail items were discovered and tested, Petitioner's email communications with Rasmussen (in particular the email containing the tracking number of the package), and Petitioner's statement at the DHO hearing and his written submission. Id. at pp. 2-3. DHO Chetwood rejected Petitioner's claim that the report writer only wrote the incident report because he was ordered to do so and found Petitioner's claim he was emailed the tracking number by mistake to be incredible. Id. at p. 3. The DHO found that Petitioner's claim that he had "no history of drugs" did not have a bearing on the charge against him, and considered Petitioner's statement that he "knew of other drug issues" adversely, as it suggested Petitioner was purposely withholding potentially incriminating information. Id. at p. 4. DHO Chetwood imposed sanctions of 41 days loss of good conduct time, 60 days of disciplinary segregation (suspended pending 180 days of clear conduct), 180 days loss of commissary privileges, and one-year loss of social visiting privileges (suspended pending 180 days of clear conduct). Id.

Petitioner exhausted his administrative remedies. On January 18, 2019, he filed his Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 with this Court asking that the disciplinary action be expunged from his record and that his 41 days of good conduct time be restored. Petitioner alleges the DHO hearing was procedurally flawed because the hearings officer was not fair and impartial. He alleges that DHO Chetwood communicated with

Technician Aguilar in advance of the hearing and agreed to impose "minimal sanctions" if Petitioner did not fight the charges. Petitioner also alleges he did not receive adequate notice of the charges against him. Petitioner alleges the NIK tests are not able to detect "designer drugs," including K2 or Spice, that NIK testing kits have a limited "shelf life," and that the Bureau of Prisons ("BOP") has not shown that the kits used in his case were not expired. Finally, Petitioner alleges that the NIK tests have known reliability issues with respect to testing paper for amphetamines. Respondent contends that Petitioner is not entitled to habeas corpus relief because the disciplinary proceeding comported with due process requirements and because the DHO's finding was supported by sufficient evidence.

After briefing was completed, Petitioner filed a Motion for Discovery seeking production of 11 categories of documents. Respondent objects to Petitioner's Motion on the basis that the requests do not meet the threshold for discovery in a habeas case.

## LEGAL STANDARDS

Under 28 U.S.C. § 2241, a district court may grant habeas relief when a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c) (3). "A necessary predicate for the granting of federal habeas relief [to a petitioner] is a determination by the federal court that [his] custody violates the Constitution, laws, or treaties of the United States." Rose v. Hodges, 423 U.S. 19, 21 (1975) (citing 28 U.S.C. § 2241).

## DISCUSSION

### I. Procedural Due Process

"Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell,

418 U.S. 539, 556 (1974). Instead, due process requirements are met if the inmate receives: 1) advance written notice of the charges and the evidence against him; 2) an opportunity to present documentary evidence and witnesses; 3) legal assistance if the charges are complex or the inmate is illiterate; 4) an impartial decision-maker; 5) a written statement describing the reasons for the disciplinary action; and 6) a disciplinary decision supported by "some evidence" in the record. Id. at 563, 566, 570; Superintendent v. Hill, 472 U.S. 445, 454-55 (1985).

Petitioner first contends that DHO Chetwood was not impartial. A fair trial in a fair tribunal is a basic requirement of due process that applies in prison disciplinary proceedings. In re Murchison, 349 U.S. 133, 136 (1955); Wolff, 418 U.S. at 570-71. Fairness requires an absence of actual bias and of the probability of unfairness. Murchison, 349 U.S. at 136. Bias may be actual, or it may consist of the appearance of partiality in the absence of actual bias. Stivers v. Pierce, 71 F.3d 732, 741 (9th Cir. 1995). A showing that the adjudicator has prejudged, or reasonably appears to have prejudged, an issue is sufficient. Kenneally v. Lungren, 967 F.2d 329, 333 (9th Cir.1992). There is a presumption of honesty and integrity on the part of decision makers which may be overcome by evidence of a risk of actual bias or prejudgment based on special facts and circumstances. Withrow v. Larkin, 421 U.S. 35, 46-47, 58 (1975).

Petitioner contends DHO Chetwood was biased because he communicated in advance of the hearing with Technician Aguilar and agreed to prearrange the result of the hearing and the sanctions to be imposed. In an Affidavit attached to his Petition, Petitioner avers that Aguilar told him that Aguilar's boss required Aguilar to write up a shot on someone, and that because Petitioner had the tracking number, it would be him. He states that Aguilar further told him,

"If you take the shot on the chin and you don't fight it, I will make sure that you don't do any DS time and that you will receive much easier sanctions. If you do fight this, I will make sure that you do 180 days more in the SHU and that you receive the maximum sanctions and I will also personally contact the AUSA and ask them to prosecute you." Petitioner states he "chose not to fight" the charges. Petitioner further states that when he went into the disciplinary hearing, DHO Chetwood told Petitioner, "I have already talked to SIS Aguilar and he told me the deal." According to Petitioner, DHO Chetwood kept the deal and imposed "ridiculously lenient punishment."

Petitioner's theory is not persuasive. First, Petitioner did not "take the shot on the chin" as the alleged agreement with Technician Aguilar required. While Petitioner did not admit or deny the allegations or present any witnesses, he did provide a lengthy list of objections. Also, Petitioner's argument that he received no disciplinary segregation is belied by the fact that he was immediately placed in the Special Housing Unit and remained there for several weeks prior to the disciplinary hearing. The DHO imposed a suspended sentence of 60 additional days of disciplinary segregation and an additional suspended sentence of one year of loss of visitation privileges pending six months of clear conduct. Under these circumstances, petitioner has not established that DHO Chetwood was not impartial.

**II. Fair Notice of Charge**

Petitioner also contends that he did not receive fair notice of the charges against him. He argues that the record is ambiguous regarding the substance he is alleged to have introduced into the prison. "In the prison context, the law requires less in the way of notice," and "[f]ederal courts defer to prison authorities' interpretation of prison rules unless fair notice was clearly

lacking." Ely v. McGrew, Case No. CV 12-5266-JFW(OP), 2014 WL 3941578, at *4 (C.D. Cal. June 3, 2014) (internal citations and quotations omitted) report and recommendation adopted as modified by 2014 WL 3941584 (C.D. Cal. Aug. 12, 2014). The sufficiency of the notice hinges upon whether it allows the prisoner to "marshal the facts" to prepare a defense. Wolff, 418 U.S. at 564.

Here, fair notice was not "clearly lacking." The Incident Report charged Petitioner with the prohibited act of "[i]ntroduction or making of any narcotics, marijuana, drugs or related paraphernalia not prescribed for the individual by medical staff," and stated that Petitioner "facilitated and arranged with an outside person, to have narcotic soaked papers to be sent to another inmate housed" at the institution. Chetwood Decl., Exh. 2, p. 1. This was sufficient notice to Petitioner of the charged prohibited conduct.

## III. Sufficiency of Evidence

Petitioner also challenges the sufficiency of the evidence supporting DHO Chetwood's decision to sustain the Code 111 charge. As noted, judicial review of a prison disciplinary decision is limited; this Court cannot overturn the disciplinary decision of prison officials so long as the decision is supported by "some evidence." Hill, 472 U.S. at 455-56. The "some evidence" standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." Id. Indeed, in examining the record, a court is not to make its own assessment of the credibility of witnesses or re-weigh the evidence. Hill, 472 U.S. at 455. Rather, the standard "is minimally stringent, such that a decision will be upheld if there is *any* evidence in the record that *could* support the conclusion reached by the disciplinary board." Powell v. Gomez, 33 F.3d 39, 41 (9th Cir. 1994) (emphasis in original).

Here, Petitioner contends that the result of the NIK chemical testing kit used to identify the paper as containing amphetamines lacked sufficient reliability to support the disciplinary sanction. He argues that chemical field tests of the type used are proven to be unreliable, that there is no evidence that the agent who conducted the NIK test was adequately trained, and that the agent used the test kit improperly. In essence, Petitioner argues the lack of confirmation testing renders the initial test results void.

Numerous courts have held that a prisoner does not have a constitutional right to an additional drug test to verify the results of an initial positive test. White v. Stansil, Case No. 2:15-cv-0242-EFB P (TEMP), 2016 WL 4009954, at *6 (E.D. Cal. July 25, 2016) (collecting cases). Moreover, DHO Chetwood relied upon multiple sources of evidence to determine Petitioner violated prison rules: detailed communications between Petitioner and the supplier of the contraband which included a message from the supplier containing the exact tracking number of the sized envelope; photographs documenting the appearance of the papers in question and evidencing the testing process; staff memoranda; the positive test results; and statements from Petitioner confirming his relationship with the sender. DHO Chetwood also found Petitioner lacked credible explanations and made demonstrably false statements. Despite Petitioner's contention that the NIK test was not reliable, this Court finds some evidence in the record to support DHO Chetwood's finding that Petitioner committed the prohibited act. See White, 2014 WL 4009954, at *6 (independent confirmatory testing could, at best, be used to attack the accuracy of the prison's drug testing procedures and would not necessarily discount the fact that "some evidence" supported the conclusion of the disciplinary board).

## III. Discovery Motion

As noted, after the briefing was completed in this case, petitioner filed a motion for discovery seeking several categories of documents. "Habeas petitioners are not routinely entitled to discovery." Bracy v. Gramley, 520 U.S. 899, 904 (1997). The discovery provisions of the Federal Rules of Civil Procedure do not generally apply. Harris v. Nelson, 394 U.S. 286, 295 (1969). "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." See Rule 6(a) of the Rules Governing § 2254 Cases.[2] Good cause is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy, 520 U.S. at 908-09 (citing Harris, 394 U.S. 286). As discussed above, Petitioner has not presented allegations demonstrating that he is entitled to relief. Accordingly, Petitioner has not shown good cause and is therefore not entitled to the discovery requested.

## IV. Evidentiary Hearing

Petitioner requests the Court hold an evidentiary hearing. In habeas proceedings, however, "an evidentiary hearing is not required on issues that can be resolved by reference to the [underlying] record." Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998). Accordingly, petitioner's request for an evidentiary hearing should be denied.

---

[2]The Rules Governing Section 2254 Cases apply to § 2241 habeas petitions. See Rule 1(b) of the Rules Governing Section 2254 Cases ("[t]he district court may apply any or all of these rules to a habeas corpus petition not covered by" § 2254).

## CONCLUSION

For these reasons, the Petition for Writ of Habeas Corpus (ECF No. 1) and Petitioner's Motion for Discovery (ECF No. 20) should be DENIED and a judgment of DISMISSAL should be entered.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 25th day of February, 2020.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge

# EXHIBIT 3

Oregon ECF 39

Opinion and Order adopting the Findings and Recommendation, filed May 18, 2020, 2 pages.

Blue rectangular outlines are added emphasis.
Original ECF page numbers control.
Complete document included.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**BILLY F. STEFFEY**,

Petitioner

v.

**WARDEN J. SALAZAR**,

Respondent.

Case No. 3:19-cv-00093-JR

OPINION AND ORDER

**MOSMAN, J.**,

On February 25, 2020, Magistrate Judge Jolie A. Russo issued her Findings and Recommendation ("F&R") [ECF 30], recommending that this court deny Mr. Steffey's Petition for Writ of Habeas Corpus [ECF 1] and Motion for Discovery [ECF 20]. Mr. Steffey objected. [ECF 37]. Mr. Salazar filed a response. [ECF 38]. Upon review, I agree with Judge Russo, and I DENY both the petition and the motion.

//

## DISCUSSION

The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge but retains responsibility for making the final determination. The court is generally required to make a de novo determination regarding those portions of the report or specified findings or recommendation as to which an objection is made. 28 U.S.C. § 636(b)(1)(C). However, the court is not required to review, de novo or under any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the F&R to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 149 (1985); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). While the level of scrutiny under which I am required to review the F&R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any part of the F&R. 28 U.S.C. § 636(b)(1)(C).

## CONCLUSION

Upon review, I agree with Judge Russo's recommendation and I ADOPT the F&R [30]. I DENY Mr. Steffey's Petition for Writ of Habeas Corpus [1] and, consequently, DENY his Motion for Discovery [20].

IT IS SO ORDERED.

DATED this 18th day of May, 2020.

*Michael W. Mosman*
MICHAEL W. MOSMAN
United States District Judge

# EXHIBIT 4

Oregon ECF 40

Judgment, filed May 18, 2020, 1 page.

Blue rectangular outlines are added emphasis.
Original ECF page numbers control.
Complete document included.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**BILLY F. STEFFEY**,

Petitioner

v.

**WARDEN J. SALAZAR**,

Respondent.

Case No. 3:19-cv-00093-JR

JUDGMENT

**MOSMAN, J.**,

In light of my order [ECF 39] denying Mr. Steffey's Petition for Writ of Habeas Corpus [ECF 1] , it is ordered and adjudged that this case is DISMISSED.

DATED this 18th day of May, 2020.

Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge

# EXHIBIT 5

Oregon ECF 63

Order, filed June 23, 2026, 11 pages.

Blue rectangular outlines are added emphasis.
Original ECF page numbers control.
Complete document included.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**BILLY F. STEFFEY,**

Petitioner,

v.

**WARDEN, FCI LOMPOC,**[1]

Respondent.

Case No. 3:19-cv-93-JR

**ORDER**

**Michael H. Simon, District Judge.**

On January 18, 2019, Petitioner filed a Petition for Writ of Habeas Corpus. ECF 1. In his Petition, Mr. Steffey challenged a disciplinary hearing in which he lost 41 days of good-time credit. Prison officials accused Petitioner of "[i]ntroduction or making of any narcotics, marijuana, drugs or related paraphernalia not prescribed for the individual by medical staff." ECF 30 at 3. In his Petition, Mr. Steffey raised arguments about the investigator assigned to his case and the "NIK" test that was used to determine if the substance at issue contained narcotics.[2]

[1] The Court replaces Warden Salazar, who no longer serves as the Warden of FCI Lompoc, having passed away since the filing of Petitioner's original habeas case, with a generic reference to the warden, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] Although not raised in his Petition, Mr. Steffey also argued in his supporting brief, prepared by appointed counsel, that he was not provided with "fair notice." Judge Russo rejected this argument. ECF 30 at 8-9.

ECF 1 at 7. He contended that the tests were being used improperly, "manipulat[ed]," and used after their expiration dates. *Id.* Petitioner also alleged that the misuse of the NIK tests resulted in "false positives" and that prison staff knew about these false positives. *Id.* at 8.

On February 25, 2020, U.S. Magistrate Judge Jolie A. Russo issued Findings and Recommendation, recommending that the Court deny the Petition. ECF 30. On May 18, 2020, the Court adopted the Findings and Recommendation and entered Judgment denying Petitioner's Petition. *See* ECF 39, 40.

On January 26, 2026, Petitioner filed a Motion for Relief from Judgment, and on January 30, 2026, filed an Amended Motion for Relief from Judgment, seeking relief under Rule 60 of the Federal Rules of Civil Procedure and generally based on "fraud on the court." *See* ECF 43, 45. The Court requested that Petitioner show cause in writing why his motion should not be denied because his Petition appeared to be moot and thus the Court could not provide any relief in this case if the Court granted the requested relief from Judgment. ECF 49. Petitioner argued, among other things, that his Petition was not moot because he suffered ongoing collateral consequences in employment and in a custody dispute for his partner's children. ECF 51. The Court rejected this argument, relying on *Spencer v. Kemna*, 523 U.S. 1 (1998), and denied Petitioner's motion for relief from judgment. ECF 53.

Now before the Court is Petitioner's motion to amend or alter the judgment under Rule 59(e) of the Federal Rules of Civil Procedure. Petitioner challenges the Court's Order denying Petitioner's motion for relief from judgment.[3] Petitioner now argues that the Court failed to consider binding precedent from the Ninth Circuit and based its decision on material factual

---

[3] Although the Court did not enter a judgment after deciding Plaintiff's motion for reconsideration, a "judgment" for purposes of the Federal Rules of Civil Procedure includes "any order from which an appeal lies." Fed. R. Civ. P. 54(a).

misunderstandings. Thus, Petitioner contends, the Court's decision was clearly erroneous or manifestly unjust.

**A. Standards**

**1. Rule 59(e)**

Under Rule 59(e) of the Federal Rules of Civil Procedure, a court has discretion to alter or amend a judgment if: (1) it is presented with newly discovered evidence; (2) it committed clear error or made an initial decision that was manifestly unjust; or (3) there is an intervening change in controlling law. *Ybarra v. McDaniel*, 656 F.3d 984, 998 (9th Cir. 2011); *see also McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999) (emphasis in original) ("A motion for reconsideration under Rule 59(e) should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed *clear error*, or if there is an intervening change in the controlling law." (cleaned up)). "Although Rule 59(e) permits a district court to reconsider and amend a previous order, the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (quotation marks omitted).

"A Rule 59(e) motion may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Id.* (emphasis in original). To establish entitlement to reconsideration under Rule 59 based on newly discovered evidence, the movant must show that: "(1) the evidence was discovered after trial, (2) the exercise of due diligence would not have resulted in the evidence being discovered at an earlier stage and (3) the newly discovered evidence is of such magnitude that production of it earlier would likely have changed the outcome of the case." *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 929 (9th Cir. 2000); *see also Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992-93 (9th Cir.

2001). A motion under Rule 59(e) must be filed within 28 days of the entry of judgment. Fed. R. Civ. P. 59(e).

**2. Mootness**

Section 2241 authorizes habeas relief for federal prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(1), (3). "[T]he Ninth Circuit has long held that 'the writ of habeas corpus is limited to attacks upon the legality or duration of confinement . . . .'" *Pinson v. Carvajal*, 69 F.4th 1059, 1065 (9th Cir. 2023) (quoting *Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979)). When success on a petitioner's claims would not necessarily result in immediate or earlier release from confinement, those claims do not fall within the "core of habeas corpus." *See Nettles v. Grounds*, 830 F.3d 922, 927-35 (9th Cir. 2016).

A petitioner's release from custody and conclusion of supervised release generally causes the petition to become moot because it no longer presents "an actual injury traceable to the defendant" that is likely to be "redressed by a favorable judicial decision." *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990)). Certain collateral consequences, such as those that inherently arise from a criminal conviction, are sufficient to constitute redressable injury in habeas even after the completion of a petitioner's sentence. *Id.* at 8.

**B. Discussion**

Petitioner relies on *Robbins v. Christianson*, 904 F.2d 492 (9th Cir. 1990), to argue that his Petition is not moot. If his Petition is not moot, the Court would need to reconsider its Order of May 6, 2026, denying Petitioner's motion for relief from the judgment of May 18, 2020, based on mootness. That would lead to evaluating Petitioner's Rule 60 motion on the merits and, if that motion is granted, setting aside the May 2020 judgment and reopening Petitioner's original

Petition challenging his disciplinary hearing. Petitioner would then move forward litigating his Petition—a briefing schedule would be set on that Petition and, ultimately, the Court would decide that Petition on the merits. Because the result of Petitioner's motion would be a decision on the merits of his Petition challenging his disciplinary hearing, his disciplinary hearing must give rise to collateral consequences sufficient to keep his Petition justiciable.

Petitioner argues that his circumstances are directly governed by *Robbins*. Petitioner, however, did not raise *Robbins* in responding to the Court's Order to Show Cause. Generally, a motion under Rule 59(e) may not be used to raise arguments that could have been raised earlier. *See Kona Enters.*, 229 F.3d at 890. The Court, however, gives latitude to Petitioner based on his status as a pro se litigant. *See generally Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). Thus, the Court will consider Petitioner's argument based on *Robbins*.

**1. Whether *Robbins* was abrogated by *Spencer***

A Ninth Circuit panel opinion remains binding authority unless overruled by an en banc decision of the circuit or "where 'intervening Supreme Court authority is clearly irreconcilable with . . . prior circuit authority." *Fiedler v. United States*, 165 F.4th 1310, 1317 (9th Cir. 2026) (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc)). "The clearly irreconcilable requirement is a high standard that demands more than mere tension between the intervening higher authority and prior circuit precedent." *Id.* (cleaned up). Thus, if a court can apply the panel decision consistent with the higher authority, the court "must do so." *Id.* (quoting *United States v. Eckford*, 77 F.4th 1228, 1233 (9th Cir. 2023)).

*Robbins* involved a petition for writ of habeas corpus challenging a disciplinary decision that resulted from a finding that Robbins had been using restricted drugs. 904 F.2d at 493. Robbins had been unconditionally released by the time the district court reviewed the petition, and so the district court dismissed the petition as moot. *Id.* The Ninth Circuit explained that the

petition may not be moot if "the prisoner can show that he will suffer some collateral legal consequences if the challenged conviction is allowed to stand." *Id.* at 494. In considering what might constitute sufficient legal consequences, the Ninth Circuit discussed at length the U.S. Supreme Court's decision in *Lane v. Williams*, 455 U.S. 624 (1982). *Id.* at 494-95.

The court in *Robbins* noted that the Supreme Court had found sufficient collateral consequences when "the prisoners had been able to show an immediate injury such as the fact that the prisoner could not engage in certain businesses, could not serve as an official of a labor union, could not vote in local elections and could not serve as a juror." *Robbins*, 904 F.2d at 494 (citing *Lane*, 455 U.S. at 632). The Ninth Circuit also noted that a mere parole violation was insufficient, and that the Supreme Court rejected such claims where the prisoner "would be affected by '[a]t most, certain non-statutory consequences . . . [such as] employment prospects, or the sentence imposed in a future criminal proceeding.'" *Id.* at 495 (alterations in *Robbins*) (quoting *Lane*, 455 U.S. at 632). This was because

> it was more likely that an employer or a court would be influenced by the underlying conduct which had caused the parole revocation rather than the mere fact that the prisoners had violated parole. Since the prisoners had not challenged the findings that their conduct had violated the terms of their parole, but had only challenged the fact that they had been returned to custody, the Court stated that it was unable to provide any relief via a habeas corpus proceeding.

*Id.* (citing *Lane*, 455 U.S. at 633).

The Ninth Circuit in *Robbins* emphasized that "[t]his circuit has not said what result is appropriate when a prisoner attacks the finding of misconduct that caused his parole to be revoked or his sentence to be lengthened." *Id.* The court "assum[ed]" that Robbins had to show that "he will suffer actual harm." *Id.*

The *Robbins* court held that two collateral consequences were sufficient to avoid mootness: (1) the potential detriment in any future charge or conviction of a federal offense; and

(2) likely future employment consequences. *Id.* at 495-96. For the latter, the Ninth Circuit noted that although an employer may be affected by someone's underlying felony, there also was the threat of employment discrimination in the disciplinary proceedings because Robbin's disciplinary charge involved drugs. *Id.* The *Robbins* court emphasized that were the conduct other than drug-related, it "would seem very speculative" to find collateral consequences but that "the threat of discrimination is much more real when drug charges are involved." *Id.* This is because of society's highly negative view about illegal drugs. *Id.* As summarized by the Ninth Circuit, "The charge against Robbins was that he was a user of illicit drugs. Given the present climate in our society regarding drug use, that is no minor matter." *Id.* This rendered the potential employment harm "not too ephemeral to constitute a collateral consequence for mootness purposes." *Id.*

The Supreme Court in *Spencer* summarized the history of its previous opinions regarding the development of the "presumption" of collateral consequences, and with respect to that doctrine as applied to revocation of parole quoted similar passages from *Lane* that the Ninth Circuit quoted and cited in *Robbins*. *Spencer*, 523 U.S. at 12-13. These included that challenges to employment prospects had been rejected as "nonstatutory consequences" that were "dependent upon '[t]he discretionary decisions . . . made by an employer or a sentencing judge,' which are 'not governed by the mere presence or absence of a recorded violation of parole,' but can 'take into consideration, and are more directly influenced by, the underlying conduct that formed the basis for the parole violation.'" *Id.* at 13 (quoting *Lane*, 455 U.S. at 632-33).

Regarding whether to apply a presumption of collateral consequences, the court in *Spencer* concluded that it would "adhere to the principles announced in *Lane* and decline to presume that collateral consequences adequate to meet Article III's injury-in-fact requirement resulted from petitioner's parole revocation." *Id.* at 14. Instead, the petitioner must

"demonstrate[] such consequences." *Id.* This conclusion is not "clearly irreconcilable" with *Robbins*, because *Robbins* presumed that Robbins had to show actual harm. *Robbins*, 904 F.2d at 495.

After deciding not to apply a presumption of collateral consequences, the Supreme Court in *Spencer* evaluated whether the petitioner had demonstrated any collateral consequences. The Supreme Court specifically analyzed and rejected that any potential negative effect from revocation of parole on a future parole hearing, future sentencing, or future prosecution was a valid collateral consequence. *Id.* at 14-16. The *Spencer* court also rejected a collateral consequence based on using a finding for impeachment if the petitioner were ever called in the future as a witness. *Id.* at 15-16. Thus, *Spencer* abrogated the first finding of collateral consequences in *Robbins* involving effects on any potential future charge or conviction for a federal offense. *See, e.g.*, *Wilson v. Terhune*, 319 F.3d 477, 481 n.5 (9th Cir. 2003) ("*Robbins* also concluded that the possibility of a harsher sentence in any future criminal proceedings was another collateral consequence sufficient to prevent mootness. This type of collateral consequence was rejected in *Spencer*, in which the Court stated that the habeas petitioner is expected to prevent such a possibility by avoiding violating the law." (citation omitted)); *Maxwell v. Neotti*, 2010 WL 3338806, at *7 n.6 (S.D. Cal. July 15, 2010), *report and recommendation adopted*, 2010 WL 3338803 (S.D. Cal. Aug. 24, 2010) ("[I]n *Spencer*, the Supreme Court did not expressly address the distinction between a challenge to the misconduct and a challenge to the disciplinary conviction in rejecting the argument that a negative impact on future parole proceedings constitutes a collateral consequence and, thus, it appears *Spencer* abrogated *Robbins*.").

In *Spencer*, the Supreme Court did not address whether the petitioner had *demonstrated* a collateral consequence involving employment opportunities. The only discussion regarding

employment opportunities was in the context of discussing *Lane* in the section resolving whether to apply a *presumption*. Thus, *Spencer* is not "clearly irreconcilable" with the *Robbins* analysis on whether a prisoner convicted of a disciplinary charge based on a drug offense has demonstrated a collateral consequence. Courts in this circuit continue to apply the analysis from this portion of *Robbins*. *See, e.g.*, *Wilson*, 319 F.3d at 481-82 (applying and distinguishing this portion of *Robbins* while also noting the separate portion of *Robbins* that was abrogated in *Spencer*; concluding that Wilson failed to show the necessary collateral consequences because unlike Robbins, Wilson did not challenge the underlying conduct that gave rise to the disciplinary charge); *Santos v. Holland*, 2017 WL 111627, at *5 (E.D. Cal. Jan. 10, 2017), *subsequently aff'd*, 761 F. App'x 707 (9th Cir. 2019) (quoting *Robbins* and concluding that gang validation resulting in extended placement in security housing unit presented a live case or controversy even after the petitioner was removed from that housing unit because it presented collateral consequences that were "not too ephemeral").

*Robbins*' discussion about how future employment consequences can be shown in the context of a prison disciplinary charge remains good law. Thus, the Court next considers whether *Robbins* presents a sufficient basis to provide relief under Rule 59(e).

**2. Rule 59(e) Motion**

No party brought *Robbins* to the Court's attention when the Court was resolving Petitioner's motion for relief from judgment and the Court specifically asked for briefing regarding mootness. *Robbins* is directly on point regarding Petitioner's claim of ongoing collateral consequences related to employment.

*Robbins* concluded that the mere chance that an employer "may" find out about a prison disciplinary charge that involves illicit drug use presents sufficient collateral consequences to maintain a live case or controversy for a habeas petition challenging the validity of that

disciplinary proceeding. 904 F.2d at 496. As discussed, this conclusion was based on the Ninth Circuit's consideration of society's negative view of illicit drug use. The Ninth Circuit stated this view was demonstrated by "harsh criminal penalties, random drug testing of employees, and high visibility government campaigns against the drug menace." *Id.* (citations omitted). All of those factors remain just as relevant today, which supports finding a live case or controversy. Accordingly, under *Robbins*, his case is not moot.

Respondent argues that Petitioner's claim involving a disciplinary proceeding is not within the "core" of habeas and thus is not cognizable. That only matters, however, outside the context of collateral consequences. When evaluating a habeas petition after release, so long as Petitioner had a valid claim under habeas when he originally filed (which no one disputes), then the Court only looks to whether his current allegations raise sufficient collateral consequences. He does not independently need to raise a claim within the core of habeas. *Cf. Spencer*, 523 U.S. at 7 (explaining that the issue when a habeas petitioner has been released is not whether he is "in custody" as required under the habeas statute, but whether he claims sufficient "collateral consequences").

The Court relied on mootness in denying Petitioner's Rule 60 motion for relief from judgment. The Court, however, also noted in a footnote that it would have denied the motion on the merits because Petitioner argued that the NIK test was "inaccurate" but Judge Russo had found "some evidence" supporting the disciplinary finding in addition to the NIK test. Petitioner disputes this footnote by challenging the other evidence relied on by Judge Russo. Petitioner, however, only based his Rule 60 motion on a challenge to the NIK test, not against the other evidence cited by Judge Russo. Nonetheless, the Court acknowledges that based on Petitioner's pro se status, he might not have understood the statement by Judge Russo as relying on evidence *in addition to* the NIK test as opposed to not accepting Petitioner's contention *about* the NIK

test, such that he believed it necessary to raise these arguments in his Rule 60 motion. *See* ECF 30 at 10 ("Despite Petitioner's contention that the NIK test was not reliable, this Court finds some evidence in the record to support DHO Chetwood's finding that Petitioner committed the prohibited act."). Accordingly, the Court will not preclude Petitioner from litigating his Rule 60 motion on the merits and raising these new arguments. Thus, Petitioner may file a further amended Rule 60 motion.

The Court finds that it would be manifestly unjust to allow the Order dated May 6, 2026 denying Petitioner's Rule 60 motion to stand in light of the new arguments raised by Petitioner based on *Robbins* and the Court's conclusion that the Petition is not moot under that case. The Court, therefore, grants Petitioner's Rule 59(e) motion. The parties shall confer and provide the Court with a proposed expedited briefing schedule on a further amended Rule 60 motion.

**C. Conclusion**

The Court GRANTS Petitioner's Amended Motion for Relief from Judgment, ECF 54. The parties shall confer and provide the Court by June 26, 2026, with a proposed expedited briefing schedule on Petitioner's Rule 60 motion, as discussed herein.

**IT IS SO ORDERED.**

DATED this 23rd day of June, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge

# EXHIBIT 6

Oregon ECF 37 and 37-1 through 37-3

Objections and attachments, filed April 23, 2020, 56 pages in the supplied combined record (12, 36, 5, and 3 pages respectively).

Blue rectangular outlines are added emphasis.
Original ECF page numbers control.
Complete document included.

**Elizabeth G. Daily, OSB #111758**
**Assistant Federal Public Defender**
**Email: liz_daily@fd.org**
**101 SW Main Street, Suite 1700**
**Portland, OR 97204**
**Tel: (503) 326-2123**
**Fax: (503) 326-5524**

**Attorney for Petitioner**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **BILLY F. STEFFEY,**<br><br>**Petitioner,**<br><br>**v.**<br><br>**WARDEN J. SALAZAR,**<br><br>**Respondent.** | **Case No. 3:19-cv-00093-JR**<br><br>**PETITIONER'S OBJECTIONS TO FINDINGS AND RECOMMENDATION** |

**Introduction**

Pursuant to 28 U.S.C. 636(b)(1)(C), Billy F. Steffey, through counsel, objects to Magistrate Judge Russo's findings and recommendation that his petition for writ of habeas corpus be denied. CR 30. On de novo review, this Court should reject the findings and recommendation and grant the petition for writ of habeas corpus. The loss of good conduct time in this case was premised on allegations that Mr. Steffey arranged for papers soaked with "liquid narcotics" to be introduced into prison through purported legal mail. But the narcotics identification kit (NIK test) used to test the paper is a test that lacks sufficient indicia of reliability to contribute to the "some evidence"

standard. Not only is the test scientifically invalid and unreliable generally, it was used in this case in express contravention of the manufacturer's directions, producing an invalid result.

The Court should grant the habeas corpus petition, and order the Bureau of Prisons (BOP) to expunge the disciplinary action and restore Mr. Steffey's 41 days of good conduct time credit.

**Custody Status**

Mr. Steffey is in prerelease custody of the Bureau of Prison on home confinement. His projected release date from the present term of imprisonment is September 9, 2020.

**Argument**

**A. The "Some Evidence" Standard For Substantive Due Process Requires Reliable Evidence.**

Prisoners have a constitutionally protected liberty interest in good conduct time credits. *Wolff v. McDonnell*, 418 U.S. 539 (1974). That interest cannot be infringed without appropriate procedural protections and a sufficient quantum of proof. *Superintendent v. Hill*, 472 U.S. 445, 453-54 (1985). Substantively, the requirements of due process are satisfied only when the decision to revoke good time credits is supported by "some evidence." *Id.* at 455.

The "some evidence" standard articulated in *Hill* is not toothless. While the BOP has a strong interest in "avoiding burdensome administrative requirements that might be susceptible to manipulation" and in "act[ing] swiftly on the basis of evidence that might be insufficient in less exigent circumstances," *id.* at 455-56, those interests must be balanced against the prisoner's important liberty interest in good conduct time. A prisoner's loss of good conduct time credits "threatens his prospective freedom from confinement by extending the length of imprisonment." *Id.* at 445. Under the Administrative Procedures Act, applicable to the BOP, agency action cannot

be arbitrary, capricious, or an abuse of discretion. *See Tablada v. Thomas*, 533 F.3d 800, 805 (9th Cir. 2008) (citing 5 U.S.C. § 706(2)(A)).

Thus, "some evidence" does not mean "any evidence." Rather, the law is well established that evidence must bear "some indicia of reliability" to satisfy due process. *Castro v. Terhune*, 712 F.3d 1304, 1314 (9th Cir. 2013) (quoting *Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990)); *Sira v. Morton*, 380 F.3d 57, 82 (2d Cir. 2004) (due process requires an independent assessment of the confidential informant's credibility). When evidence is not shown to be reliable, the court must disregard that evidence to determine whether the disciplinary action is supported. *Broussard v. Johnson*, 253 F.3d 874, 877 (5th Cir. 2001) (disregarding informant's tip and holding that bolt cutters found in area where prisoner worked with others, standing alone, did not provide some evidence that the prisoner intended to escape).

**B. The Results Of The NIK Test Should Have Been Disregarded Because NIK Tests Are Not Reliable Indicators Of The Presence Of Controlled Substances.**

Magistrate Judge Russo erred in allowing any consideration of the NIK test results, even as corroboration of other evidence. Case law confirms that, even under the "some evidence" standard, prison officials cannot blindly rely on unreliable testing procedures. *See, e.g.*, *Higgs v. Bland*, 888 F.2d 443, 449 (6th Cir. 1989) (noting that "a test which produced frequent incorrect results could fail to constitute 'some evidence' under the *Hill* standard"); *Henson v. U.S. Bureau of Prisons*, 213 F.3d 897, 898 (5th Cir. 2000) (denying claim that BOP must retest suspected marijuana pipe because the defendant had not shown "that the test is unreliable or that it was improperly administered"); *see also Peer v. Denham*, No. 15-CV-00754-GPG, 2015 WL 5579654, at *6 (D. Colo. Sept. 23, 2015) ("The Court recognizes that, in the context of a prison disciplinary hearing, prison officials generally are entitled to rely on institutional test results, such as the NIK

field test, *absent any evidence of unreliability or irregularity in conducting the tests*." (emphasis added)). In *Spence v. Farrier*, the Eighth Circuit held that unconfirmed urinalysis testing was reliable enough to use in prison disciplinary hearings because that type of test has a low margin of error: "Although it is conceivable that an inmate could be unjustly disciplined as a result of EMIT tests, *the margin of error is insignificant* in light of institutional goals." 807 F.2d 753, 756-57 (8th Cir. 1986) (emphasis added).

Chemical field tests of the type used here are not reliable indicators of the presence of controlled substances. A 2016 investigation by ProPublica and The New York Times found that tens of thousands of people are sent to jail each year based on the kits' results, which "routinely" generate false positives. Ryan Gabrielson & Topher Sanders, *Busted*, PROPUBLICA (Jul 7, 2016), https://www.propublica.org/article/common-roadside-drug-test-routinely-produces-false-positives. According to the reporting, "There are no established error rates for the field tests, in part because their accuracy varies so widely depending on who is using them and how." *Id.* Anecdotally, the article indicates that a Florida laboratory found 21 percent of evidence police identified with field tests as methamphetamine was not methamphetamine. In Harris County, Texas, hundreds of drug convictions were determined to be wrongful after laboratory testing revealed faulty chemical tests. *Id.* Because of their unreliability, the Department of Justice prohibited the use of chemical field tests for evidentiary purposes in 1978. *Id.*

Even the Safariland manufacturer of NIK brand tests states that false positives are known to occur: "False positives are possible in field tests due to the limitations of the science, which is why we also clearly state in our training materials and instructions that they are not a substitute for laboratory testing." Ryan Gabrielson, *Unreliable and Unchallenged*, PROPUBLICA (Oct. 28, 2016), https://www.propublica.org/article/unreliable-and-unchallenged). "In a trial or other criminal

procedure setting . . . field tests should not be used as evidence of the presence, or lack thereof, of any substance." *Id.*

The high incident of false positives for NIK tests is partially due to the subjective nature of the tests and the high risk of user error, but it is also attributable to the fact that NIK tests are not *intended* to provide any evidence of the presence of controlled substances. NIK tests simply indicate the presence of chemical structures that exist within the same family of compounds that can include both controlled and non-controlled substances. *Michel v. United States*, No. 16CV277-GPC(AGS), 2017 WL 4922831, at *3 (S.D. Cal. Oct. 31, 2017). If the chemical reaction with a substance produces a color change, it simply means that the testing reagent has reacted with a similar chemical structure within the targeted family of compounds. According to the Safariland NIK test training materials, "*all test results*, positive or negative should be confirmed by the crime laboratory." *Id.* at *5 (emphasis added; internal citations omitted). The instructions direct users to "[a]lways retain sufficient sample of suspect material for evidential analysis by the forensic laboratory." *Id.* at *5.

Case law and news reports establish that NIK tests and other similar colorimetric field tests produce false positive results with regularity:

**Case Reports**

- In *Peer v. Denham*, No. 15-CV-00754-GPG, 2015 WL 5579654 (D. Colo. Sept. 23, 2015), a federal prisoner was disciplined for dietary supplements that tested "positive" for amphetamines with a NIK test. Confirmatory laboratory testing was ordered—the result: "Controlled substances were not detected." *Id.* at *3.

- In *Terry v. Dep't of Pub. Safety & Corr. Servs.*, No. 11-CV-01686, 2012 WL 2564779 (D. Md. June 29, 2012), *aff'd sub nom. Terry v. Middleton*, 499 F. App'x 64 (4th Cir. 2012), a Maryland state prisoner was disciplined after correctional officers found a "black like tar substance wrapped in saran wrap" that the prisoner claimed was coffee. *Id.* at *1. The NIK field test "first change[d] to orange and then further change[d] from orange to brown" indicating a "positive" result for the

presence of amphetamines. *Id.* The officer "ha[d] been trained and certified to perform NIK field tests since 2006, [and] averred that 'he followed the NIK kit directions.'" *Id.* The substance was eventually sent for confirmatory testing—the result: "No [Controlled Dangerous Substances] Detected." *Id.* at *2.

- In *Blasirue v. Jones*, No. 1:16-cv-00288-TH-KFG (E.D. Tex.) (2017), an inmate lost 41 days good time credit after plant material in a package around his neck yielded a "positive" result on a NIK test. However, confirmatory laboratory testing showed it was simply organic plant material; the result—no controlled substances. The BOP expunged Blasirue's disciplinary violation and restored his good conduct time credit.

- In *Michel v. United States*, No. 16CV277-GPC(AGS), 2017 WL 4922831, (S.D. Cal. Oct. 31, 2017), Customs and Border Protection officers obtained a "positive" NarcoPouch result for methamphetamine from suspicious liquids that the plaintiff attempted to bring over the border. *Id.* at *2. She asserted that the liquid was "cuajo," a substance used to make cheese. *Id.* at *3. Later laboratory testing was performed on the suspected liquids—the result: "negative for methamphetamine." *Id.* at *1.

- In *Fincher v. Monroe Cty. Bd. of Commissioners*, No. 5:18-CV-00424-TES, 2019 WL 510448, at *1 (M.D. Ga. Feb. 8, 2019), plaintiff Dasha Fincher spent 94 days in jail after being arrested for allegedly trafficking methamphetamines after a field drug test yielded a "positive" result. *Id.* The substance in question (which later turned out to be nothing more than blue cotton candy) was later sent to a laboratory for confirmation testing. *Id.* at *2. The result: "[n]o controlled substances." *Id.*

- In *Jenkins v. Fed. Bureau of Prisons*, No. 2:17-CV-1951-AKK-JEO, 2018 WL 992057, at *1 (N.D. Ala. Jan. 11, 2018), *report and recommendation adopted*, No. 2:17-CV-1951-AKK-JEO, 2018 WL 985763 (N.D. Ala. Feb. 20, 2018), a federal prisoner was disciplined based on a "NIK" test performed on a piece of brown paper soaked in some substance, which was discovered during a random search of his cell. The prisoner claimed that the substance was merely Vaseline. Although the case does not report any confirmatory laboratory testing, the BOP later moved to expunge the disciplinary violation and restore the good conduct time credits, rendering the prisoner's § 2241 petition moot.

**News Reports**

- A woman was wrongfully jailed after a field drug test indicated a "positive" test result for crack cocaine; the actual substance—a small crumb of an over-the-counter pain relief medicine. Tim Cushing, *Field Drug Tests: The $2 Tool That Can Destroy Lives*, TECHDIRT (Jul 18, 2016), https://www.techdirt.com/articles/20160712/15543134951/field-drug-tests-2-tool-that-can-destroy-lives.shtml.

- A man received a settlement for an arrest predicated on a drug field test that indicated a "positive" result for methamphetamine; the actual substance—Krispy Kreme donut crumbs. Tim Cushing, *Man Gets $37,500 Payout After Field Drug Test Says Donut Crumbs Are Methamphetamines*, TECHDIRT (Oct 31, 2017), https://www.techdirt.com/articles/20171024/16042838475/man-gets-37500-payout-after-field-drug-test-says-donut-crumbs-are-methamphetamines.shtml.

- In the same state, a man was arrested after a drug field test indicated a "positive" result for cocaine; the actual substance—drywall residue. Laurel Wamsley, *Florida Man Awarded $37,500 After Cops Mistake Glazed Doughnut Crumbs for Meth*, NPR: THE TWO WAY (Oct 16, 2017), https://www.npr.org/sections/thetwo-way/2017/10/16/558147669/florida-man-awarded-37-500-after-cops-mistake-glazed-doughnut-crumbs-for-meth.

- In a highly-publicized August 2019 incident, Georgia college football player Shai Werts was arrested after a substance on the hood of his car tested "positive" for cocaine. Confirmatory laboratory testing was conducted with the result: no controlled substances. Charges were dropped and the player was reinstated to the team after submitting to drug testing. Radley Balko, *Opinion: A Young Black Football Player Was Arrested After Claiming 'Cocaine' on His Car Was Bird Poop. It Was Bird Poop*, THE WASHINGTON POST (Aug. 9, 2019), https://www.washingtonpost.com/opinions/2019/08/09/young-black-football-player-was-arrested-after-claiming-cocaine-his-car-was-bird-poop-it-was-bird-poop/).[1]

- A school resource officer in Washington received a positive result for PCP after testing suspiciously-packaged gumballs handed out on Halloween. Confirmatory testing at the state crime lab determined the candy did not contain any controlled substances. Police explained the mistake as due to the unreliability of the test: "[F]alse positives can happen with sugar-laced items because of the chemical reaction." *'Suspicious' Candy Handed Out in Lake Stevens Did Not Contain PCP, Tests Confirm*, KING 5 NEWS (Nov. 1, 2019), https://www.king5.com/article/news/local/lake-stevens-halloween-candy-preliminary-test-results-pcp/281-1897f704-8365-491d-bc8c-5345f899d6fd.

[1] The Washington Post opinion piece cited 24 other substances that had produced false positive results in field tests, including: "Sage, chocolate chip cookies, motor oil, spearmint, Dr. Bronner's Magic Soap, tortilla dough, deodorant, billiards chalk, patchouli, flour, eucalyptus, breath mints, loose-leaf tea, Jolly Ranchers, vitamins, Krispy Kreme doughnut glaze, air, Tylenol, just about every brand of chocolate at your local convenience store, dry wall, BC powder, cotton candy, powdered sugar and, now, bird poop."

These are among countless nationwide reports of false positive field test results harming citizens and prisoners alike. In *People v. Chacon*, No. JCF36904 (Apr. 24, 2018) (slip opinion attached), the Superior Court of California after a thorough scientific review concluded that NIK test results were not sufficiently reliable to be offered as evidence before the grand jury. The court noted that "the test does not work as marketed by Safariland," and it has "never "been validated[.]" *Id.* at 25-26. Rather, Safariland only tests its kits against "known, pure controlled substances," and has not "conducted testing with any of its kits . . . with real world drug samples under conditions that actually exist." *Id.* at 26. The court found "[m]ultiple examples" of the tests identifying non-controlled substances, like the sugar substitute Equal, which mimics methamphetamine. *Id.* at 27. "The NIK color testing methods fall far short of meeting minimum scientifically acceptable criteria," the court held. *Id.* at 28. "Over all the evidence presented before the court throughout the hearing suggests that colorimetric tests are not accepted by the relevant scientific community as [a] reliable scientific method to identify an illegal drug, presumptive or otherwise." *Id.* at 30.

The "some evidence" standard takes into account not only indicia of reliability for testing procedures, but also the administrative burden attendant on requiring confirmatory testing. *See, e.g.*, *Koenig v. Vannelli*, 971 F.2d 422, 423 (9th Cir. 1992) (retest not required for some evidence standard because of significant administrative burden). Confirmatory laboratory testing of disputed NIK test results would not place an undue administrative burden on the BOP. In fact, the BOP already requires such confirmation for all urine testing. *See* BOP Program Statement 6060.08, *Urine Surveillance and Narcotic Identification* at 5 (stating that the urinalysis contractor must screen samples and that "[a]n initial positive test [must be] confirmed by a second test before it is reported to the institution."). This despite the fact that urine testing methods are much more reliable than colorimetric field tests. *See Spence*, 807 F.2d at 756 (discussing error rate); *Proposed*

*Revisions to Mandatory Guidelines for Federal Workplace Drug Testing Programs*, 69 Fed. Reg. 19673-01 (Apr. 13, 2004) (describing validation). This BOP policy establishes that requiring laboratory confirmation of a screening test would not be unduly burdensome nor would it unduly delay the exigencies of prison discipline.

By contrast to the careful procedures for urine testing, the program statement addressing narcotics identification does nothing to safeguard against arbitrary and erroneous deprivation of good conduct time credits. It states simply, "All lieutenants will be proficient in using the Narcotic Identification Kit and ordinarily are responsible for testing unknown substances." *Id.* at 8. The policy does not state what tests shall be used, how those tests shall be stored, what training and certification is required to demonstrate "proficiency," and what procedures will be used to mitigate instances of false positives.

Because NIK tests are known to provide false positive results, have no established error rate to assess their reliability, and in fact are not designed to test for the actual presence of controlled substances, the NIK test results here did not have sufficient indicia of reliability to be considered in the "some evidence" analysis.

**C. The NIK Test Results Should Have Been Disregarded Because The Tests Were Conducted In Contravention Of The Manufacturer's Directions And Because The Results Were Misinterpreted.**

Even if the NIK colorimetric tests' general lack of reliability would not be sufficient to preclude their use in BOP disciplinary hearings across the board without confirmatory testing, the results in *this* case should have been disregarded because the administrative record definitively establishes that the tests were conducted in contravention of the manufacturer's instructions.

The testing instructions included in the SIS investigation reports state that "it is important to classify the material" to be tested before testing can begin. CR 12-6 at 3; *see also* Ex. A at 1-2

(excerpt from NIK self-training course). The approved types of material are: tablets, capsules, powders, plant material, and suspected brown or black tar heroin. *Id.* The tests kits are not approved for testing paper. In fact, paper is not mentioned at all except as a means for testing liquid, which the NIK tests are "not designed for." *Id.* And when testing liquids, "[t]he choice of paper is critical." *Id.*

> **Liquid samples** - NIK tests are NOT designed for use with liquid samples. However, liquids may be tested by placing the tip of an NIK SUBSTANCE LOADING DEVICE or a 1cm square (roughly 1/2" square) piece of paper into the liquid. Remove and allow to air dry. Place the dry paper into the test pack and proceed with the test as instructed. *The choice of paper is critical. Unscented, uncolored filter paper is ideal.* NEVER use brown paper, hand towels or newsprint.

*Id.* (emphasis added).

The undisputed facts here established that the disciplinary action in this case was based on a NIK test conducted on paper of unknown origin, contrary to the limitation of suitable testing materials. The testing officer took a small piece of legal papers that had been sent from an unknown source through the postal service and that had been processed through the institution's mail processing room, offering numerous sources of potential contamination. The "positive" result obtained through this impermissible procedure lacks any indicia of reliability.

In addition to the fact that the NIK test is not designed to test paper, the fact finder also misunderstood that Test U "indicated a positive result for Amphetamines." In fact, Test U is not a test for amphetamines. CR 12-6 at 4. The Test U instructions and the NIK self-training course clearly state that Test U solely identifies the presence of methamphetamines or MDMA. Ex. A at 3-5; Ex. B. "Test U will turn a burgundy color *all by itself* when the ampoules are broken with substance placed in the pouch. This is the nature of the chemicals." Ex. A at 5 (emphasis added). Thus, any result other than a dark blue color is a *negative* result and cannot be used as evidence of

the presence of any illegal substance. However, the hearing officer report indicates that DHO Chetwood relied on the results of *both* Test A *and* Test U in concluding that Mr. Steffey violated Prohibited Act Code 111. CR 12-5 at 2. The misunderstanding of the Test U results further undermines the result of the adjudication.

The multiple errors in the use and reliance on the NIK testing system in this case underscores the fact that the BOP has offered no evidence regarding the training or expertise of the personnel who are charged with conducting and interpreting the results of NIK chemical tests or the hearing officers who are charged with applying those results to infringe on prisoners' liberty interests. In other cases, courts have specifically considered the training and certification of the testing agent in upholding reliance on NIK test results. *Cf. Baker v. Lake*, No. 118CV01642SKOHC, 2019 WL 1455326, at *2 (E.D. Cal. Apr. 2, 2019), *recons. denied*, No. 118CV01642SKOHC, 2019 WL 2125458 (E.D. Cal. May 15, 2019).[2]

A chemical test that has been performed incorrectly and interpreted incorrectly by officers of unknown expertise does not have any "indicia of reliability." The results should have been disregarded as invalid in the "some evidence" analysis.

**D. The Remaining Evidence Was Insufficient To Support The Disciplinary Violation.**

In the findings and recommendation, the Magistrate Judge did not directly address the petitioner's challenge to the reliability of the NIK test. Instead, the Magistrate Judge simply noted

[2] The petitioner's filed a discovery motion seeking to produce, among other things, the BOP's training protocol for chemical testing and other information that would go to the reliability of the NIK test results. CR 20. The petitioner also sought additional time to offer an expert affidavit as to the errors in the testing procedures employed here. CR 21. But the Magistrate Judge denied the discovery motion and declined to permit further evidentiary development regarding the NIK test reliability. CR 30. To the extent that the Court does not find that the NIK test result so unreliable that it should have been disregarded entirely, then the petitioner would ask the Court to order discovery and allow further development of the evidence on that issue.

that the hearing officer "relied upon multiple sources of evidence to determine Petitioner violated prison rules[.]" CR 30 at 10. However, only *reliable* evidence can be considered in the "some evidence" analysis, and the NIK test results do not meet that standard. The government has never argued that the disciplinary sanction would have been permissible if the NIK test results were discounted entirely. The other sources of evidence linked Mr. Steffey to the mail, but did not point to the presence of narcotics. If the suspect paper did not contain narcotics, then no violation occurred. Since the NIK test was the only evidence that the papers contained narcotics, the unreliability of the NIK test invalidates the discipline.

**Conclusion**

For the reasons stated herein and in the petitioner's other pleadings (CR 1, 17), this Court should reject the magistrate judge's findings and recommendation and instead grant the writ of habeas corpus, order the BOP to expunge the disciplinary infraction, and grant such other and further relief as law and justice require pursuant to 28 U.S.C. § 2243.

Respectfully submitted this 23rd day of April, 2020.

*/s/ Elizabeth G. Daily*
Elizabeth G. Daily
Attorney for Petitioner

FILED
APR 24 2018
SUPERIOR COURT
COUNTY OF IMPERIAL
CLERK
DEPUTY
T. Escalera

SUPERIOR COURT OF CALIFORNIA

COUNTY OF IMPERIAL

PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, v. RANDY CHACON, Defendant. — Case No. JCF36904

**STATEMENT OF DECISION AND ORDER RE: MOTION TO SET ASIDE, DISMISS, GRAND JURY INDICTMENT [Pen. Code, § 995]**

PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, v. GREGORY MOORE, Defendant. — Case No. JCF36709

PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, v. SHARREL ANN MYERS, Defendant. — Case No. JCF36710

PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff, v. OSCAR MARTINEZ, Defendant. — Case No. JCF37344

## INTRODUCTION

Imperial County, California, has two prisons Calipatria State Prison and Centinela State Prison. Both prisons are under the jurisdiction of the California Department of Corrections and Rehabilitation (hereinafter "CDCR"). Three of the four defendants in this case, Randy Chacon ("Chacon"), Gregory Moore ("Moore"), and Oscar Martinez ("Martinez"), are currently serving state prison sentences. Defendant Sharrel Ann Myers ("Myers"), has been indicted on felony charges.

The Imperial County District Attorney has established a prison unit that prosecutes crimes committed on the grounds of Calipatria and Centinela State Prisons. The District Attorney has authorized that unit to proceed either by way of Grand Jury Indictment or by way of complaint. As a matter of policy, the unit has chosen to proceed by way of indictment in the majority of cases it prosecutes, including the cases at issue here.

In the instant consolidated cases defendants were each arrested for possession of suspected heroin within Calipatria or Centinela State prison. The principal issue in each case is the scientific validity of a color test, commercially known and marketed as the "Narcotics Identification Kit" (hereafter referred to as the "NIK" test) used to identify heroin and other seized drugs.

CDCR Correctional Officers, who were trained by CDCR personnel to use the NIK test in the fashion recommended by Safariland, LLC ("Safariland"), its manufacturer routinely testify before the Imperial County Grand Jury, resulting in criminal indictments. No published California case has addressed a scientific challenge to a NIK color test or any similar color test. Color tests oftentimes referred to as "field tests" are routinely used by police officers in the field as part of an illegal drug investigation before making an arrest decision.

The court conducted more than 7 days of hearings, at which six Correctional Officers, three expert witnesses, and a representative of Safariland testified, during which it admitted over 112 exhibits all focused on the ability of the NIK color change test to correctly identify heroin as a suspected seized drug. Suspected heroin, a federally scheduled one (1) narcotic drug derived and illicitly manufactured from the opium poppy, is typically manufactured in

clandestine laboratories. Illicit drugs are frequently diluted (cut) with a variety of materials prior to sale or resale to bulk up the product and increase profit. Adulterants are generally selected due to their physical resemblance to a drug, low cost, or added physiological effects. Cutting agents are constantly changing over time.

With the NIK color field test in question, a small portion of the suspected substance is placed in a clear vinyl pouch containing glass vials with chemical reagents using a device provided with the NIK testing kit. The reagent identified and used with the test for heroin is known as the "Mecke modified" test, where the sample is mixed with the reagents and is agitated. If the reagent solution turns green, the test is positive for heroin.

The Imperial County District Attorney's office regularly calls CDCR officers as expert witnesses before the criminal Grand Jury to testify as to NIK drug identification test results. Such officers testify that precautions are taken to avoid cross-contamination, that the test procedures prescribed by Safariland are followed, and that although false positives could occur that in the officer's experience no false positive has ever been experienced. CDCR officers before this court testified, consistent with training and educational materials from the manufacturer, that the NIK test was reliable and according to the testifying officers in sworn testimony, was "100%" accurate.

GRAND JURY PROCEEDINGS

Statement of the Cases:

RANDY CHACON

Correctional Officer Alejandro Paniagua (Paniagua), while conducting a clothed body search on Chacon, discovered a small object in the inmate's right pocket. The item was wrapped in clear plastic and contained what appeared to be a tar-like substance. Paniagua transferred the item to correctional Sergeant Alejandro Gonzalez (Gonzalez) for chemical testing. Gonzalez, an eight and a half year veteran of CDCR, subjected the contents of the item to an examination utilizing the Narcotics Identification Kit (NIK). Gonzalez testified before the Imperial County Criminal Grand Jury that he conducted a NIK color test for heroin. Gonzalez testified that the way the NIK test works is that depending on the color, it will be

Case 3:19-cv-00093-JR Document 37-1 Filed 04/23/20 Page 4 of 36

positive or negative. When asked what was the result was of the substance found on Chacon that he conducted the NIK color test on was that it tested "positive for heroin". Gonzalez was also asked before the grand jury,

"Q. Have you ever heard of what a false positive is?

A. Yeah, but I never had it.

Q. What is a false positive?

A. I guess when you get mixed readings when you conduct a test. It's not clear.

Q. Was there a false positive?

A. No."

The bindle weighed .4 grams and Gonzalez also testified before the Imperial County Criminal Grand Jury that, based upon his training and experience and on multiple conversations he has had with both Correctional Officers and inmates, this was a usable quantity of heroin. The Grand Jury indicted Chacon on one felony count of custodial possession of contraband (heroin) in violation of Penal Code section 4573.6.

GREGORY MOORE & SHARREL ANN MYERS

Correctional Officer Waymond Fermon (Fermon) was watching from his office activities in one of Calipatria State Prison's visiting rooms via surveillance monitor when he noticed Myers exit the women's restroom and returned to her assigned table where she sat down next to Moore. Shortly thereafter, the couple stood up from the table and walked over to the area in the visiting room designated for the taking of photographs. As Fermon watched, he saw the visiting room porter, Inmate Lamar Williams (Williams), purportedly taking a photograph of Moore and Myers. Moore is standing behind Myers and Fermon sees the inmate taking something from Myer's right-side waistband area and keeping it in his hand.

After taking the photo, Williams walks up to the couple to show them the photograph and Moore is then seen taking the unknown object from his own hand and placing it inside Williams's right rear pants pocket. Fermon, along with his supervisor, Sgt. Robert Moore (no relation to defendant Moore) went to the visiting room and made contact with all three individuals. Sgt. Moore escorted Inmate Moore to the inmate strip room. Fermon, meanwhile,

made contact with Williams, and after placing him in handcuffs, escorted him to the strip room where he performed a clothed body search on the inmate. During the search, Fermon located two items in Williams's right rear pants pocket. No contraband was found on Inmate Moore.

Fermon then contacted Myers in the prison's Main Visiting Processing Area. Myers agreed to an unclothed body search by two female Correctional Officers; no contraband was found during this search. Fermon then left Myers with the female officers and went to an evidence room where he tested the contents of the two using a NIK color test for herion test. The tests resulted in a positive result for heroin. Both bindles had a combined gross weight of 157 grams which Fermon testified that, based upon his training and experience, along with conversations he has had with both other Correctional Officers and inmates, that was a usable quantity of heroin. Fermon and another Correctional Officer later interviewed Myers, during which, she admitted to bringing the bindles into the prison where Moore took them from her waistband area. Because of this testimony, the Grand Jury indicted both Moore and Myers on July 29, 2016.[1] Inmate Williams was not indicted.

OSCAR MARTINEZ

Correctional Sergeant John Truchanovich (Truchanovich) exited the Facility C Program Office at Centinela State Prison and observed Inmate Martinez (Martinez) walking towards him. Martinez was heading for the inner perimeter. As he walked towards Truchanovich, he noticed that Martinez kept his hand closed in an awkward fashion. Truchanovich ordered Martinez to "cuff up." At this point, Martinez opened his left hand and Truchanovich could see that he held a clear, small plastic object with a dark brown substance inside. Truchanovich took possession of the object and later gave it to Correctional Officer Ricardo Estrada for a "field test"..., "in order to determine whether it is indeed a controlled substance".

After taking possession of the object, Officer Estrada weighed it (determined to be 0.1 grams gross weight), opened it and observed a dark brown substance. Estrada told the

[1] Meyer's disputes the evidence testified to before the Grand Jury that she confessed. In her Penal Code section 995 motion Myers counsel quotes the actual transcript of her recorded interview with Correctional Officers that does not show she made any such admissions.

Imperial County Criminal Grand that he utilizing the NIK test that he had been trained to use and had utilized over 50 times determined that the substance was heroin. Estrada told the Grand Jury that the results, depending on the color the results will be positive or negative. Estrada testified the NIK test was "positive for heroin". Also, that he knew what a false positive was, "when the substance is not – it doesn't come up positive or results of the test are not what you expected". He later opined based upon his training and experience, and based upon conversations he has had with both Correctional Officers and inmates, that the item contained .1 grams, a usable quantity of heroin. Based on this testimony, the Grand Jury indicted Martinez on one felony count of custodial possession of contraband (heroin) in the state prison in violation of Penal Code section 4573.6.

## ISSUES PRESENTED

1. Whether or not Narcotics Identification Kit ("NIK") color test result is legally admissible evidence for purposes of finding probable cause by a Grand Jury;

2. If the answer to question 1. Is "yes", what the appropriate parameters are for administration of such test and the presentation of the results of same to the Grand Jury;

3. Whether California Department of Corrections officers are qualified to testify as experts as to the results of the NIK test and the accuracy of such results before the Grand Jury; and

4. Whether probable cause existed for the indictment in the cases before the court were it to decline to consider the evidence of the NIK test and the Correctional Officer's interpretation of its results.

## LEGAL ANALYSIS

The defendants are asking this court to rule the NIK color test was legally inadmissible before the Grand Jury and therefore the indictments should be dismissed.

In considering a motion to dismiss charges brought in a Grand Jury indictment pursuant to Penal Code section 995 the Superior Court sits as a reviewing court. (*People v. Block* (1971) 6 Cal.3d 239, 245.) The role of the Grand Jury in issuing an indictment is to "determine whether probable cause exists to accuse a defendant of a particular crime."

(*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1026.) Probable cause "means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." (*Cummiskey v. Superior Court, supra*, 3 Cal.4th at p. 1029.) As with a preliminary hearing where a magistrate presides, the Grand Jury must determine whether sufficient evidence has been presented to support holding a defendant to answer on an indictment. In the usual case "The duty of determining whether or not an indictment should be found is lodged exclusively in the Grand Jury and not in the courts," and the court's duty is to determine whether the defendant has been committed without reasonable or probable cause. (*Lorenson v. Superior Court* (1950) 35 Cal.2d 49, 55.) The reviewing court does not substitute its judgment as to the weight of the evidence for that of the Grand Jury, and upon a review the court must draw all reasonable inferences in favor of the indictment. (*Williams v. Superior Court* (1969) 71 Cal.2d 1144, 1148.) The evidence presented to the Grand Jury need not be sufficient to support a conviction beyond a reasonable doubt; there must however be some factual showing as to each element of the crime. Such a showing may be made by circumstantial evidence supportive of reasonable inferences. *(Ibid.)*

The defendants in the instant cases have raised legal and evidentiary issues that were not addressed in the Grand Jury proceedings. In effect defendants have made a pretrial non-statutory motion to dismiss. This procedure is an appropriate way to raise a variety of defects in preliminary hearings. (See, e.g., *People v. McGee* (1977) 19 Cal.3d 948; *People v. Superior Court (Hartway)* (1977) 19 Cal.3d 338; *People v. Durrett* (1985) 164 Cal.App.3d 947]; *Lockwood v. Superior Court* (1984) 160 Cal.App.3d 667]; People v. Smith (1984) 155 Cal.App.3d 1103; *People v. Crudgington*, (1979) 88 Cal.App.3d 295.)

The Supreme Court has approved the Superior Court's receipt of evidence outside the record of the preliminary examination when reviewing a claim of violation of a substantial right. *People v. Coleman* (1988) 46 Cal.3d 749 [testimony on whether counsel was effective]; *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 263 n.5 [potential bias or appearance

*/////*

Case 3:19-cv-00093-JR Document 37-1 Filed 04/23/20 Page 8 of 36

of conflict of prosecutor at preliminary examination]; *People v. Pennington* (1991) 228 Cal.App.3d 959, 964 [conflict of interest of defense counsel].

In *People v. Laney* (1981) 115 Cal.App.3d 508, 513, the appellate court held:

> "We conclude and hold that the rule announced in *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529, with regard to irregularities in preliminary examination procedures applies also to grand jury proceedings. Consequently the irregularities, if any there be, require reversal only if an accused can show he was deprived of a fair trial or otherwise suffered prejudice. Relief without showing of prejudice is limited to pretrial challenges."

In *People v. Towler* (1982) 31 Cal.3d 105, 123, the Supreme Court concurred, holding: "The reasoning in *Pompa-Ortiz* applies with equal force in the grand jury context."

In the case of *Stanton v. Superior Court* (1987) 193 Cal.App.3d 265 ("*Stanton*"), at page 271 the court held that the prosecution's duty to disclose material evidence that is favorable to the defense (commonly referred to as a *Brady* [2] obligation) applied to preliminary hearings. In *Stanton* the court struck an element of the charged offense because of the prosecution's failure to disclose evidence material to defense cross-examination of eyewitnesses at a preliminary hearing.

The People have objected to the court allowing any evidence to be considered outside of the Grand Jury record and have argued that the *Stanton* decision does not apply to a Grand Jury indictment case being challenged by a motion to dismiss pursuant to Penal Code section 995. However several case decisions have referred with approval to a trial Court receiving evidence outside the record of a Grand Jury proceeding when reviewing a claim of violation of a substantial right. In *Cumminskey v. Superior Court, supra,* 3 Cal.4th 1018, at page 1022 the defendant asserted that the District Attorney failed to present exculpatory evidence at Grand Jury proceedings. *Berardi v. Superior Court* (2007) 149 Cal.App.4th 476, held at page 481 that in assessing substantial prejudice under Penal Code section 939.71 the test is whether, evaluating the entire record, it is reasonably probable that a result more favorable to the defendant would have been reached if the exculpatory evidence had been disclosed to the Grand Jury. Neither of these Grand Jury cases directly refer to *Stanton*;

[2] *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215

however, the only manner to adjudicate errors outside of the record, just like with respect to a preliminary hearing, is to allow in evidence during a pretrial motion proceeding.

Thus a *Brady* violation claim and inadmissible scientific evidence claim, as being made herein, could be raised in a non-statutory motion to dismiss, distinguishing Penal Code section 995 motions, which are confined solely to the record. The trial court has authority, because of the constitutional nature of the issue and would be obligated, based upon due process and equal protection principles, to allow the defense to raise such claims. In *Stanton*, at page 272, the Court stated "Nondisclosure of evidence impeaching eyewitnesses on material issues is the deprivation of a substantial right". In a Grand Jury proceeding, there is no meaningful way to reach the issue because *Brady* and improper admission of scientific evidence claims are inherently always outside the record. Also, by statute the prosecution's failure to inform the Grand Jury of exculpatory evidence of which it is aware is grounds for dismissal if that failure results in substantial prejudice. (Penal Code section 939.71.)

The standard of the review is the same under a statutory or non-statutory motion to set aside the information. (*People v. Woods* (1993) 12 Cal.App.4th 1139,1147.)

**THE LAW AS TO WHAT EVIDENCE IS ADMISSIBLE**
**IN A GRAND JURY PROCEEDING.**

The rules of evidence that apply to a criminal trial are statutorily applicable in Grand Jury proceedings. (Penal Code section 939.6. subdivision (b).) A Grand Jury indictment predicated on evidence that is legally inadmissible at a trial is subject to dismissal (*People v. Barkus* (1979) 23 Cal.3d 360, 393; *Cook v. Superior Court* (1970) 4 Cal.App. 3d 822.) Evidentiary objections may be properly raised by a defendant in a Penal Code section 995 motion to dismiss an indictment due to the inability to object beforehand. (*Dong Haw v. Superior Court* (1947) 81 Cal.App.2d 153.)

The question herein raised by defendants is whether evidence of a color change field test that identifies heroin, the modified Mecke "L" "Narcotics Identification Kit" ("NIK"), is admissible before a Grand Jury over a multiple prong scientific validity challenge. The admissibility of the NIK "L" test for heroin must be determined under the trial evidence

standard of *People v. Kelly* (1976) 17 Cal.3d 24 ("*Kelly*"), and *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 ("*Sargon*"). Admissibility of a NIK color "L" test under *Kelly* or *Sargon* is dependent on proof of a "preliminary fact" as a foundation to each. (Cal. Evid. Code §§ 400-401.) Any evidence is excluded if the foundation is not made. (Cal. Evid. Code §702(a).) The People have the burden of establishing the reliability of the color drug field test for heroin and the validity of the underlying principles upon which it is based both under a *Kelly* or *Sargon* analysis.

Correctional Officers testify to the results of the NIK "L" test used in the field to identifying herion before the Grand Jury. The Correctional Officers do not know anything as to how the chemical features of the NIK field colorimetric tests work or why they produced or fail to produce a certain color that either identifies or fails to identify a suspected substance as heroin. The evidence presented during the hearing was that Correctional Officers do not know about the overall reliability or accuracy of the color field test. It is unknown to them, except what the Correctional Officers learn from their Safariland training. The Correctional Officers acknowledged in testimony that they are not experts in identifying seized drugs, they just follow the directions that come with the NIK kit.

By their very nature, the People have impliedly conceded that NIK field colorimetric tests lack the reliability necessary to make their results proof beyond a reasonable doubt. The People only use the NIK colorimetric test at Grand Jury and always send the drug evidence to the California Department of Justice if a case proceeds to trial. A question is raised as to whether a lay witness can testify to the results of a scientific test as evidence before a Grand Jury that the material tested, as they did in these consolidated cases, is a controlled substance, specifically heroin. The testimony by Correctional Officers about the performance and results of a field test is expert testimony. Therefore to be admissible at a trial over objection the NIK L heroin field test would have to be admissible as expert witness evidence. (Evid. Code, §§801, 802.) CDCR officers a typically testify: (1) they are trained to administer the field test; (2) they follow the proper procedures and instructions for the test; (3) they

/////

explain what they did; and (4) the NIK field test is used routinely by the California Department of Corrections and Rehabilitation.

There is now an extensive record before this court as to the nature and performance of NIK tests. The NIK modified Mecke "L" color test for heroin (3, 6-Diacetylmorphine) as with all color tests is sensitive; hence, very small quantities of sample are used. Generally, from a chemistry standpoint, color testing can be used for a variety of purposes, including as a field test for suspected drugs. NIK testing is based on color testing principles known and used in basic chemistry.

The chemistry discipline examines the way atoms and molecules interact with each other ("chemical reactions"). All chemical compounds have chemical signatures or functional groups, a set of characteristics that determine the type of interactions a molecule will be amenable to. All chemical compounds have functional groups, some more than others, and many share common chemical groups. The latter are sometimes classified in terms of chemical classes.

In simple terms, functional groups are the parts of a molecule that extend beyond the "core" body of the molecule. Certain chemicals called reagents can cause a color change when a substance, a chemical compound, is added and a reaction occurs. Color reactions have been used by chemists for hundreds of years. A visible color change when a reagent is mixed with a substance is evidence of a chemical reaction. A color change reaction occurs when there is a change in the environment surrounding the chemical compound, for example via chemical bonding. A color change is viewed by the naked eye. An average human being can discriminate from up to one million different colors from the seven basic colors of red, orange, yellow, green, blue, indigo and violent. The human eye can perceive 142,000 shades of Green. (Bell, Forensic Chemistry, (2nd ed., 2013) p. 228.)

The Narcotic Identification Kit, NIK test, is manufactured and sold only by Safariland and is distributed worldwide primarily to military and civilian law enforcement agencies. Safariland manufactures a test kit plastic pouch that contains sealed ampule(s) containing color reagents. The type of color reagent contained varies depending on the type of drug

being tested for. The ampules are systematically broken after a measured amount of a suspected material is added to the pouch. The pouch is re-sealed and then agitated. If no color change occurs, according to the manufacturer Safariland, the drug being tested for is not identified and the test result is considered negative for its presence. If a color change occurs, a color chart known as the "IDENTIDRUG™ CHART" [Exhibit 3] that comes with each kit, is referenced by the user of the test and the illicit drug, according to the manufacturer Safariland, is identified.

Safariland, in addition to selling the NIK kit, also markets to law enforcement a "NIK public safety basic competency training coarse" for use with its "NIK Polytesting system" that teaches law enforcement how to use its color test kits. Safariland offers a certificate of completion for officers who pass a self-guided test after 4 hours of training given by a master trainer who is also certified by Safariland using a PowerPoint-based training program. [Exhibit 70, CD-ROM] The master trainer certification takes four hours and allows the master trainer to instruct others on how to conduct drug identification testing using the NIK Polytesting system. Part of the training is hands-on so that the students can learn how to use the pouches and break the ampoules.

Terry Allen Miller, called as a witness by the People, has a bachelor's degree in chemistry. Miller testified that he has been employed for 17 years by an entity based in Florida, by the name of Safariland LLC (manufacturer of the NIK tests) as its product manager. Prior to his employment with Safariland Miller was a senior crime scene analyst at the Florida Department of Law Enforcement Jacksonville Regional Crime laboratory for 21 years. Safariland has DEA and ISO certifications for the manufacturing of the NIK and other color tests. Only informal unpublished studies have been done in Virginia and Nevada as part of the bid process for public entities to purchase the test kits. NIK tests are sold to the FBI, DEA, ATF, Customs and Border Patrol, U.S. embassies around the world, Army, Navy, and Coast Guard, as well as entities in Germany, Italy, France, Spain, England, the Netherlands, South America, South Africa, the Middle East, and the Pacific Rim.

/////

Case 3:19-cv-00093-JR Document 37-1 Filed 04/23/20 Page 13 of 36

The court finds that Miller is a properly qualified expert on color tests based upon his degree in chemistry. The court however finds that Miller is not a qualified expert in making an identification of an illegal controlled substance (seized drug) due to him not ever having engaged in identifying such other than supervising the quality control of the NIK test manufacturing process. The court notes that Miller has never worked as a criminalist in a crime laboratory. Miller demonstrated his lack of knowledge of seized drug chemistry when he testified that the Scientific Working Group for Drug (SWIGDRUG) was started by the Federal bureau of Investigation (FBI) when the record herein shows that the group was started and is administered by the Drug Enforcement Administration (DEA).[3] As a product manager Miller overseas the manufacturing and product training for Safariland. The NIK color test kits, also known as colorimetric tests, are marketed for use as an in the field test to aid law enforcement officers in making an arrest decision. Safariland does not train police officers on the color tests chemistry because it is not within the law enforcement officer's purview of what they are doing, they are required to follow directions and look for a specific color change, only if it happens or if it does not. Why the color change occurs is not knowledge they need to know, according to Miller.

Miller explained the reasons for a color change, noting that the kits are set up to find classes of chemicals, and are labeled based on the chemical family to which the specific drug belongs, with the idea being that based on the circumstances of the discovery of the substance to be tested, the law enforcement personnel already have an idea of what they think the drug is. Miller testified that it is possible for a test to come up presumptively positive for a substance that is not an illegal drug but belonged to the same chemical family as an illegal drug. Miller testified that the tests are marketed as presumptive identification tests, as not being able to actually identify a controlled substance, and that the actual existence of an illegal drug must always be confirmed in a laboratory. For example it does not identify cocaine, the test just tells you that it has the components of cocaine. The NIK colorimetric

[3] See Exhibit 49, Letter by Scott R. Olton, Secretariat an Chair, Drug Enforcement Administration, Washington, D.C.

tests should be the last item to be checked off the probable cause list, not the first, second, or even third. Miller also stated there are plenty of instances that can be found where colorimetric tests were used to wrongly detain a suspect only to have the compound or substance test negative in the laboratory. According to Miller the Safariland field tests are manufactured as presumptive for the determination of probable cause to effect confiscation and/or arrest or a detainment. Safariland maintains a list of 50 to 60 non-illicit substances that, based on NIK test user customer information, have yielded presumptive positive for controlled substance results using the NIK type colorimetric tests.

Allison Baca was called by the People as an expert criminalist who is employed by the California Department of Justice (DOJ) As a DOJ criminalist Baca is experienced in doing confirmatory testing for suspected controlled substances. Her DOJ laboratory in Riverside is accredited.

The court found Ms. Baca's testimony to be entirely credible.

Ms. Baca works in the DOJ laboratory in Riverside where she receives and processes evidence from all different police agencies. She was the criminalist that processed the evidence in the *Chacon* case. The prosecution asked Ms. Baca whether she could tell by observation as to what she was looking at when she first opened the envelope relating to the *Chacon* case. Ms. Baca responded she does not guess on what something is by what it looks like. Ms. Baca explained that the procedure in her DOJ lab is to first weigh the substance and then take a small sample to do a presumptive color screen. Baca defined a "presumptive color screen" (also sometimes referred to in laboratories as a "spot test") as just a test that she runs on a sample using a combination of reagents that may possibly produce a color change that can indicate what type of drug it possibly could be, like what family of drugs it could possibly be. The color screen test she used in the *Chacon* case was the Marquis reagent which is usually the color-screening test that she starts with just because it covers a wide variety of possible controlled substances. Ms. Baca described the results of the Marquis Color screen as "purple" and that purple is "indicative of an opiate". She also described the reporting of results of any color test as "very subjective" and it is DOJ protocol to always

document exactly what is observed. So, if the color reaction observed is yellow-green, a DOJ analyst would not just record that as "green" and if it was a faint purple, it would be recorded exactly as that, not just "purple."

Ms. Baca indicated in her training at DOJ she is made aware that there are substances other than controlled substances that will turn a color test screen similar to that of a controlled substance. The DOJ has list of some of these items in a training binder in the lab but it is not an exhaustive list because there are millions of compounds. After concluding the color screen, the next step is to prepare a sample for a confirmatory analysis on a gas chromatograph mass spectrometer (GC/MS). A sample is prepared for a GC/MS by placing the substance in a solution that reduces it to liquid form which is called an extraction. The extracted solution is then injected into a GC/MS instrument where it is analyzed. Ms. Baca defined a confirmatory test one that gives a complete result. It gives an exact result that it is this and no other, a complete structural analysis done on that piece of evidence, a result enabling a forensic chemist to make an identification of an illegal drug. Ms. Baca stated that without a confirmatory test result you cannot identify an unknown suspected drug.

Ms. Baca explained the color screen testing is only for the extraction process to determine the most efficient method for extracting the sample to put in the GC/MS. If the laboratory did not use a color screen test or if all of the color screen tests showed no color result, a GC/MS could still be completed but it would just involve more extractions. For her and the DOJ laboratory the color screen does not contribute in any way to the confirmatory answer of if a controlled substance is present in a sample. The color test essentially tells the criminalist what to do next as far as the analytical scheme. Color tests are never used to make any type of an identification of a specific drug. Baca also explained that all DOJ criminalist's work is reviewed by two peer reviewers.

Ms. Baca understands the concept of a “false positive”. As to color tests the DOJ does not use the term "false positive" or "presumptive false positive" because they do not consider a color test to be either positive or negative. When recording the result of a color test, they write the color, not positive or negative, because they never make a determination based

upon the color spot test. Ms. Baca said the use of the term "false positive," is not a proper scientific conclusion with color tests. Baca is familiar with scientific standards and protocols to test for seized drugs. She agreed with the scientific bases of the SWIGDRUG guidelines [Exhibit 49] and the consensus standard published by the ASTM ("ASTM") International E-30 Committee on Forensic Science – E2329-14 "*Standard Practice for Identification of Seized Drugs.*" [Exhibit 48] Although her laboratory uses a different standard (ISO 17025[4]) she agrees with the SWIGDRUG and ASTM E2329-14 minimum standards for making drug identification decisions.

Ms. Baca conducted the testing on suspected heroin that was collected and tested positive as heroin from Correctional Officer Jose Espinoza using the NIK test. She conducted several color screens on the substance and noted that there was no color change on any of them. [Exhibit 59] Ms. Baca also took a photograph of the evidence. [Exhibit 60] After completing the GC/MS, the conclusion was that the suspected heroin was identified as being caffeine. [Exhibit 58]

The people called expert witness Dr. Hanoz Santoke a professor at California State Bakersfield in the department of chemistry. Although not an expert in testing controlled substances Dr. Santoke is a qualified expert in colorimetric tests of the type used in the NIK kit. The court found Dr. Santoke to be, within the scope of his academic experience a credible expert witness.

Dr. Santoke testified that colorimetric tests are "preliminary" because they are a first indication, not definitive, so you have to be followed up with more accurate tests. It was Dr. Santoke's expert opinion that he would not base a decision solely on a colorimetric spot test. Dr. Santoke testified, consistently with the other experts, that a "false positive" is possible when someone is testing for a particular compound, because the test is for "functional groups" which could also occur in other compounds, which would produce the exact same

[4]ISO 17025 is a Forensic Scientific standard promulgated by the International Organization for Standardization ("ISO"). Standard 17025 specifies the general requirements for the competence to carry out tests and/or calibrations, including sampling. It covers testing and calibration performed using standard methods, non-standard methods, and laboratory-developed methods.

color change, and that it would not be used to determine a substance is a controlled substance because of the false positive potential, but is useful as a preliminary indicator. Dr. Santoke testified that the exact amount of reagent is not significant when you are doing a qualitative analysis, as to whether the substance is there, as opposed to a quantitative analysis regarding the amount of a substance. It was Dr. Santoke's opinion that the NIK test has not gone through any validation studies, hence there would be no error rate known. Dr. Santoke does believe it has errors. According to Dr. Santoke "scientific reliability" depends on the intended application. If it's 99 percent, then it does not meet that standard, referring to spot tests in general. Dr. Santoke further testified that "presumptive positive" as used by the chemist, product manager Terry Miller from the Safariland Corporation, with whom he spoke about the NIK tests, is not a scientific term that all positive results would properly be submitted to a laboratory for confirmation, and that NIK tests are not a confirmation of a controlled substance.

A scientifically reliable analytical testing technique should ideally have a high probability of a "true" result, and minimize the probability of a false positive. The NIK field color tests are not specific as they fail in discriminating between controlled substances and other compounds. As with all color testing that are used for drug identification, it is not uncommon for there to be a false positive. Limitations with color tests including: (1) they are not specific tests, (2) the possibility of using of too much sample, thereby overwhelming the chemical reagent, and (3) contribution to the color change from other components within in the sample. Opium, "black tar" heroin, and samples containing dyes can produce problematical color test results. (Lerner, *New Color Test for Heroin,* (February 1960) Analytical Chemistry, vol.32, no. 2, 198).

The court has been unable to find any California case that discusses the sufficiency of the use of the "NIK" or similar color tests as used in this case. *People v. Bautista* (2014) 223 Cal.App.4th 1096 involved the use of the Valtox color test, which is similar to the NIK heroin test used in the instant case, by an officer on a substance suspected to be heroin. However,

/////

that case involved analysis as to whether the substance in question was held for personal use, as opposed to sale, and a qualified expert testified at the preliminary hearing.

The U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, in its publication "Color Test Reagents/Kits for Preliminary Identification of Drugs of Abuse NIJ Standard–0604.01" (2000) includes in its list of "requirements" item 4.1.4 General, which provides:

a) A statement that the kit is intended to be used for presumptive identification purposes only, and that all substances tested should be subjected to more definitive examination by qualified scientists in a properly equipped crime laboratory.

b) A statement that users of the kit should receive appropriate training in its use and should be taught that the reagents can give false-positive as well as false-negative results.

c) A discussion of the possibility of reagent and/or sample contamination and consequent misleading results.

d) A discussion of proper kit storage in buildings and vehicles.

If there is no California legal authority that has approved of a scientific test method the court may to look to precedent from other jurisdictions for guidance in determining whether the theoretical or technical methodology underlying an analytical technique is accepted as scientifically reliable. With un-established techniques the court may look to indices of reliability, to determine whether the expert's proffered scientific or technical method is sufficiently reliable. Several jurisdictions have looked at color tests of the nature used in the consolidated cases being litigated herein. In *State v. Carter*, 765 S.E.2d 56 (2014) the North Carolina Court of Appeals found that a trial court abused its discretion by admitting an officer's testimony that narcotics indicator field test kits ("NIK" tests) indicated the presence of cocaine on various items. *Carter* cited the case of *State v. Ward*, 364 N.C. 133, 142, 694 S.E.2d 738, 744 (2010) which held that "expert witness testimony required to establish that the substances introduced . . . are in fact controlled substances must be based on a scientifically valid chemical analysis" (Id.) In *Carter*, a sheriff's deputy tested for the presence of cocaine on various items in a residence using a NIK test. As in the instant cases involving the defendants herein, the CDCR officers did not introduce evidence about what the color

change was or how the color change chemical analysis worked or any testimony about the test's reliability apart from personal experience with the NIK kits.

In *State v. Morales*, 45 P.3d 406, 411 (N.M.App. 2002) the court held that the State has the burden of establishing the reliability of the drug field test and the validity of the underlying principles upon which it is based. In *Morales*, like the instant case with the CDCR officers, the deputies did not know or explain the chemical features of the field test or how it produced a certain color that identified the substance as heroin. No evidence was presented as to the level of reliability of the field test. The *Morales* court therefore held the results of the test were inadmissible.

In *State v. Hagberg*, 703 N.E.2d 973, 976 (Ill. App. 1998) the court held that a field test, without more, is insufficient to prove beyond a reasonable doubt that substance tested is a controlled substance. "[B]y their very nature, [field tests] lack the reliability necessary to make their results proof beyond a reasonable doubt absent sufficient foundational evidence establishing their reliability beyond something more than the probable presence of a narcotic".

*Smith v. State*, 874 S.W.2d 720, 721 (Tex. App. 1994) held that testimony about the performance and results of a field test must be given by an expert. In *Meister v. State*, 864 N.E.2d 1137 (Ind. Ct. App. 2007) the court found a field test admissible under Rule 702 where the officer testified: (1) he had been trained to administer the field test; (2) he followed the proper procedures for the test; (3) how the field test worked . . . ; and (4) that the field test was used routinely by the Sheriff's Department.

Similar testimony was presented to the Grand Jury by Correctional Officers in this case. No case has been found by the court that actually explores or evaluates what illegal drug identification color test do, how they work, there validation, the error rate or there scientific reliability. There is no evidence in the Grand Jury records as to the reliability of the NIK color test.

/////

/////

## *SARGON*

Defendants' motions to dismiss the indictment because of faulty scientific evidence testimony in this case involves the "interplay" between the California Supreme Court's decision in *Sargon Enterprises, Inc. v. University of Southern California, supra,* 55 Cal.4th 747, and a defendant's constitutional right to a lawful probable cause determination by a Grand Jury. In *Sargon*, the Supreme Court held that trial courts have a gatekeeper role on the question of the admissibility of expert witness testimony. The Supreme Court identified the statutory bases for the trial court's gatekeeper function as Evidence Code sections 801 and 802, which provide that an expert's testimony must be based on matter "that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . ." Thus *Sargon* operates as a paradigm for a trial court's exercise of discretion regarding admission of expert opinion testimony. It holds: "Under California law, trial courts have a substantial 'gate keeping' responsibility." (*Id.*, at p. 769.)

Evidence Code section 802 provides: "A witness testifying in the form of an opinion may state ... the reasons for his opinion and the matter ... upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion. *Sargon* also states speculative testimony should be excluded. (*Sargon Enterprises, Inc. v. University of Southern California, supra,* 55 Cal.4th 747, 770.)

While Evidence Code section 801 tests the acceptability of the type of matter the expert relies upon, section 802 tests the expert's reasoning from the data to support his/her opinion (*Sargon Enterprises, Inc. v. University of Southern California, supra*, 55 Cal.4th 747, 771). This means trial courts are obligated to critically evaluate any challenged expertise to determine if it meets the *Sargon* evidentiary standards for admission.

Does the *Sargon* expert witness opinion gatekeeper standard apply to a court reviewing the sufficiency of evidence of a Grand Jury record? The People argue it does not while the defendants argue that it does.

Recently the Fourth District Court of Appeal addressed the question of the applicability of *Sargon* to the use of expert opinion evidence in the context of a pre-trial Class Certification

Case 3:19-cv-00093-JR Document 37-1 Filed 04/23/20 Page 21 of 36

decision being made by a trial court. (*Apple Inc. v. Superior Court* (2018) 19 Cal, App.5th 1101 ("*Apple*").) The court in *Apple* held that a trial court may consider only admissible expert opinion evidence in deciding class certification. Although *Sargon* involved expert opinion evidence presented at trial, the Supreme Court's discussion was not so limited. The *Apple* court held:

> Sargon interpreted the relevant provisions of the Evidence Code. Its interpretation therefore applies wherever the Evidence Code does. For example, courts have applied Sargon to declarations submitted in connection with motions for summary judgment and summary adjudication. (See, e.g., *Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 156; *Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 253.)

Therefore there is no reason why *Sargon* should not apply with its full force and effect in the review of a Grand Jury indictment through a Penal Code section 995 or non-statutory motion to dismiss. This court must apply the evidence code standard for admissibility of any expert opinion evidence, and *Sargon* describes that standard. All trial courts are bound to adhere to the *Sargon* and *Apple* decision. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Even if this court were we free to disregard *Sargon* (as the People argue), this court concludes that its standards for admissibility must apply to protect the defendants' due process rights to a fair Grand Jury probable cause determination.

Although a Penal Code section 995 motion is a pretrial motion and not a determination on the merits, it has consequences for the litigation and the due process rights of the parties. Grand Jury indictments based on unfounded scientific and therefore improper expert opinion testimony should be not be permitted. The trial court's gatekeeping role required by *Sargon* serves a purpose in each of these consolidated cases.

Applying the *Sargon* standard in a Penal Code section 995 review of probable cause is a limited scope of inquiry, when compared with an inquiry at trial. Opposing this conclusion, the People object to a hearing claiming that applying *Sargon* would require the trial court to hold evidentiary hearings under Evidence Code section 802 for every expert who provides evidence at a Grand Jury proceeding. The People seem interpret *Sargon* primarily as describing the "process" for admitting expert evidence at trial, which the People assert then

and only then requires a hearing under Evidence Code sections 801 and 802 hearing. This court disagrees. *Sargon's* discussion of admissibility is a requirement, and nothing in the Supreme Court opinion directs holding a hearing for every expert, at trial or otherwise. Whether to hold a hearing is in the trial court's discretion. *Sargon's* substance is to ensure that expert opinion evidence is reasonable, reliable, and logical. The court concludes that *Sargon* applies to the admissibility of the NIK modified Mecke "L" color tests for heroin that was proffered as evidence to the Grand Jury in each of the consolidated defendant's cases.

## *KELLY-FRY*

A significant issue being raised with the disputed NIK color test for heroin drug identification evidence is an objection under the standard of *People v. Kelly*, *supra*, 17 Cal.3d 24. The defendants argue that the NIK modified Mecke "L" heroin test Grand Jury evidence was not admissible because the scientific method employed is not generally accepted in the scientific community. The People contend that *Kelly* does not apply to Grand Jury proceedings.

At a trial the admissibility of the NIK heroin color field test would depend on whether it was derived from a method that is generally accepted to be reliable. To make this determination, a trial court would apply the standard set forth in *Kelly*.[5] The *Kelly* standard has three "prongs": (1) It must be established, usually by expert testimony, that the scientific methods utilized are generally accepted as reliable by the relevant scientific community, (2) The witness furnishing such testimony must be properly qualified as an expert to give an opinion on the subject, and 3) the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. (*Id.*, at p. 30.)

/////

/////

---

[5]In *Kelly*, the California Supreme Court adopted a test for the admissibility of scientific evidence that was first articulated in *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013. Hence, the test has long been known as the *Kelly-Frye* rule. In 1993, the United States Supreme Court held that *Frye* had been superseded by the Federal Rules of Evidence, so *Frye* is no longer the rule in federal courts. *Daubert v. Merrill Dow Pharmaceuticals, Inc.* 113 S.Ct. 2786 (1993). Nevertheless, *Kelly* remains the law in California. (*People v. Venegas, supra,* 18 Cal 4th 47, at p.76 n.30)

Important for the litigation of the NIK "L" color test in the instant case is *People v. Venegas*, *supra,* 18 Cal.4th 47 ("*Venegas*"), where the California Supreme Court clarified, at page 78, that

> The *Kelly* test's third prong does not apply the *Frye* requirement of general acceptance--it assumes the methodology and technique in question has already met that requirement. Instead, it inquiries into the matter of whether the procedures *actually utilized in the case* were in compliance with that methodology and technique, as generally accepted by the scientific community. The third prong inquiry is thus case specific; 'it cannot be satisfied by relying on a published appellate decision. (Citations omitted, emphasis theirs.)[6]

Nevertheless, as *Venegas* requires the court herein, "(I)n determining the question of general acceptance, courts must consider the quality, as well as quantity, of the evidence supporting *or opposing* a new scientific technique." (*Id.*, at p. 85) *Venegas* requires the trial court's role in the inquiry not to be one of abdication to the scientists. The point being is that the court's role in the inquiry is not passive acceptance. *Kelly* requires that each step of a NIK testing procedure be generally accepted as reliable by the scientific community.

**RULING**

In reaching its decisions in this case the court has not considered the case of *People v. Rios*, Superior Court of California, County of Imperial case number JCF35453. The Rios case is not a published opinion and does not involve a commonality of parties that would make it relevant to the instant case. The court expresses a serious concern that a decision by any counsel to cite the decision, relate the facts of or result of a case that does not appear in the Official Reports and does not involve the exact same parties could be viewed as a violation of California Rules of Court rule 8.1115, and, concomitantly, of California Rules of Professional Conduct rule 5-200.

The legal burden of proof and persuasion applicable to a case presented to a Grand Jury pertains to a level of subjective confidence that is reasonably based on the evidence.

/////

[6]When evaluating whether a new scientific technique is generally accepted, the Court may take judicial notice of transcripts of scientific testimony in previous hearings. (Cal.Evid.Code, § 452(d).) The Court may also consider scientific and legal articles and judicial opinions from other jurisdictions. (*People v. Brown* (1985) 40 Cal.3d 512, 530; *People v. Smith* (1989) 215 Cal.App.3d 19, 25.) The parties have provided numerous such publications that have all been marked and for the most part been admitted into evidence.

Case 3:19-cv-00093-JR Document 37-1 Filed 04/23/20 Page 24 of 36

In *Santosky v. Kramer*, 455 U.S. 745 (1982), the Supreme Court, citing earlier cases, observed that:

> The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of fact finding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.

Although the burden of proof before a Grand Jury to sustain an indictment is relatively low, the defendants nonetheless have an important due process right that the Grand Jury process complies with statutory and constitutional legal requirements.

## *SARGON*

The court, in compliance with its gatekeeping role under *Sargon*, is required to exclude invalid and unreliable expert opinion. In short, the gatekeeper's role is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. The NIK colorimetric test or any similar color test does not meet the admissibility requirements of *Sargon*. The People argue that the NIK tests, that were testified to by Correctional Officers as positive for heroin are a valid "presumptive test". In fact the NIK test is not presumptive in nature because it identifies other compounds other than controlled substances. The training received by CDCR Officers was evidenced in detail in the instant hearing. The marketing by Safariland that suggests that the NIK "modified Mecke L" color test for heroin is presumptive is incorrect. The full name of the test itself, "Narcotics Identification Kit" ("NIK") is misleading because it uses the word "Identification".

The term "presumptive," although very frequently used in the American legal system is scientifically a dubious term. Some forensic scientists argue that there is really no such thing as a "presumptive" test. When the forensic science community uses the term "presumptive," it usually means that a test method has high sensitivity but low specificity. "Presumptive" also suggests that the test method is designed to be used as a preliminary screening tool, usually not in a laboratory.

/////

The term "confirmatory" is used to describe a scientific test method that has high specificity. It suggests that the test method is used in a forensic laboratory setting by a criminalist were the test method has been validated for use and determined to be fit for purpose. An unfortunate consequence of the use of the term "presumptive" in the legal system and in this case in particular is that its use created a false sense that an identification of a seized drug was made and that it was valid and accepted in the forensic science discipline of forensic chemistry; it's not.

Accuracy can only be demonstrated thorough validation studies for any test method used for making a drug Identification. A valid qualitative identification method should clearly describe its sensitivity and specificity. Words like "sensitivity" and "specificity" are better able to describe the performance of a scientific test method. These terms provide an accurate description about the accuracy of conclusions in terms of Type I Errors (False Positive) and Type II Errors (False Negative) and allows for an evaluation of the uncertainty that comes with any scientific measurement.

Although the chemical reagents used in the color testing process by Safariland have been in use within the field of general chemistry for hundreds of years for a variety of purposes they were not developed or designed to identify any controlled substance. The experts who testified in the hearing all agreed that colorimetric tests in general are not specific for a controlled substance.

Testimony presented at the hearing of this motion shows that the test does not work as marketed by Safariland or that it has ever been validated for use specifically in identifying the chemical compound structure of heroin. Exhibit 75, a chapter from *Clarke's Analysis of Drugs and Poisons,*[7] *Fourth Edition,* Chapter 30 at page 471: Colour Tests states:

> Colours exhibited by these tests cannot be described with any accuracy. They may vary in intensity or tincture with the concentration of compounds in the test samples and the presence of extraneous material. In addition, their assessment is always a subjective one, even in people with normal colour vision. Some of the complexes formed are unstable such that the colour changes or fades with time.

[7] *Clarke's Analysis of Drugs and Poisons* is considered an authoritative reference in the field of Drug Chemistry.

Case 3:19-cv-00093-JR Document 37-1 Filed 04/23/20 Page 26 of 36

> For some of the tests, the colour reactions can be correlated with certain aspects of the chemical structure of a compound or group of compounds. However, anomalous responses often occur that cannot be explained on that basis…

The NIK color drug field test kits, specifically the "Modified Mecke L" test for heroin, does not comply with any recognized standard for drug identification nor is it part of an analytical scheme that is a validated test method. All scientific tests should, to comply with the requirements of *Sargon*, incorporate methods that are validated or verified to demonstrate that they perform reliably in the operational environment used and are done by individuals who are qualified to use the test method in casework. In order for the NIK heroin test to be *Sargon* admissible it would have to be demonstrated to be valid and reliable. Reliability, scientifically and statistical would require consistency of results as demonstrated by reproducibility or repeatability. Evidentiary or legal reliability implies credibility and trustworthiness of proffered evidence. The NIK test satisfies neither definition of reliability.

The NIK test has not been validated. Validation is a process of evaluating a system or component, through objective evidence, to determine that requirements for an intended use or application have been fulfilled. According to the peer reviewed publications admitted into evidence and the expert testimony presented at the hearing colorimetric field tests such as the one used in this case has never been subject to scientific peer review. Peer review would require a competent independent party's evaluation of a work product to evaluate the methods, claims, and conclusions before dissemination in a scientific or academic publication.

The only testing that Safariland does with its NIK color test kit products is against known, pure controlled substances. Safariland has never conducted testing with any of its kits actual tests with real world drug samples under conditions that actually exist. Testing of actual samples as encountered in the field is needed to determine an error rate. Known sample testing of pure controlled substances against the reagents is a quality control measure. Safariland's product manager Alan Miller testified that Safariland's testing does not replicate testing in the field with variables such as testing samples with adulterants or cutting

agents that are commonly in controlled substances. Safariland has not conducted any controlled validation study with regard to its color testing products.

Multiple examples have been evidenced to the court that the NIK colorimetric test will identify non-controlled substances. For example, with the NIK colorimetric test used for identifying methamphetamine the master trainer will use the sugar substitute "equal" to simulate methamphetamine as it mimics the same exact color change as the one that occurs with the illicit substance. [Exhibit 102]

It is clear from the Grand Jury records put into evidence that the People regularly seek and obtain Grand Jury indictments relying on NIK testing even though the manufacturer states the tests are not evidentiary and that a confirmatory test should always be done. When confirmatory testing is done by the Department of Justice some Grand Jury charged cases there turns out to be no controlled substances. One of the many examples of the NIK testing errors was a case were heroin was identified using a NIK colorimetric test and a second Valtox colorimetric test. The substance was determined to be chocolate. So, if one were to accept the logic proffered by the People that the NIK heroin test is presumptive for heroin it would also be true that it is a presumptive test for chocolate. Likewise, if the NIK colorimetric test for methamphetamine is presumptive the same colorimetric test would also be a presumptive test for "equal", the sugar substitute.

The NIK Color test for heroin does not meet any recognized forensic scientific standard. Criminalist Allison Baca, from the California Department of Justice (DOJ), whose laboratory follows a recognized scientific standard protocol, ISO 17025, does not recognize color testing as valid for any use other than assisting the drug laboratory chemist in evaluating a drug sample for more definitive testing done by a GC/MS method. A recognized standard practice for doing seized drug testing, ASTM Designation E2329-14: *Standard Practice for Identification of Seized Drugs* [Exhibit 48] has incorporated the recommendations from the DEA sponsored Scientific Working Group for the Analysis of Seized Drugs (SWGDRUG). [Exhibit 49] These standards describe minimum test criteria for the qualitative analysis (identification) of seized drugs.

Case 3:19-cv-00093-JR Document 37-1 Filed 04/23/20 Page 28 of 36

Ms.Baca, as the Peoples expert criminalist from the DOJ, acknowledged SWGDRUG as a reputable scientific group that produces credible forensic science. She also explained that SWGDRUG was a "minimum standard" and emphasized that her laboratory has even higher standards. ASTM E2329-14 Standard 4.2 Practice for Identification of Seized Drugs, section 4.2 [Exhibit 48] states: "Correct identification of a drug or chemical depends on the use of an analytical scheme based on validated methods." The NIK color testing methods fall far short of meeting minimum scientifically acceptable criteria.

The People contend that the Safariland NIK color test at issue is validated as explained and demonstrated in a scientific publication. In a peer reviewed article, O'Neala, et. al., *Validation of twelve chemical spot tests for the detection of drugs of abuse,* Forensic Science International 109 (2000) 189–201, [Exhibit 47A] color spot tests were evaluated and reported upon. In this peer reviewed publication validation procedures were described for 12 separate chemical spot tests, using similar reagents as the NIK test kits that are used within a crime laboratory. Each laboratory had done validation on their methods and procedures for color testing, including specificity and the limits of detection of each color spot test utilized. Each of the 12 chemical spot tests the final colors resulting from positive reactions with known amounts of analytes (controlled substances) were compared to two reference color charts used for the identification of unknown drugs. The centroid color charts, were published by the Inter-Society Color Council and the National Bureau of Standards. These laboratory based chemical spot tests were found to be sensitive depending on the drug (analyte) being tested. The color test procedures for conducting the chemical spot tests included using porcelain plates with wells, glass culture tubes using a known control and a negative control. The article notes that the validated chemical spot tests were described as presumptive and provided information that would allow the analyst to select the appropriate testing procedure to confirm the result.

Unlike the peer reviewed study described, in the NIK color testing method used by CDCR, the color change was matched to the pouch that it was tested in or a chart provided by Safariland. No controls, positive or negative are used in NIK colorimetric testing. Allison

Baca testified that her DOJ laboratory would not do any type of test without a negative and positive control. The Study does not support the People's view that the NIK testing system was found to be scientifically reliable. A careful review of spot test study actually contradicts the validity of NIK color testing.

**_KELLY-FRY_**

The defendants contend that allowing the NIK "Modified Mecke L" color test result for heroin to be evidenced before the Grand Jury because was erroneous because the People have failed to satisfy the *Kelly* three-prong test for admission of the NIK test scientific results. Under the *Kelly* analysis, the first prong of *Kelly* requires proof that the technique is generally accepted as reliable in the relevant scientific community. The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject. The third prong requires proof that the person performing the test in the particular case used correct scientific procedures. (*People v. Bolden* (2002) 29 Cal.4th 515, 544–545; *People v. Lucas* (2014) 60 Cal.4th 153, 244.)

Hanoz Santoke, Ph.D., the People's retained expert testified that he became familiar with the NIK tests by doing internet research and through discussions with Alan Miller, the product manager from the Safariland Corporation. Dr. Santoke found the NIK tests to be scientifically valid in his opinion, because the chemistry behind the tests is well understood and the reaction that takes place can be predicted. The chemistry according to Dr. Santoke has been studied, as long as you understand the limitations of the test, "I think that they are valid tests".

There was no evidence, by way of opinion or otherwise, that the relevant scientific community would agree that NIK color testing as use in this case by CDCR is scientifically acceptable for making a determination that a substance is a controlled substance. The People have failed in their burden to satisfy the *Kelly* standard because the People's retained expert, who apparently was not knowledgeable about the relevant scientific community, did not qualify or attempt to testify as an expert about the general acceptance of the NIK test within the relevant scientific community, Dr. Santoke did not offer any opinion on the subject.

Over all the evidence presented before the court throughout the hearing suggests that colorimetric tests are not accepted by the relevant scientific community as reliable scientific method to identify an illegal drug, presumptive or otherwise. The weight of evidence presented is that colorimetric testing is sometimes unreliable. At best color tests are an indication that an illegal drug may be present that would inform a chemist to proceed and do additional testing. The limits of the NIK color testing is well known to the manufacturer. Exhibit 72 was admitted into evidence and was described as a correspondence from an agent of Safariland wherein the limits of the NIK color testing products were described:

> The Safariland Group's training materials, instructions and labeling for its field test kits clearly state that the tests are presumptive aids, to be used only as a piece of information in helping an officer to determine if probably cause exists. False positives are possible in field tests due to the limitations of the science, which is why we also clearly state in our training materials and instructions that they are not a substitute for laboratory testing. Importantly, field tests are specifically not intended to be used as a factor in the decision to prosecute or convict a suspect, and our training materials and instructions make it clear that every test kit, whether positive or negative, should be confirmed by an independent laboratory.
>
> The implication that our testing equipment could give rise to reasonable doubt in criminal cases ignores the fact that these tests are not dispositive, are presumptive in nature and should be used only in the field. In a trial or other criminal procedure setting, field tests should not be used as evidence of the presence, or lack thereof, of any substance.

The goal of the *Kelly* decision requiring general acceptance standard was to "forestall the jury's uncritical acceptance of scientific evidence or technology that is as foreign to everyday experience as to be unusually difficult for lay persons to evaluate." (18 Cal.4th at p.80) It was felt that such scientific evidence would be overvalued by the jury due to an "aura of infallibility" that goes with scientific evidence. (*In re Amber B*. (1987) 191 Cal.App.3d 682, 690-91) With traditional jury trials there was a further concern that efforts to challenge controversial scientific evidence through cross-examination and expert testimony would consume inordinate amounts of time and raise issues outside of the abilities of average juror. Time would not be a concern with a Grand Jury; however, the danger of an "aura of infallibility" arises with even greater force and effect when scientific evidence is presented before a Grand Jury that will listen to it without the benefit of the expert witness being cross

examined. The aura of infallibility goes unchecked as it did in the Grand Jury determinations in each of the consolidated cases. In fact, color drug identification testing by its inherent design is quite fallible, when a critical analysis and understanding of the reliability of the technique is understood.

Therefore, the Grand Jury finding on possession of heroin must be reversed based on a failure of proof of general scientific acceptance of the NIK modified Mecke "L" test for heroin as required by *People v. Kelly* (1976) 17 Cal.3d 24. The People have failed to prove any of the *Kelly's* three prongs as required.

**INADMISSABLE HEARSAY**

In each of the consolidated cases, Correctional Officers gave expert witness testimony to the Grand Juries that the substances recovered were identified as heroin. The basis of this expert testimony was the written material published by Safariland and provided with its NIK test kits. The colorimetric tests required an observation of a color change when a portion of the suspected seized drug was placed in the sample pouch. The Correctional Officers were not, by their own admission, qualified as expert witnesses in drug identification. According to the testimony given at the evidentiary hearing the Correctional Officers are trained by materials provided exclusively by Safariland to observe whether there is or is not a color change and then follow the written directions given in the NIK kit manufacture and interpret the result. The "IDENTIDRUG™CHART" [Exhibit 3] contains detailed instructions for the use of the test and explains how make a controlled substance drug identification. Specifically, the instructions on use for the Mecke test "L" for heroin, state: "Modified MECKE's reagent-a test for heroin, including white, brown and black tar, and MDMA (ecstasy), as well as certain dye combinations designed to give false positive with test A." The instruction for use, in the column interpreting a "POSITIVE RESULTS" states as follows, "A purple color after breaking the first ampoule indicates Ecstasy (MDMA). A green color after breaking the second ampoule that intensifies with prolonged agitation indicates Heroin."

Essentially, what the Correctional Officers are doing is viewing a color change, referencing the instructions, and reporting a test result consistent with what is written by

Safariland. The Correctional Officers, not being experts, are simply relating hearsay information provided by the manufacture to the trier of fact, which in this case is the Grand Jury. In some instances, the Correctional Officers testify that they look at the color on the outside of the NIK pouch and compare that to what is inside the pouch. On the outside of the NIK "Test L" pouch is a green colored box and beside it says it says "Heroin". The word "Heroin" is a hearsay statement printed by the Safariland manufacturer. (Samples of the actual NIK color testing pouches, including color test kit "L", the modified Mecke for heroin, were admitted into evidence, [Exhibit 2])

In the case of *People v. Stamps* (2016) 3 Cal.App.5th 988 the defendant was pulled over by police because her car did not display a license plate. Her car was searched, and suspected drugs were discovered. Stamps was convicted of multiple drug possession offenses. At trial the prosecution called an expert witness who identified pills found in the defendant's possession by comparing them to pills pictured on a website called "Ident-A-Drug." In reversing the multiple convictions for drug possession, the Court found that there was no hearsay exception that permitted such evidence. It further noted the recent case of *People v. Sanchez* (2016) 63 Cal.4th 665, in which the California Supreme Court limited what hearsay may be conveyed to the jury as a basis for an expert's opinion. The court of appeal reversed in *Stamps* finding that the trial court improperly admitted the testimony of an expert criminalist who identified the drugs in pill form as controlled substances (oxycodone and dihydrocodeineone) solely by comparing their appearance to pills pictured on a Web site called "Ident-A-Drug." The expert's testimony was based solely on unreliable and inadmissible hearsay from a Web site and did not involve the use of the witness's expertise.

What happened before the Grand Jury in each of the consolidated cases is that a non-expert Correctional Officer, testified as an expert, who referred to the Safariland "IDENTIDRUG™CHART" or NIK test pouch and conveyed a drug identification opinion based upon the hearsay provided by the manufacturer of the NIK kit. This testimony was inadmissible hearsay. Because the NIK color test kit does not meet a scientific admissibility

/////

standard on its own and is therefore not independently admissible, it does not support the Grand Jury indictment.

### *BRADY* ERROR

When the NIK color tests are testified to by Correctional Officers the Grand Jurors are usually told that that although the test could yield a false positive, the testifying witness has never experienced one. Officer Gonzalez, testified that he knew what a false positive is, but had never had it in his experience. He further testified to the Grand Jury that a "False Positive was "when you get mixed readings when you conduct a test. It's not clear", and there was no false positive in this case.

Officer Michael Ramirez testified that he was a Lieutenant at Centinela State Prison for 24 years, he qualified as Master Trainer for the NIK test which is a presumptive test for the presence of any particular drug, and the California Department of Justice (DOJ) performs the confirmatory test. He testified he is not a chemist and that is why he only performs presumptive tests. He estimated he had performed over 100 NIK tests, described the NIK test procedure, and testified he had never had a "false positive".

A false positive is a test result that states that an analyte (suspected seized drug) is present, when, in fact, it is not present or, is present in an amount less than a threshold or designated cut-off concentration. Correctional Officers do not understand what a false positive is and therefore incorrectly testified before the Grand Jury. The Correctional Officer testimony was consistent with other Correctional Officers' testimony in the Grand Jury proceedings that were lodged as exhibits. In each case the Correctional Officer did not understand what a false positive was. The officers' Safariland education and training from Safariland seems to be deficient.

A prosecutor is duty bound to turn over exculpatory evidence within his or her possession. *Brady v. Maryland* (1963) 373 U.S. 83, 87 says: "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad

Case 3:19-cv-00093-JR Document 37-1 Filed 04/23/20 Page 34 of 36

faith of the prosecution." Prosecutors are responsible not only for what they know and what they have in their files but also for all the files and records in the files of the "team" that works with the prosecutor including law enforcement agencies involved in investigating the case.

The Supreme Court has clearly held,

> [T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, [citation]), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable. (*Kyles v. Whitley* (1995) 514 U.S. 419, 437–438.)

A leading California case explaining the reach of the Brady obligation is *In re Brown* (1998) 17 Cal.4th 873. Brown secured habeas corpus relief due to the nondisclosure of a portion of toxicology blood test results on his blood (a radioactive immunoassay). The test was positive for PCP (a fact the defense wanted to establish) whereas other results presented at trial (gas chromatography mass spectrometry [GC/MS]) were negative for PCP. (*Id.* at p. 877.) The California Supreme Court held that a crime laboratory assisting the District Attorney's office in prosecution of case was "part of the investigative 'team.'" Failure to provide the toxicology test result showing PCP in the blood was *Brady* error because it was relevant to the defendant's defense. As to the issue of the *Brady* team concept, *Brown* held,

> Courts have thus consistently 'decline[d] "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel."' [Citation.] 'A contrary holding would enable the prosecutor "to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial," [citation].' [Citations.] (*Id.,* at page 879.)

"In *Brady*, the high court announced a rule, founded on the due process guarantee of the federal Constitution that requires the prosecution to disclose evidence that is favorable and 'material' to the defense." (*Ibid.*) The prosecution's failure to inform the Grand Jury of exculpatory evidence of which it is aware is grounds for dismissal if that failure results in substantial prejudice. (Penal Code section 939.71.) Although Penal Code section 939.71 does not define "exculpatory evidence," it expressly codifies the holding in *Johnson v Superior Court* (1975) 15 Cal.3d 248, which described such evidence as evidence that tends

to explain away the charges and as evidence that reasonably tends to negate guilt (*Cummiskey v Superior Court, supra,* 3 Cal.4th 1018, 1033.).

Since the adversary system does not extend to Grand Jury proceedings if the District Attorney does not bring exculpatory evidence to the attention of the Grand Jury, it is unlikely to learn of it. Therefore, when a District Attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated under section 939.7 to inform the Grand Jury of its nature and existence, so that the Grand Jury may exercise its power under the statute to order the evidence (*Johnson v. Superior Court* (1975) 15 Cal.3d 248, 255.)

The prosecution was required to inform the Grand Jury of exculpatory evidence but failed to do so when Correctional Officers testified to incorrect definitions of a false positive. What Correctional Officers described is a failed or negative test result; when the NIK test is unable to render a clear answer, no result or a test result that is actually negative for a controlled substance.[8]

A false positive, on the other hand is when the NIK test indicates the substance is a controlled substance when it is fact not. Correctional Officers should not be allowed to testify that there was no false positive in any Grand Jury case because they don't know what it is. A *Brady* violation occurred when the People, who were aware of the many instances were true false positives have occurred using the NIK testing system, did not present that information to the Grand Jury. Essentially the Grand Jury was told a half truth, that a Correctional Officer has never had a false positive, yet the NIK colorimetric test used in fact can and does produce false positive results. This was well known to the prison investigators and the People. Half the truth is not the truth. *Brady* was violated.

It should be emphasized that the purpose of the hearings the court held in these matters was limited to the propriety of having the prosecution offer the chemical reagent test results as ultimate proof of the existence of a controlled substance into evidence for the purpose of obtaining an indictment in the context of a Grand Jury proceeding. The court

---

[8] Correctional Officer Ricardo Estrada told the Grand Jury in the Oscar Martinez case that the NIK test was "positive for heroin". Also, that he knew what a false positive was, "when the substance is not – it doesn't come up positive or results of the test are not what you expected".

expresses no opinion whatsoever that these color tests would not have utility in the context of field testing for the purpose of determining whether or not to proceed with further investigation or an arrest decision, by law enforcement or Department of Corrections and Rehabilitation personnel. It is clear that such tests, when properly administered, have utility as a tool to rule in or out the existence of a controlled substance, along with other case specific facts for purposes of determining whether further investigatory action is appropriate.

ORDER

In light of the foregoing, the court finds that as to each defendant in the consolidated cases there was insufficient legally admissible evidence before the Grand Jury to give it reasonable or probable cause to sustain the Indictment as to any count. Defendants' Penal Code section 995/non-statutory motions are therefore granted.

All Counts of each Grand Jury indictment as to each defendant are dismissed.

IT IS SO ORDERED.

Dated: April 24, 2018

Christopher J. Plourd
CHRISTOPHER J. PLOURD
Judge of the Superior Court

# **Step 1:** Classify the Material to be Tested

- Solid materials (tablets)
- Capsules
- Powders/Crystals/Granules/ Flakes
- Plant material (Cannabis/Hallucinogens)
- Liquids
- Gels (Caps or Cubes)



SAFARILAND

nik®

1005991 rev - 0517

35

# Testing Liquids

- NIK tests are designed to test dosage sample of unknown substances. Dosage samples are generally powder, crystals, pills or capsules. When liquid samples are encountered do not introduce them directly into any test pouch (except Test O for GHB). All other tests require the liquid sample to be dried before testing.
- To sample a liquid:
  - Thoroughly wet the tip of the Loading Device or wet a ½"x½" piece of paper with the liquid
  - Allow it to air dry
  - Then insert into the proper test kit and remove the perforated tip




- The paper should be unscented and uncolored; do not use brown hand towels or newsprint

- It is not recommended to use cotton swabs as the cotton may react with some of the chemicals and cause a erroneous color reaction

SAFARILAND

# Test U for Methamphetamine and MDMA (Ecstasy)

- Test U contains 3 ampoules
  - 1st ampoule – No color change
  - 2nd ampoule – No color change
  - 3rd ampoule – Dark Blue
- Test U is used for both Methamphetamine and MDMA (Ecstasy). To determine difference, you must use Test A.



SAFARILAND

nik®

1005991 rev - 0517





EXHIBIT 6 - BLUE RECTANGLES ADDED BY COUNSEL

# Test U for Methamphetamine and MDMA (Ecstasy)

- The first two ampoules do not give a color reaction, but merely put the sample in the proper chemical order to produce a color reaction with the third ampoule.

- This test does not differentiate between MDMA and Methamphetamine. Test A must be used to provide that clarification. Test U tests for the presence of a chemical group called secondary amines. Both of these drugs fall into this chemical group. You may encounter other chemicals that are also in this group in the field. Test A is the only way to provide a better screening for the presence or non-presence of illicit drugs.

# Test U for Methamphetamine and MDMA (Ecstasy)

- It should also be noted that Test U will turn a burgundy color all by itself when the ampoules are broken with substance placed in the pouch. This is the nature of the chemicals.

- The logic to be used here is that Test A (if it shifts from Orange to Brown) tells us that the substance is presumptively an Amphetamine-type compound. Test U then tells us if there is an indication of Amphetamine (burgundy) or Methamphetamine (dark blue) present. By not turning dark blue and staying burgundy, this is considered a negative reaction for the presence of Methamphetamine and therefore, by default, it indicates Amphetamine.







Exhibit A
Page 5 of 5

NIK PUBLIC SAFETY

# SYSTEM OF NARCOTICS IDENTIFICATION

## INSTRUCTIONS FOR USE

# TEST U

**FOR:** Methamphetamine or Ecstasy

**Test Function**

1. This reagent system presumptively identifies methamphetamine or MDMA (Ecstasy).

**How to Use Test U**

1. Remove clip and insert into the test pouch an amount of powdered suspect material that fits inside this circle. ○ Reseal the pouch with clip and tap or agitate gently to assure material falls to the bottom of the pouch.
2. Break the ampoules, beginning from left to right by squeezing the center of the ampoules with the tips of the thumb and forefinger.
3. Agitate each ampoule for about 30 seconds before proceeding to the next ampoule.

**Interpretation of Resulting Colors**

1. An immediate dark blue color indicates the presumed presence of methamphetamine or MDMA (Ecstasy).
2. If any other color develops, proceed to Test A and continue Polytesting as instructed in the Polytesting procedures.

### CAUTION

A. Since these tests contain strong acid or base. it is suggested that Test F - Acid Neutralizer be used after testing and before disposal.
B. Before discarding used test pouches, remove the clip and add one measure of acid neutralizer from Test F.
C. Add slowly to prevent bubbling over.
D. Do not reseal the test pouch until effervescence has completely stopped.
E. Reseal the test pouch with the clip and discard in a tamper-free disposal unit.
F. No attempt should be made to crush the glass particles after the ampoules have been broken.
G. **Antidote:** In case of contact, immediately flush eyes or skin with water for at least 15 minutes while removing contaminated clothing and shoes. Call a physician. If swallowed, do not give emetics. Contact a physician.

### WARNING

These tests are NOT designed for use with liquid samples.

NIK PUBLIC SAFETY
13386 International Parkway
Jacksonville, Florida 32218
904.485.1836 FAX: 904.741.5407

Exhibit B
Page 1 of 3

# IDENTIDRUG™ CHART

for use with the NIK® Polytesting System

**IMPORTANT:** Follow the Polytesting flow chart. Do not jump from sequence to sequence; i.e. follow the arrows from one test to another, noting the results.




[1] The total process of the Orange changing to Green may take as long as 15 to 20 minutes.

[2] Only after Test A goes from orange to brown AND Test U turns can you presumptively identify the substance of an amphetamine-type compound. Red in Test U alone does NOT indicate amphetamine-type compounds.

[3] Following breakage of the left ampoule, a flash blue will be observed when the middle ampoule is broken. This is a standard colorimetric reaction between the chemistry in the two ampoules. It is most noted when cocaine base is being profiled. The flash-blue is insignificant and should be ignored. The flash-blue alone does NOT indicate the presence of cocaine.

**IMPORTANT**

The tests to the right are not included in the Polytesting system. If positive results are not obtained when using any of these tests, proceed to Test A and begin the Polytesting process, as you may still be in possession of a controlled substance.

This latest revision in no way reflects upon or affects the accuracy of previous Polytesting charts.

PART# 190-601 REV 0907

© Copyright 2007 BAE Systems

**MARIJUANA, HASHISH & THC**

E — 1 NC, 2, 3 — Marijuana, Hashish & THC

NOTE: The last ampoule contains a chemical which evaporates rapidly and has a tendency to expand the pouch. Should this occur, open pouch and release swelling. Reseal the pouch and proceed with testing.

**METHAQUALONE**

M

NOTE: If a flash blue or solid blue color develops, stop testing. A blue color is an indicative of many controlled substances. Proceed to Test A and begin Polytesting. Methadone and PCP (Phencyclidine) are potential false positives in this test. For the detection or elimination of these substances, use Test H for Methadone and Test J for PCP.

**TALWIN & PENTAZOCINE**

N — 1, 2

A slowly developing purple color with the first ampoule, followed by an immediate yellow or brown color with the second ampoule presumptively identifies TALWIN, TALWIN Nx and Pentazocine HCL.

**PROPOXYPHENE (DARVON®)**

P — 1, 2, 3

A blue color developing with the second ampoule and remaining after breaking the third presumptively identifies Propoxyphene. If a blue color does not develop after breaking the second ampoule, stop the test and proceed to Test A for Polytesting. Methadone is a false positive in this test.

DARVON® is a registered trademark of Eli Lily Co.

**EPHEDRINE**

Q — 1 NC, 2

A purple/violet color developing after breaking the second ampoule presumptively identified Ephedrine.

NOTE: The third ampoule is not part of the Q test, but is utilized in neutralizing the reagent materials, which are highly caustic.

nik®
PUBLIC SAFETY, INC.
13386 International Parkway
Jacksonville, FL 32218
Tel: (800) 852-0300 or
(904) 485-1836
www.armorforensics.com

Exhibit B
Page 2 of 3

Oregon ECF 37-3 at 2

EXHIBIT 6 - BLUE RECTANGLES ADDED BY COUNSEL

## Introduction to the NIK Polytesting System

The NIK® System of Narcotics Identification is based upon a polytesting procedure whereby a suspect material is subjected to a series of progressively discriminating screening tests. The results of individual tests may or may not yield a valid result. However, the sequential results of several tests provide a high degree of certainty that the suspect material is in fact what the NIK® Polytesting System indicates it to be.

Ongoing experiments are conducted with hundreds of licit and illicit chemical compounds in an effort to eliminate false positive results. However, no chemical reagent system for field use exists that is capable of eliminating occasional invalid test results. A complete forensic laboratory would be required to qualitatively identify an unknown suspect substance. In the absence of such a laboratory, utilizing the NIK® Polytesting System is your best assurance that the presumptive results of a positive identification are what they appear to be.

Always begin Polytesting with Test A and continue from test to test until a positive or negative result is obtained. Tests E, L, M, N, P, Q and R are exceptions to this rule and are designed as standalone tests.

**EXAMPLE:** Beginning with Test A, a suspect material sequences from orange to brown within 10 to 12 seconds. Following the Polytesting Chart, Test U comes next in sequence. A blue result in Test U confirms the presence of Methamphetamine. A reddish-pink or negative result in Test U indicates an Amphetamine-type compound. Only by following the proper sequence of tests from A to U is a positive result obtained.

## General Polytesting Procedures

Before testing can begin, it is important to classify the material using one of the classifications below:

**Tablets or other hard materials** - Crush a part of the tablet into powder and insert into the test pouch.

**Capsules** - Open the capsule, remove part of the powder and insert into the test pouch.

**Powders** - Insert powder directly into the test pouch

**Plant material** - Begin testing with Test E. Use only a few leaf fragments.

**Suspected Brown or Black Tar Heroin** - Begin testing with Test L.

**Liquid samples** - NIK® tests are NOT designed for use with liquid samples. However, liquids may be tested by placing the tip of an NIK® SUBSTANCE LOADING DEVICE or a 1cm square (roughly 1/2" square) piece of paper into the liquid. Remove and allow to air dry. Place the dry paper into the test pack and proceed with the test as instructed. The choice of paper is critical. Unscented, uncolored filter paper is ideal. NEVER use brown paper, hand towels or newsprint.

## Determining the amount of suspect material to use

The amount of suspect material needed to make a successful test varies with the amount and purity of the material. With the exception of plant material, gelatin squares, etc., you should begin by using the loading device to collect an amount of powdered suspect material that would fit inside this circle: ◯ If the resulting colors are too weak, use more material; if too intense, use less.

## Safety Precautions

Many of the tests in the NIK® Polytesting System contain strong acid(s) or bases. Always insert a portion of Pack F (Acid Neutralizer) into the test pack after testing and before disposal of the used test pack. Once an ampoule has been broken, no attempt should be made to further crush the glass or tablet remnants.

In the event that a test pack or chemical is ingested, seek immediate medical attention. If chemicals come into contact with the skin or eyes, wash the skin thoroughly with soap and water. Flush eyes with water and seek immediate medical attention. Call (800) 424-9300 or (202) 483-7616 to obtain additional safety information.

Store NIK® tests in a cool, dark area. Heat will speed up the action of the chemicals in each test, and extreme cold will slow them down. Appropriate care should be exercised. Do NOT store in direct sunlight. Technical Assistance is available during business hours at: (800) 852-0300 or (904) 485-1836

## Breaking the Chemical Ampoules

Care should be taken when breaking the glass ampoules in each test. Each test includes a plastic "harness" that serves to hold the ampoules in place and protect the user from injury. Press firmly in the center of the harness to break each ampoule. Once the glass has broken, do NOT continue to crush the glass ampoules, as a shard may puncture the pouch and result in injury.




## Interpretation of Test Results

For any test, there are three important factors you should look for:

1. The color or lack of color
2. The color change
3. The location of colors in the test pouch




To view the colors correctly, hold the test pack roughly 2 to 3 cm away from a white background. Light must filter through the test pouch to review the desired color results. Viewing test results under non-white light or over a colored surface may result in an incorrect determination of the resulting color. Color results may not match the color on the pouch exactly, but should be viewed as a color family. Blue is always blue, regardless of whether it is dark or light.

Exhibit B
Page 3 of 3

Oregon ECF 37-3 at 3

EXHIBIT 6 - BLUE RECTANGLES ADDED BY COUNSEL

# EXHIBIT 7

Peters ECF 37

Civil Minutes, filed January 16, 2026, 3 pages, PageID 397-399.

Blue rectangular outlines are added emphasis.
Original ECF page numbers control.
Complete document included.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-11105-VBF-SK Date: January 16, 2026
Title Billy F. Steffey v. Colette S. Peters, et al.

Present: The Honorable: Steve Kim, United States Magistrate Judge

| Connie Chung | n/a |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiff(s)/Petitioner(s): None present | Attorneys Present for Defendant(s)/Respondent(s): None present |

**Proceedings:** (IN CHAMBERS) **ORDER CONDITIONALLY GRANTING PLAINTIFF'S REQUEST TO PROCEED IN FORMA PAUPERIS [ECF 2]**

Plaintiff Billy Steffey, a formal federal inmate, seeks to proceed in forma pauperis (IFP) with a first amended complaint against several officials and employees of the Federal Bureau of Prisons (BOP), including Colette Peters in her official capacity as BOP Director, and a private drug test manufacturer—Safariland, LLC—from which the BOP allegedly bought field drug test kits used with federal inmates. (ECF 14 at 1, 4–8). He alleges that product defects in these testing kits led to false positive results used to impose disciplinary sanctions—including solitary confinement—on federal inmates (including him while formerly in BOP custody). (ECF 14 at 8–18, 21–22). Seeking to remedy those wrongs not only for himself but also prospectively for current federal inmates, plaintiff seeks monetary damages along with sweeping declaratory and injunctive relief through the Federal Tort Claims Act (FTCA) and an implied cause of action under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). (ECF 14 at 22–23, 31–35). Plaintiff claims that the defendants not only violated federal due process and inmates' First Amendment rights, but also that they are liable for a variety of torts including fraud, false imprisonment, malicious prosecution, and product liability. (ECF 14 at 1–36).

As explained before, because plaintiff seeks to proceed in forma pauperis, the court is required to screen his operative complaint to "identify cognizable claims"—that is, claims that are neither "frivolous, malicious, or fail[] to state a claim upon which relief may be granted," nor seek "monetary relief from a defendant who is immune from

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-11105-VBF-SK Date: January 16, 2026

Title Billy F. Steffey v. Colette S. Peters, et al.

such relief." 28 U.S.C. § 1915A(a)-(b). Having performed that screening with the liberal pleading standards for pro se litigants, the court finds that plaintiff may be able to allege a colorable cause of action under the FTCA for certain of his state-law tort claims (e.g., false imprisonment) against the BOP. The FTCA provides the exclusive remedy "for injury or loss of property . . . arising or resulting from the negligent or wrongful act or omission of any employee of the [federal] Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). But "the United States is the only proper party defendant in an FTCA action." *Kennedy v. U.S. Postal Serv.*, 145 F.3d 1077, 1078 (9th Cir. 1998). And plaintiff can seek only monetary damages from the United States under the FTCA. *See Westbay Steel, Inc. v. United States*, 970 F.2d 648, 651 (9th Cir. 1992); *see also* 28 U.S.C. § 1346(b)(1). Otherwise, the balance of plaintiff's first amended complaint cannot proceed as alleged.

Most critically, no implied *Bivens* remedy is available for plaintiff's alleged federal constitutional claims. *See Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (declining to extend *Bivens* for procedural or substantive due process claims); *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) (recognizing that Supreme Court has never recognized *Bivens* remedy for First Amendment claims). The Supreme Court has warned federal courts not to create *Bivens* remedies on their own without its express guidance. *See Ziglar*, 582 U.S. at 135. In addition, by suing the BOP Director and others in their official capacities, plaintiff is essentially suing the United States. *See Hutchinson v. United States*, 677 F.2d 1322, 1327 (9th Cir.1982). But except to the extent waived by federal statute (e.g., the FTCA), the United States and its federal agencies enjoy sovereign immunity from damages suits. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994). And even if plaintiff had standing to challenge drug testing practices employed on other inmates, *contra*, e.g., *Wasson v. Sonoma Cnty. Junior Coll.*, 203 F.3d 659, 663 (9th Cir. 2000) ("Parties ordinarily are not permitted to assert constitutional rights other than their own."); *Mayweathers v. Hickman*, 2007 WL 2326086, at *3 (S.D. Cal. July 31, 2007) (plaintiff lacks standing to seek injunctive relief on behalf of other prisoners after release), he cannot obtain equitable relief like injunctions under *Bivens*. *See Solida v. McKelvey*, 820 F.3d 1090, 1093 (9th Cir. 2016). Nor can plaintiff sue under *Bivens* against "private entities acting under color of federal law" like Safariland. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:25-cv-11105-VBF-SK Date: January 16, 2026

Title Billy F. Steffey v. Colette S. Peters, et al.

For all these reasons, plaintiff's request to proceed in forma pauperis is CONDITIONALLY GRANTED provided that he files a second amended complaint naming the United States as defendant and alleging state-law claims actionable against the United States under the FTCA. The court could then order such second amended complaint served on the United States.[1] Plaintiff could also join Safariland to that FTCA suit and ask this court "to exercise supplemental jurisdiction over" any separate actionable state-law claims against that private party arising from the same set of facts at issue in the FTCA suit against the United States. *Agyeman v. Corr. Corp. of Am.*, 390 F.3d 1101, 1103–04 (9th Cir. 2004); *see* 28 U.S.C. § 1367(c)(3).

The deadline for plaintiff to file a second amended complaint consistent with this order is **January 30, 2026**. Alternatively, if plaintiff wishes to dismiss this action *without prejudice* (e.g., to exhaust tort claims with the United States before filing an FTCA suit), he may do so by signing and returning the attached Form CV-09x by the response deadline. But failure to comply with this order or to otherwise respond in writing by that deadline may lead to involuntary dismissal of this action (with or without prejudice) with no further notice for lack of prosecution and noncompliance with court orders. *See* Fed. R. Civ. P. 41(b); L.R. 41-1. Failure to keep the court timely apprised of plaintiff's current address of record may also lead to immediate closing of this case with no further warning. *See* L.R. 41-6.

IT IS SO ORDERED.

[1] Nothing in such order, however, would prevent the United States from asserting any and all defenses to the FTCA complaint, including for failure to state a claim on which relief may be granted. *See, e.g.*, *Relyea v. United States*, 220 F. Supp. 2d 1048, 1050 (D. Ariz. 2002) (The FTCA authorizes "the United States to assert defenses that would be available to an individual under state law."). Nor is anything in this order intended to suggest that plaintiff is excused from the requirement to exhaust administrative remedies before filing an FTCA suit. *See Gartner v. S.E.C.*, 913 F. Supp. 1372, 1381 (C.D. Cal. 1995) (citing 28 U.S.C. § 2675(a)). To the contrary, failure to administratively exhaust may be grounds to dismiss unexhausted FTCA claims for lack of jurisdiction. *See McNeil v. United States*, 508 U.S. 106, 112 (1993).

# EXHIBIT 8

Current action ECF 18, 18-1, 18-2, and 18-3

Selected complete pages of the operative FAC and its attached course materials, identified individually in the exhibit index.

Selected complete pages only; intervening pages omitted.
ECF 18 pp. 9, 54-55; ECF 18-1 pp. 8-18, 31-44;
ECF 18-2 pp. 28, 41; ECF 18-3 p. 5.
Three course pages rotated for readability.
Blue rectangular outlines are added emphasis.

(Paragraph 28). Plaintiff's claims against Safariland arise out of and relate to those California-directed contacts: the products, instructions, and materials at issue were used on Plaintiff at FCI Lompoc in this District, and the injuries alleged were suffered in California. The exercise of jurisdiction is reasonable. On information and belief, based on the California Secretary of State business registry, Safariland, LLC is registered to transact business in California and maintains a registered agent for service of process in this State.

15. This action is a refiling of claims previously asserted in *Steffey v. Peters*, No. 2:25-cv-11105-VBF-SK (C.D. Cal.), filed November 18, 2025 and voluntarily dismissed without prejudice under Rule 41(a)(1) on January 21, 2026 so that Plaintiff could complete FTCA administrative exhaustion. A Notice of Related Cases under Local Rule 83-1.3 (ECF 3) and a Notice of Pendency of Other Actions under Local Rule 83-1.4 identifying the Oregon Action (ECF 4) are on file in this action.

## III. ADMINISTRATIVE EXHAUSTION UNDER 28 U.S.C. § 2675

16. On January 22, 2026, Plaintiff mailed an administrative claim (Standard Form 95) to the BOP Western Regional Office asserting the claims at issue here and stating a sum certain of $2,000,000. The claim was delivered on January 27, 2026 at 9:19 a.m. (USPS No. 9410 8301 0935 5007 9230 43) and was assigned Tort Claim No. TRT-WXR-2026-01701. (Exhibit A.)

swore that at their final interview the SIS technician told him "that his boss said that someone had to get a shot, and because [Plaintiff] had the tracking number, it would be [him]," and that if Plaintiff contested the charge the technician would "make sure that you do 180 days more in the SHU and that you receive the maximum sanctions" and would ask the United States Attorney's Office to prosecute him. (*Id.*, ECF 1 at 16, ¶ 12.) (h) The testing memorandum records no measured time for the Test A reaction, and the produced photograph does not capture the transition (Paragraph 60); those omissions were apparent on the face of the testing record to anyone who read it. The identities of the staff who knew, and the communications reflecting that knowledge, are in the United States' exclusive possession. Consistent with Paragraphs 114 and 126, this alternative does not displace the alternatives on which Counts III and IV proceed and is not an admission against them: knowing institutional misuse is among the risks Safariland's duties addressed, and the Safariland-branded course's correctional message made such reliance foreseeable (Paragraphs 117, 126).

64. The sanctions imposed were disallowance of 41 days of good conduct time; 180 days' loss of commissary privileges; 60 days of disciplinary segregation, suspended pending clear conduct and never served; and one year's loss of visitation, suspended and never served. Plaintiff seeks no damages for the suspended sanctions that were never executed. Plaintiff's Lompoc SHU

confinement, approximately three and one-half months as alleged in Paragraph 62, preceded and followed the hearing as administrative detention. The disciplinary finding remained on Plaintiff's record for the remainder of his custody and beyond.

65. The 41-day good-conduct-time disallowance extended Plaintiff's projected release date and remains part of the outstanding finding. Plaintiff seeks no damages for any extension of his term of custody. The finding and its consequences delayed Plaintiff's Residential Reentry Center placement by approximately six weeks, adversely affected his custody classification, program eligibility, and institutional placement — including his transfer to FCI Sheridan in March 2018, where BOP's receiving-and-discharge and health-screen records document his arrival on March 26, 2018 (BOP health records produced September 15, 2026, 2018 PDF pp. 68, 94, 98) — and followed him into every subsequent custody, employment, and court context in which his BOP record was consulted.

**G. The Practice Was Not Isolated: Recurrence and Institutional Notice**

66. The Bailey incident described in Paragraph 46 is a specific comparator showing use of the same burgundy-as-amphetamine reporting step at another BOP institution before Plaintiff's test. Plaintiff alleges recurrence and institutional notice from that record and the communications identified above. He seeks relief

93. Deferred accrual of claims dependent on the disciplinary finding. The SHU detention and the Code 111 disciplinary finding rest on the same recorded NIK identification: the detention began the day after the test and was continued, on information and belief, on reviews that rested on that identification (Paragraph 62); the recorded NIK result is the only identification of any drug in the produced disciplinary record (Paragraphs 59–63); and the finding disallowed 41 days of good-conduct time (Paragraph 64). A judgment that the recorded identification supplied no lawful basis for Plaintiff's confinement may therefore be held to imply the invalidity of that finding. *See Edwards v. Balisok*, 520 U.S. 641, 646–48 (1997). In the Ninth Circuit, an FTCA action "for negligently calculating a prisoner's release date, or otherwise wrongfully imprisoning the prisoner, does not accrue until the prisoner has established, in a direct or collateral attack on his imprisonment, that he is entitled to release from custody." *Erlin v. United States*, 364 F.3d 1127, 1133 (9th Cir. 2004). *Erlin*'s claim sounded in negligence, and the court reserved whether *Heck v. Humphrey*, 512 U.S. 477 (1994), "would also delay the accrual of a false imprisonment claim under the FTCA," and whether its rule applies to a tort action "brought after the prisoner had been released, without any such attack." *Erlin*, 364 F.3d at 1133. Plaintiff alleges that *Erlin*'s rule governs any claim here whose success would necessarily imply the invalidity of the outstanding finding, and that its reasoning extends to Count I to the same extent,

including as to the confinement that continued after the February 13, 2018 finding, pending the transfer the finding produced (Paragraph 102). Plaintiff's collateral attack on the finding is pending and under submission in the District of Oregon, which has held that the petition is not moot (Paragraph 9). To the extent the Court concludes that any claim against the United States depends on the invalidity of the finding, that claim has not yet accrued, and Plaintiff requests that it be stayed pending the Oregon Action or, in the alternative, dismissed without prejudice (Paragraph 84).

94. Alternative accrual and equitable tolling. If any claim against the United States is held to have accrued independently of the disciplinary finding, Plaintiff pleads equitable tolling in the alternative: he pursued his rights diligently (Part V.I), and the following circumstances, beyond his control, stood in the way of earlier presentment. (a) On August 28, 2019, while Plaintiff was in custody, the government responded to his discovery request in the Oregon Action that "the BOP has no emails between DHO Chetwood and SIS Aguilar about Steffey's Code 111 violation" (Oregon Action, ECF 24 at 4), while the January 2018 regional chain directed to every SIS office in the Region remained in the Bureau's files (Paragraph 56); and on September 27, 2019, BOP withheld in full the four pages of NIK directives responsive to his FOIA request (Paragraph 74). (b) In late October 2019, at FCI Sheridan, SIS Lieutenant Carter told Plaintiff, in a witness's

presence, that he would be placed in the SHU unless he turned over the internal BOP emails he held and disclosed how he had obtained them; at a second meeting in late November 2019, Lieutenant Carter stated in substance, “We know that that’s a false reading,” and that it was known among BOP staff that inmates were placed in the SHU on the basis of a burgundy Test U result treated as positive for drugs when staff “wanted to” do so. Oregon Action, ECF 54-1, Ex. 1 (Forsyth Decl., dated May 10, 2026) ¶¶ 4–10 (filed May 11, 2026). At a meeting at FCI Sheridan in late 2019, Lieutenant Carter also told Plaintiff that he had just gotten off the phone with the Western Regional Office (“Region”); that Region wanted to know how Plaintiff had obtained the internal BOP emails he held and where he had gotten them; and, in substance, that if Plaintiff did not disclose where he had obtained them, he would be placed in the SHU indefinitely and accused of having compromised staff. On information and belief, the call came from, or at the direction of, R. John Lynn, the Western Region’s senior Special Investigative Agent, who supervised the SIS operations of the Region’s institutions and who authored the January 2018 regional emails (Paragraphs 52–53). The basis for that belief is that Lieutenant Carter was FCI Sheridan’s SIS lieutenant, that the call concerned SIS records, and that, before the call, Plaintiff had attached copies of those same emails to the administrative appeal of a different inmate (not the inmate described in Paragraph 45) to the Western Regional Office. The records of

that call and of any communications between the Regional Office and FCI Sheridan's SIS staff about it are within the United States' exclusive possession. (c) In response to Plaintiff's February 2020 request for its testing flow chart and training records, BOP's May 6, 2020 determination withheld the flow chart in full, as a duplicate of the earlier request whose responsive pages it had already withheld, and released in part only two training pages (Paragraphs 49, 74–75). (d) In more than six years, BOP has produced none of the testing directives, advisories, Lynn communications, or BOP–Safariland communications Plaintiff requested — the records needed to show the source of the reporting practice and its attribution to Safariland (Paragraph 48). Apart from the two partially redacted training pages (Paragraph 75), it has withheld in full every testing directive it located, including the four pages located in response to his request for the "March 27th SIS Advisory," a withholding OIP affirmed on September 22, 2026 and that Plaintiff is now litigating in the Eastern District of California (Paragraphs 73–79, 82). That withholding continues. BOP also would not acknowledge the internal BOP records Plaintiff already had: he sent BOP copies of internal BOP emails and directives and asked it to acknowledge them, and it never did (Paragraph 73). BOP thus withheld both its own copies of those records and any official acknowledgment that they were genuine. (e) While those directives were withheld, the United States defended the disciplinary finding in Plaintiff's own case as

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 12 of 69 Page ID #:234

resting on positive NIK results: "corroborating evidence of the NIK Test's positive result for narcotics" (Oregon Action, ECF 38 at 4); the Oregon court entered judgment against Plaintiff on May 18, 2020 (Paragraph 83); and the United States' October 8, 2020 appellate answering brief described two positive NIK tests (Paragraph 63). Plaintiff requests tolling for the period during which these circumstances prevented timely presentment.

95. The June 23, 2026 Oregon order granted Rule 59(e) relief, held the petition not moot, and authorized a further amended Rule 60 motion; it did not itself set aside the original judgment or the disciplinary finding. Plaintiff will move under Rule 15(d) to supplement this Complaint upon any order vacating or expunging the finding.

96. On information and belief, the administrative detention was not imposed or continued on any ground independent of the recorded identification and the investigation built upon it: no reviewing official identified any basis for the continued detention that did not rest on them (Paragraphs 62, 102), and the incident report charging the drug offense issued only on January 31, 2018, fifty-seven days after the test. The SIS technician told Plaintiff that he was in the SHU because another inmate "received legal mail that tested positive for amphetamines and that it was 'Spice'" — a substance no NIK test identifies (Paragraph 38) — and because Plaintiff had received an email containing the

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 13 of 69 Page ID #:235

envelope's tracking number (Oregon Action, ECF 1 at 16, ¶ 10); the tracking-number inquiry was part of the investigation built upon the recorded identification. The detention and the disciplinary finding therefore rest on the same predicate for purposes of Paragraph 93.

97. Counts III and IV: accrual under California's discovery rule. The two-year period of Cal. Civ. Proc. Code § 335.1 runs from accrual as postponed by the discovery rule. Where a plaintiff's reasonable and diligent investigation "discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort," the discovery rule postpones accrual of the claim based on the newly discovered conduct. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807–08, 813 (2005). Plaintiff pleads the time and manner of discovery, and accrual, theory by theory. (a) What Plaintiff pursued earlier. Plaintiff sought BOP's testing directives (Paragraphs 73–75, 81) and disputed BOP's recording of his test in the Oregon Action (Paragraph 83); BOP withheld the directives (Part V.I). When Plaintiff asked Safariland directly in April and May 2020 how a burgundy Test U reaction following a Test A reaction should be interpreted, its forensic technician declined to speak with him once he identified himself as an inmate (Paragraph 81). Nothing Plaintiff had in 2019–2020 disclosed that the Safariland-branded certification course had told correctional users that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 14 of 69 Page ID #:236

correctional setting" (subparagraph (c)). (b) The certification directive. BOP's January 21, 2010 directive, released in part on May 6, 2020 in response to Request No. 2020-02370 (Paragraphs 49, 75), showed that BOP obtained every NIK certification through a vendor — the course, the examination, the grading, and the certificate. It did not name the vendor, its vendor contact information was redacted, and it disclosed nothing about what the vendor's course taught correctional users. (c) The correctional double standard. Plaintiff was not a party to *Jenkins v. United States*, No. 1:20-cv-01815-CLM-SGC (N.D. Ala.). In or about July 2025, while researching federal decisions involving NIK testing through online sources and Lexis, he learned of *Jenkins*; he later obtained exhibits from its record through PACER, including, on or about August 21, 2026, the certification course docketed there as ECF 96-16 (filed May 13, 2024). Before he learned of *Jenkins*, nothing directed him to an exhibit filed in that Alabama action. Plaintiff did not see the REV 0511 course before July 2025. That course addressed correctional institutions separately from other agencies: its results slide for other users, headed "Test Results (Excluding Correctional Institutions)," states that results "*cannot* be considered proof positive," while its correctional slide states that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting" (Paragraphs 115, 117). The "proof positive" slide does not appear in the May 2017 revision; on information and belief, Safariland gave no

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 15 of 69 Page ID #:237

notice of its withdrawal to the correctional users and institutions certified on the earlier course (Paragraph 124). (d) December 15, 2025: Safariland's construction. Safariland's December 15, 2025 memorandum was the first statement by either the manufacturer or BOP, addressing Plaintiff's case, that construed the Test U instruction to require additional testing to confirm the result of a burgundy reaction (Paragraph 71), and, answering Plaintiff's K2/Spice allegation, it argued that it need not warn of risks "outside the scope of their marketed product uses" (Paragraph 39). (e) Accrual. Counts III and IV rest on the correctional carve-out in the certification course — explicit in the REV 0511 course's "proof positive" slide — and on Safariland's failure to correct it (Paragraphs 115, 117, 124). They accrued no earlier than July 2025: Plaintiff did not see, before then, the REV 0511 course's statement that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting" (subparagraph (c)). The May 2017 revision's correctional statements (Paragraph 115) did not disclose that wrong. Its results slide places its correctional sentence among statements to every user that test results "*cannot* be considered proof positive, conclusive, or evidentiary" and that the substance "should *always* be forwarded to a forensic laboratory"; its review slide's parenthetical, "(excluding some correctional applications)," appears beside the statement that substances "should *always* be submitted to a forensic laboratory." Read without the REV 0511 course, those statements describe how

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 16 of 69 Page ID #:238

correctional facilities use results — the BOP practice Plaintiff challenged in the Oregon Action. They did not disclose the REV 0511 statement, or that it had been withdrawn without, on information and belief, notice to the users certified on the earlier course (Paragraph 124). Counts III and IV do not claim that the insert, chart, or pouch, standing alone, was defective; those materials, which Plaintiff and his appointed counsel cited from 2019 forward as authority against BOP (Oregon Action, ECF 1 at 8, 16; *id.*, ECF 37 at 10–11; *id.*, ECF 37-3), are pleaded as the point-of-use context in which the course's correctional message operated. Counsel likewise cited the May 2017 revision as authority against BOP (*id.*, ECF 37-2). The January 21, 2010 directive showed only that BOP certified its testers through a vendor; it disclosed nothing about the vendor's correctional course content (subparagraph (b)). Plaintiff did not suspect, before July 2025, that the warnings Safariland delivered to correctional testers contributed to the recorded identification, and Safariland itself first construed its Test U instruction to mean that a burgundy reaction "would require additional testing to confirm the result" on December 15, 2025 (Paragraph 71). Plaintiff's January 18, 2019 petition and affidavit show what he then suspected: they alleged that the NIK tests BOP used were "notoriously manipulated by BOP staff" and produced amphetamine readings from paper towels, toilet paper, ink-jet paper, sage, and other items — readings Lieutenant Bance confirmed he knew of (Paragraph 63A(f)) — and they invoked

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 17 of 69 Page ID #:239

the manufacturer's own instruction manual, that the tests are not designed for liquid samples and that "the choice of paper is critical," as authority against BOP's testing. Oregon Action, ECF 1 at 8, 16. Those allegations faulted BOP for disregarding the manufacturer's instructions, including its paper instruction, on which Plaintiff then relied as authority against BOP; they did not suggest, and Plaintiff did not then suspect, that the manufacturer's own warning system, training, or communications with BOP contributed to the recorded identification. The correctional-course theory is a wholly different sort of wrongdoing from the BOP recording practice Plaintiff challenged in the Oregon Action. (f) Despite the diligence described in Part V.I, Plaintiff could not have discovered earlier the facts alleged in subparagraph (c).

98. The limitations period on the claims against Safariland was equitably tolled while Plaintiff pursued claims against Safariland arising from the same testing and injuries in *Steffey v. Peters*, No. 2:25-cv-11105-VBF-SK, and while he exhausted the FTCA administrative claim that the court's order contemplated. On January 16, 2026, the court offered Plaintiff the option to dismiss that action without prejudice "to exhaust tort claims with the United States before filing an FTCA suit." *Id.*, ECF 37. Plaintiff exercised that option on January 21, 2026 (*id.*, ECF 38), mailed his administrative claim the next day (Paragraph 16), and filed this action seven weeks after BOP's Final Denial. Safariland, which had appeared

in *Peters* through counsel and moved to dismiss, thus had timely notice of the claims and of their refiling after exhaustion; tolling caused it no prejudice; and Plaintiff acted reasonably and in good faith. *See McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal. 4th 88, 102 (2008) (timely notice, lack of prejudice, and reasonable, good-faith conduct).

99. No statute of repose applies to any claim herein.

## VI. CLAIMS FOR RELIEF

**COUNT I — FALSE IMPRISONMENT (FTCA — Against the United States)**

100. Plaintiff realleges and incorporates Paragraphs 1 through 99 as though fully set forth here.

101. Under California law, as incorporated by 28 U.S.C. § 1346(b)(1), false imprisonment is "the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 715 (1994) (internal quotation marks omitted) (quoting *Molko v. Holy Spirit Ass'n for the Unification of World Christianity*, 46 Cal. 3d 1092, 1123 (1988)). A privilege to confine extends only to its lawful scope; confinement lawfully commenced becomes false imprisonment when it is continued without lawful authority. *See Sullivan v. County of Los Angeles*, 12 Cal. 3d 710, 717–19, 722 n.11 (1974).

102. Acting within the scope of their employment, BOP officers

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 31 of 69 Page ID #:253

**COUNT III — STRICT PRODUCTS LIABILITY: FAILURE TO WARN**

**(Against Safariland — Jury Demanded)**

111. Plaintiff realleges and incorporates Paragraphs 1 through 99 as though fully set forth here. This count does not depend on any allegation of fraud, knowledge of falsity, or conspiracy.

112. Safariland supplied the NIK pouches, inserts, and chart and, on information and belief, the certification course (Paragraphs 49–50), for institutional use in testing material associated with inmates. BOP's procedures required each participant to purchase the vendor's certification course on disk (Paragraph 49); the course was sold for use with the NIK line. The product at issue is the NIK system Safariland sold for correctional use. Its warnings and instructions reached BOP's testers through the insert, the chart, and the mandatory course together; the course is pleaded as a channel through which Safariland warned and instructed the product's users, not as a separate product. The defect alleged in this count lies in the warnings and instructions Safariland delivered to correctional testers through that course (Paragraph 117): for correctional users alone, they qualified the course's presumptive-only warnings — a qualification that, under the first alternative in Paragraph 114, diluted for those users the distinction between a baseline or routing observation, the conditional A–U amphetamine inference, and a completed presumptive identification.

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 32 of 69 Page ID #:254

113. Plaintiff was neither the purchaser nor the operator of the NIK product and was not present during the test. He alleges that he lacked access to the instructions, chart, and training during the testing and disciplinary process and could not independently retest the intercepted material. The warnings relevant to the alleged causal error were those delivered to the institutional tester and decision makers.

114. Plaintiff alternatively alleges that the warning system actually delivered to correctional users obscured the conditional nature of the amphetamine route, or that personnel understood the applicable instructions and nonetheless used or reported the results improperly. Under the first alternative, Plaintiff attributes the identified testing error to the inadequate and inconsistent warnings Safariland delivered to correctional testers through its certification course (Paragraph 117). Under the second, he attributes the error to the United States' improper performance of instructions its personnel understood. He alleges each Defendant's own actionable conduct and resulting harm; rejection of one alternative does not establish the other.

115. Safariland's training anticipates use of NIK results in correctional discipline and warns of improper detention from erroneous interpretation. Exhibit I (rev. 0517), pp. 31, 62; Exhibit I (REV 0511), pp. 30, 59. The earlier REV 0511 course draws an express distinction: its slide headed "Test Results (Excluding

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 33 of 69 Page ID #:255

Correctional Institutions)" describes results as presumptive, calls for laboratory analysis, and cautions against making them the investigation's sole determining factor; its slide headed "Test Results (For Correctional Institutions)" states that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting," states that "NIK Polytesting is extremely accurate" and that "[p]ositive results are used for administrative punishments," and adds that "[s]mall confiscated quantities preclude return to court system for punishment," that "[a]dditional laboratory work would bog down an already overburdened system," and that "[i]n states like New York, correctional institutions do not send the suspect material to a lab for confirmation." Its summary expressly excludes some correctional applications from the general presumptive statement. Exhibit I (REV 0511), pp. 29–30, 70. Elsewhere, in slides addressed to all users, the same course states that "[a] positive predictable color change is only a *presumed* positive result for the suspected compound: in no way should the test results be considered a confirmation of identification," that "all test results, positive or negative, should be confirmed by the crime laboratory," that field testing "is not intended as a substitute for laboratory testing," and that "[t]his system is not infallible." Exhibit I (REV 0511), pp. 16–18. The May 2017 course no longer contains the "proof positive" slide but keeps a correctional carve-out: its results slide states that field test results are presumptive and never confirmatory and calls for forensic

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 34 of 69 Page ID #:256

laboratory analysis, but also states that "[i]n correctional facility applications, tests are used as determination of the substance, as the results are used in disciplinary procedures," and its review slide again states that NIK results are presumptive "(excluding some correctional applications)." Exhibit I (rev. 0517), pp. 31, 73. Plaintiff pleads those complete contexts as evidence of foreseeable institutional use and the need for clear distinctions among component observations, sequence-level inferences, and laboratory confirmation. The earlier correctional exception cannot be omitted when evaluating the manufacturer's message. Which course revision the responsible Lompoc personnel received is recorded in BOP and Safariland certification records. The correctional slide did not itself instruct users to record a baseline or routing reaction as a drug identification. It and the May 2017 statements are pleaded both as notice — that Safariland knew correctional users would treat NIK results as proof in discipline, which made clear warnings distinguishing baseline and routing observations from completed identifications essential — and as part of the defect alleged in Count III (Paragraph 117).

116. The NIK units used on December 5, 2017 — including, per the testing memorandum, Test A lot no. 10279321 and Test U lot no. 10250541 — were, on information and belief, sold and distributed to BOP in the 2015–2017 period, during which BOP issued the September 29, 2015 and January 18, 2017

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 35 of 69 Page ID #:257

Advisories. The warnings accompanying those units, as actually delivered to this institutional user, were inadequate at the time of their manufacture and distribution: by then, the Safariland-branded certification course had told correctional users that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting," and, on information and belief, every revision in use during that period excluded "some correctional applications" from its statement that results are presumptive (Paragraphs 115, 117); on information and belief, Safariland gave those users no corrective notice (Paragraph 124). The risk was known or knowable to Safariland when those units were distributed.

117. The alleged defect is the warning and instruction system Safariland delivered for the NIK product to correctional testers through its purchased certification course: for correctional users alone, that system carved correctional applications out of its presumptive-only warnings — expressly in REV 0511 and, in softer terms, in the May 2017 revision. The Safariland-branded REV 0511 course set out those warnings — that NIK results are "*presumptive* in nature (never confirmatory)," "*cannot* be considered proof positive, conclusive, or evidentiary," and should never be "the sole determining factor in the investigation" — under the heading "Test Results (Excluding Correctional Institutions)," and told correctional users, under the heading "Test Results (For Correctional Institutions)," that "[i]n *some jurisdictions*, NIK results are

considered proof positive, but only in a correctional setting," that "NIK Polytesting is extremely accurate," and that "[p]ositive results are used for administrative punishments." The May 2017 revision ("rev - 0517") no longer contained the "proof positive" slide but kept the carve-out, telling users that "[i]n correctional facility applications, tests are used as determination of the substance" and that NIK results are presumptive "(excluding some correctional applications)" (Paragraph 115). Paragraphs 35, 50, and 102 describe what the course taught about the reagent's chemistry and the timed Test A predicate; this count concerns what the course told correctional users about the evidentiary weight of a reported "positive." Under the first alternative in Paragraph 114, that message diluted the course's chemistry teaching for those users. The course's correctional exception inadequately reconciled the weight it gave results in correctional discipline with the course's own statements to every user that test results are in no way a confirmation of identification (Paragraph 115), and with the chemistry and sequence instructions given elsewhere in the course, including the timed Test A predicate and the conditional significance of a burgundy Test U reaction (Paragraphs 33–35, 50). The reagents, and the chemistry the course taught, were the same for every user; what the correctional slide changed, for correctional users alone, was the weight the course told them a reported result could bear. The course's general statements did not cure that exception for correctional users: the

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 37 of 69 Page ID #:259

slide addressed to them, under its own heading, told them that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting," and the review slide repeated that the presumptive statement excluded "some correctional applications." *Cf. Stevens v. Parke, Davis & Co.*, 9 Cal. 3d 51, 65, 67 (1973) (an adequate warning "may be eroded or even nullified by over-promotion"; whether the warnings there were "nullified by overpromotion" was for the jury). Plaintiff does not allege that BOP was required to obtain laboratory confirmation (*see* Paragraph 102); the course's laboratory statements are pleaded for what they show about the message correctional users received, not as a duty owed by BOP. The chart used with the course, which called the A-to-U sequence a "positive result" and labeled its burgundy Test U square "Amphetamine" (Paragraph 34), is pleaded only as the point-of-use context in which that message operated. Count III does not claim that the insert, chart, or pouch, standing alone, was defective, and it does not depend on authorship of any SIS Advisory. Under the first alternative in Paragraph 114, Plaintiff alleges that the course's correctional message (Paragraph 115) led correctional testers and decision makers to treat each reported reaction as a determination of the substance, without the timing and sequence qualifications on which any amphetamine-type inference depended, and so produced the two-independent-positive presentation described in his case (Paragraphs 59–60). That alternative does not allege that the

course relieved BOP's certified testers of the timing and recording the certified method required (Paragraphs 35, 107, 109), and it is not an admission against Counts I and II. Under this count, the 2021 chart is identified to distinguish later instructions from the 2017 materials and to preserve its disclaimer that the revision does not affect the accuracy of previous charts; it is not offered to prove that the 2017 warnings were inadequate or the need or feasibility of a precaution.

118. Safariland cannot avoid liability by pointing to BOP's sophistication. A supplier invoking the sophisticated-intermediary doctrine "must show not only that it warned or sold to a knowledgeable intermediary, but also that it actually and reasonably relied on the intermediary to convey warnings to end users." *Webb v. Special Elec. Co.*, 63 Cal. 4th 167, 189 (2016); *see id.* at 177. Safariland did not actually or reasonably rely on BOP to protect persons in Plaintiff's position: on information and belief, it supplied the certification training on which BOP relied (Paragraphs 49–50); it knew its results were used in correctional discipline (Paragraph 115); and its own course carved correctional applications out of its presumptive-only warnings, expressly in REV 0511 and, in softer terms, in the May 2017 revision (Paragraphs 115, 117). Nor, under the first alternative in Paragraph 114, were the responsible personnel sophisticated as to the specific danger alleged — the recording of a routing or baseline reaction as a completed identification: the warning system delivered to them obscured it (Paragraph 117).

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 39 of 69 Page ID #:261

General familiarity with field testing does not establish knowledge of that danger.

119. Plaintiff alleges that adequate, consistent warnings in the certification course would have caused the responsible personnel to distinguish the conditional sequence from two independent drug identifications and to qualify any result lacking a reliably observed Test A predicate. He alleges that the resulting change in testing and institutional reliance would have prevented or shortened confinement that otherwise lacked an adequate ground, avoiding the physical aggravation and related injuries alleged. Plaintiff attributes the harm to the alleged testing and reliance errors, not merely to a wording change in a report. Nor would an adequate warning have been futile: BOP's own advisory system shows that color-reporting communications attributed to the manufacturer were promptly incorporated into nationwide directives (Paragraphs 42, 48).

120. As a direct and proximate result, Plaintiff suffered the injuries alleged in Part V.K — including the bodily confinement and restraint alleged in Paragraph 85 and the physical injuries and aggravation alleged in Paragraphs 86 and 87 — in amounts according to proof. Plaintiff demands a jury on this count.

**COUNT IV — NEGLIGENCE AND NEGLIGENT UNDERTAKING**

**(Against Safariland — Jury Demanded)**

121. Plaintiff realleges and incorporates Paragraphs 1 through 99 and 112 through 120 as though fully set forth here. This count does not depend on any

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 40 of 69 Page ID #:262

allegation of fraud, knowledge of falsity, or conspiracy. It proceeds on two distinct theories, separately pleaded below: (A) negligence, resting on Safariland's direct duty of reasonable care; and (B) negligent undertaking, resting on the services Safariland undertook to provide.

**A. Negligence (Direct Duty)**

122. Plaintiff alleges that Safariland owed reasonable care under California Civil Code § 1714(a) in supplying the NIK instructions and training and in performing the certification services it actually provided. The foreseeable affected persons included inmates whose confinement could depend on institutional testing. The asserted duty rests on risk created by Safariland's own supplied materials and affirmative services. It does not impose a freestanding duty to control BOP or protect Plaintiff from unrelated conduct by others. Theory (A) is a negligent failure-to-warn theory: it concerns the adequacy of the warning system Safariland delivered to correctional testers through its certification course (Paragraphs 112, 117), and asserts no duty to develop, market, or substitute a different product.

**B. Negligent Undertaking**

123. Plaintiff alleges a limited negligent undertaking by Safariland to provide NIK training, examination grading, and certification to BOP. The asserted duty extends only to services Safariland actually assumed and should have recognized as necessary to protect persons foreseeably affected by institutional

testing. Plaintiff alleges careless performance, physical harm including the spinal aggravation in Paragraph 87, and either increased risk from that performance or harm caused by BOP's reliance on the service. BOP relied on those services in lieu of any independent validation of NIK color interpretation: its directive required that all NIK certifications be obtained through the vendor (Paragraph 49). No personal purchase or reliance by Plaintiff is alleged.

124. On information and belief, Safariland carelessly performed the training and certification services it provided to BOP's correctional testers. On information and belief, it certified them on course materials that carved correctional applications out of their presumptive-only warnings — in the REV 0511 course, by telling them that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting" (Paragraphs 115, 117) — and it never corrected that message: the May 2017 revision ("rev - 0517") no longer contained the "proof positive" slide but told users that "[i]n correctional facility applications, tests are used as determination of the substance," and, on information and belief, Safariland gave the correctional users and institutions certified on the earlier course no notice that the "proof positive" statement had been withdrawn. Because, on information and belief, every revision in use from at least 2011 through 2017 carried a correctional carve-out, the message reached the responsible tester whichever of those revisions he was certified on (Paragraph 50A); the date and

revision of his certification are recorded in BOP's and Safariland's records (Paragraph 115). On information and belief, Safariland or its predecessor issued every BOP NIK certificate (Paragraph 49), and its records identify the correctional users it certified, so notice was feasible; having changed the message for new users, Safariland knew or should have known that previously certified users would continue to apply the one they had been taught. On information and belief, Safariland, LLC operated the certification program when the "proof positive" statement was withdrawn and thereafter; the failure to correct and to notify is its own conduct, not a liability inherited from a predecessor. California recognizes negligence in a manufacturer's failure to notify prior purchasers after it changes its product to address a hazard. *Hernandez v. Badger Constr. Equip. Co.*, 28 Cal. App. 4th 1791, 1827–28 (1994); *Lunghi v. Clark Equip. Co.*, 153 Cal. App. 3d 485, 494 (1984). Plaintiff alleges that the deficient services delivered to the responsible personnel contributed to the testing and confinement errors identified in Paragraph 119. Count IV does not impose a freestanding obligation to audit every BOP report or control BOP's nationwide practices, and BOP's invocation of the company's name in its own directives is not itself alleged to be Safariland's breach. The allegations of this Count made on information and belief concern matters recorded in Safariland's and the United States' files and unavailable to Plaintiff — the tester's certification date and course revision, Safariland's

Case 2:26-cv-09497-VBF-SK Document 18-1 Filed 10/12/26 Page 43 of 69 Page ID #:265

certification records, and its communications with BOP (Paragraphs 73–79, 109, 115) — and rest on the facts alleged in Paragraphs 49, 50A, 115, and 119.

125. Discovery may reveal that the conduct alleged in this Count was undertaken, authorized, or ratified by an officer, director, or managing agent of Safariland, LLC within the meaning of California Civil Code § 3294(a)–(b). Plaintiff does not now seek exemplary damages and reserves the right to seek leave to amend to seek them should those facts be established. No punitive or exemplary damages are sought against the United States. 28 U.S.C. § 2674.

126. Safariland's breaches were a substantial factor in causing Plaintiff's injuries, for the reasons alleged in Paragraph 119. BOP's conduct was not a superseding cause: the institutional misuse was the very risk Safariland's duties addressed, and it was foreseeable — indeed, on the facts alleged in Paragraphs 68 and 115, known to Safariland. Under the alternative alleged in Paragraph 63A, staff reliance on an identification they knew to be unsupported was the hazard that the Safariland-branded course's correctional message — that "[i]n *some jurisdictions*, NIK results are considered proof positive, but only in a correctional setting" and that "NIK Polytesting is extremely accurate" — made foreseeable.

127. As a direct and proximate result, Plaintiff suffered the injuries alleged in Part V.K — including the bodily confinement and restraint alleged in Paragraph 85 and the physical injuries and aggravation alleged in Paragraphs 86

and 87 — in amounts according to proof. Plaintiff demands a jury on this count.

## VII. NO CONSTITUTIONAL TORT CLAIM; RESERVATION

128. No freestanding constitutional damages or *Bivens* claim is asserted. The United States' substantive liability is alleged under state law incorporated by the FTCA, and Safariland's liability under California law. The regulatory and constitutional context of hearing neutrality informs the particular process alleged in Paragraphs 55–56; it does not supply an additional FTCA cause of action.

129. Plaintiff reserves the right to seek leave to amend under Rule 15 — including to supplement under Rule 15(d) upon developments in the Oregon Action, and to seek leave to assert additional claims or remedies as warranted by facts developed in discovery. In particular: (a) upon any order vacating or expunging the disciplinary finding, Plaintiff intends to present to BOP an administrative claim for malicious prosecution under the proviso of 28 U.S.C. § 2680(h), based on the facts alleged in Paragraph 63A, and, once that claim is exhausted, to seek leave to add it to this action; and (b) if the March 27, 2017 Advisory or discovery discloses communications in which Safariland supplied or approved color-reporting guidance to BOP (Paragraph 48, alternative (a)), Plaintiff intends to seek leave to add claims based on those communications, including negligence, fraud, and misrepresentation involving risk of physical harm (Restatement (Second) of Torts §§ 310–311), and to seek exemplary damages.

165
EXHIBIT I

# Test Results

## (For Correctional Institutions)

In some jurisdictions, NIK results are considered proof positive, but only in a correctional setting

- NIK Polytesting is extremely accurate
- Positive results are used for administrative punishments
- Small confiscated quantities preclude return to court system for punishment
- Additional laboratory work would bog down an already overburdened system
- In states like New York, correctional institutions do not send the suspect material to a lab for confirmation

SAFARILAND.

nik®

REV - 0511

JENKINS_000237

30



# Test Results

- All field test results, including NIK results are considered presumptive in nature (never confirmatory)
- Test results cannot be considered proof positive, conclusive, or evidentiary; results should always be used in conjunction with the police investigation
- In correctional facility applications, tests are used as determination of the substance, as the results are used in disciplinary procedures
- Presumptive test results can be considered a component of probable cause
- The test results are used in the determination of probable cause for arrest, detainment and seizure of suspected illicit substances. Never should the results, positive or negative, be the sole determining factor in the investigation
- No matter the results of the tests, the substance in question should always be forwarded to a forensic laboratory for analysis

SAFARILAND.

nik® 1005991 rev - 0517 31

# Review: Test Results

- All field test results, including NIK results are presumptive in nature (excluding some correctional applications)

- Substances, whether the test result is positive or negative, should always be submitted to a forensic laboratory for qualitative analysis as protocols dictate

- Test results are for investigative and probable cause purposes only

SAFARILAND

nik®

1005991 rev - 0517

73

**PROOF OF SERVICE**

**Billy F. Steffey vs. United States of America, et al.**
**USDC, Central Dist. of California - Case No. 2:26-cv-09497-MCS-RAOx**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of California. My business address is 355 S. Grand Avenue, 15th Floor, Los Angeles, California 90071-1560.

On October 26, 2026, I served true copies of the following document(s) described as **DECLARATION OF SYDNEY A. SHAFFER IN SUPPORT OF DEFENDANT SAFARILAND, LLC'S MOTION TO DISMISS COUNTS III AND IV OF PLAINTIFF'S FIRST AMENDED COMPLAINT,** on the interested parties in this action as follows:

| | |
|---|---|
| Billy F. Steffey<br>455 Capitol Mall, Suite 802<br>Sacramento, CA 95814 | Plaintiff Pro Per<br><br>Tel: 916-955-6332<br>Email: bsteffev@mac.com |

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address vpanameno@yukelaw.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 26, 2026, at Los Angeles, California.

/s/ Violeta J. Panameno
Violeta J. Panameno

YUKEVICH | CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788